Seth T. Taube
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Tel: 212.408.2500
Fax: 212.408.2501

*Attorney for Plaintiff, NOVAGOLD Resources Inc.*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOVAGOLD RESOURCES INC., | |
| Plaintiff, | **CIVIL ACTION NO.:  1:20-cv-02875 (LDH)(PK)** |
| v. | |
| J CAPITAL RESEARCH USA LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

## <u>PRELIMINARY STATEMENT</u>

1.      Like any substantial theft, J Capital Research USA LLC ("JCAP or "Defendant") planned its scheme for months.  Starting at least as early as September 2019, JCAP had NOVAGOLD Resources Inc. ("NOVAGOLD" or "Plaintiff") in its crosshairs.  JCAP's plan was simple: masquerade as a legitimate research firm, create a report about NOVAGOLD containing an incendiary tapestry of inaccuracies, misstatements, and falsehoods (the "Report") that, to an uninitiated audience, may seem credible on the surface, and then release it to the unsuspecting public, all for the purpose of manipulating the price of NOVAGOLD's stock downward and causing panic.  Once its sham Report hit the wires, JCAP watched as its scheme

achieved the intended purpose, causing a cascade of selling of NOVAGOLD's stock and a precipitous drop in its share price. JCAP and its confederates used the artificial crisis to profit on the short positions it already held on NOVAGOLD. It is a textbook "short and distort" scheme. It intentionally harms NOVAGOLD and its shareholders. And it is illegal.

2.      JCAP has a track record of attempting to manipulate the market. Historically, JCAP has targeted companies based in China, or those with significant ties to the Chinese markets, and often in the technology sector. This time, with NOVAGOLD, JCAP waded out of its depth. The mining industry—and gold exploration and development, in particular—is not an area in which JCAP appears to have much experience. Indeed, the author of the Report has admitted as much himself. Yet out of nowhere, a firm known for analyzing Chinese technology companies publishes a twenty-two page hit piece on a Canadian gold development company. JCAP's intent could not be more poorly-veiled: scare investors into selling NOVAGOLD stock so that JCAP could profit on short positions. In other words: short and distort.

3.      Neither its inexperience nor the ready availability of the actual facts deterred JCAP. It did not care. Truth was not the goal. Whether acting on behalf of existing short-sellers or serving to initiate short positions with a view to profiting from a panic-driven downdraft of their own creation, the end result was an exercise in market manipulation that has caused significant reputational and financial damage. Statements in the Report about what information was or was not conveyed to the investing public by NOVAGOLD are demonstrably false. Statements in the Report about NOVAGOLD's project plans and their costs are blatantly misleading with a reckless disregard for the true facts. JCAP's statements about management dumping shares are, again, demonstrably false and distortive. All JCAP needed to do was honestly analyze the publicly

2

available information to find the truth.  But, as a perpetrator of a short and distort scheme, the truth does not pay.  A short and distort scam requires deception, not honesty.

4.       Unaware of the existence of the JCAP scheme and the falsity of its Report, the market reacted negatively to the publication of lies about NOVAGOLD.  And, as is the intent of such a scheme, those who held short positions on NOVAGOLD profited.  But, while the short sellers lined their pockets, NOVAGOLD was harmed.  In this heist, JCAP did not just rob NOVAGOLD of a significant amount of its market capitalization; it robbed it of its reputation and forced NOVAGOLD to go to great lengths—at a great cost—to debunk JCAP's lies and begin rehabilitating its reputation.  NOVAGOLD brings this Complaint to hold JCAP accountable for the damage its market manipulation scheme has caused.

## THE PARTIES

5.       Plaintiff, NOVAGOLD Resources Inc., is a Canadian company incorporated in British Columbia with its shares traded on the Toronto Stock Exchange and New York Stock Exchange under the symbol "NG."  NOVAGOLD's principal place of business is located at 400 Burrard Street, Suite 1860, Vancouver, British Columbia V6C 3A6.  It has a United States office located at 201 South Main Street, Suite 400, Salt Lake City, Utah 84111.

6.       Defendant, J Capital Research USA LLC is a New York limited liability company with a principal place of business at 223 Bedford Ave #1074, Brooklyn, New York 11211.

## JURISDICTION AND VENUE

7.       Subject matter jurisdiction in this Court is proper pursuant to 28 U.S.C. § 1332(a)(2) because this controversy is between a "citizen[] of a State and citizens . . . of a foreign state," and the amount in controversy exceeds the sum of $75,000.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because it is the judicial district in which Defendant resides.

9.     Personal jurisdiction over Defendant is proper under §§ 301 and 302 of the State of New York's Civil Practice Law and Rules, pursuant to Rule 4 of the Federal Rules of Civil Procedure and under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States of America.  This Court has personal jurisdiction over the Defendant, who is domiciled in New York and who regularly conducts business in this district and has engaged in tortious conduct within the State of New York.  The exercise of personal jurisdiction over Defendant is reasonable, consistent with the constitutional principles of due process, and comports with the principles of fair play and substantial justice.

## STATEMENT OF FACTS

10.     NOVAGOLD is a publicly-traded precious metals company focused on the development of its 50%-owned Donlin Gold project in Alaska, the second largest gold producing state in the United States.  With approximately 39 million ounces of gold in the measured and indicated mineral resource categories, inclusive of proven and probable mineral reserves,[1] Donlin Gold is regarded to be one of the largest, highest-grade, and most prospective known open-pittable gold deposits in the world.  Its partner in this venture is Barrick Gold, which is universally held to be among the most professional, credible, and highly regarded companies in the gold mining industry.  The feasibility of the Donlin Gold project is supported by thousands of pages of environmental, technical, and social studies conducted by numerous reputable firms.  Key findings of those studies are well-documented in the publicly-available "Donlin Creek Gold Project Alaska,

---

[1]     Donlin Gold data as per the Second Updated Feasibility Study (as defined herein). Donlin Gold measured resources of approximately 8 Mt grading 2.52 g/t and indicated resources of approximately 534 Mt grading 2.24 g/t, each on a 100% basis and inclusive of mineral reserves. Mineral resources have been estimated in accordance with National Instrument 43-101 – Standards of Disclosure for Mineral Projects ("NI 43-101").

USA, NI 43-101 Technical Report on Second Updated Feasibility Study," effective November 18, 2011, amended January 20, 2012 ("Feasibility Study") and in the publicly-available "Natural Gas Pipeline Plan of Development Donlin Gold, Revision 1," December 2013 ("Plan of Development") and "Letter Re: Supplemental Information for the Donlin Gold Natural Gas Pipeline," submitted to the State Pipeline Coordinator's Office, December 7, 2017 ("Supplemental Pipeline Information").

11.     JCAP first set NOVAGOLD in its crosshairs at least as early as September 2019, when Tim Murray, the author listed on the face of the Report, contacted NOVAGOLD representing that he was an analyst covering iron and steel investments transitioning to coverage of gold.  Following several emails and one phone call, NOVAGOLD offered to put Mr. Murray in contact with subject matter experts to answer specific questions, but never heard from Mr. Murray again.  Of course, Mr. Murray did not need to speak to any subject matter experts because learning the truth was not his goal.

12.     JCAP purports to be a research organization, publishing what it describes as "highly diligenced research reports on publicly traded companies, relying on deep, on-the-ground primary research" on "over-valued companies throughout the world."  But JCAP's track record tells a different story: JCAP's work is deliberately indifferent to the truth, time and time again.

13.     In 2009, Wedge Partners, a former joint venture partner with JCAP, was censured and fined $20,000 by the Financial Industry Regulatory Authority ("FINRA") for disseminating sales literature and a research report that contained statements that were misleading and/or exaggerated and/or failed to provide a sound basis for evaluating the subject company.

14.     A *Financial Review* article criticized that JCAP "would do themselves and the market a favour if they adopted a more transparent and responsible approach to the release of their reports."  That same article details JCAP's modus operandi: sucker-punch companies by publishing lengthy reports without warning in the middle of a trading day when JCAP knows the company will not have adequate time to digest and respond before uncertainty in the market causes the share price to drop.

15.     As the CEO of the Australian Stock Exchange summarized in an interview regarding JCAP in 2019, "*[i]f it was a bona fide and you'd written a five-page report, and it wasn't all about scaring the market, you would in fairness to the company put it out on a Friday night, for example, and give the company the opportunity to respond . . . It's not surprising that people question [JCAP's] motives*."

16.     JCAP's calculated disparagement of NOVAGOLD followed a recognizable pattern to anyone familiar with JCAP: it published its 22-page report at 9:00 a.m. EDT on Thursday, May 28, 2020 without ever contacting NOVAGOLD to alert it to the Report's publication.  NOVAGOLD responded as quickly as it could, informing investors on May 29, 2020 that it would provide "a more fulsome response to the numerous inaccuracies and falsehoods contained in the report."  But—as JCAP well knew—responding to more than 100 misleading and false statements with a comprehensive factual response is no small task.  JCAP's Report had taken months to draft.  NOVAGOLD had days to respond.  While NOVAGOLD was preparing its response, the market reacted predictably to the false and defamatory JCAP Report.

17.     JCAP's tactics will also be instantly recognizable to anyone familiar with a "short and distort" scheme—a particularly malicious brand of stock manipulation in which perpetrators inject the market with misleading and false negative information about a company to

6

drive down the price of its securities in order to allow those with short positions to quickly cover them at an artificially low price.

18.     Although the tactics used by JCAP to attack NOVAGOLD were all too familiar, JCAP's target was not.  JCAP touts its "particular expertise" in the Chinese market. Nearly half of the reports JCAP has produced have targeted Chinese companies.  In terms of sectoral focus, JCAP's coverage primarily focuses on companies in the technology and consumer cyclical industries.  JCAP has only previously made two recommendations in the mining industry: a short recommendation on Fortescue Metals Group, the share price of which subsequently nearly trebled in value, and a bullish stance on Mongolian Mining Corporation, whose stock has since fallen 99%.  JCAP swerved out of its lane to attack NOVAGOLD.

19.     JCAP's lack of experience covering mining companies—a highly specialized and technical industry—was no impediment to its goal of falsely smearing NOVAGOLD's reputation, ethics, and honesty.  With no credentials of his own, and relying only on an anonymous and presumably uncredentialed engineer, Mr. Murray asserted in the Report that "NOVAGOLD's management team has systematically misled investors," and that the Donlin Gold project is "so remote and technically challenging that the mine will never be built."  JCAP's statements disregard years of publicly-available research by engineers with decades of experience working at the industry's most respected engineering, construction, and mining firms.  The Report's central falsehood—that the mine cannot be constructed—is built on a foundation of intentionally false statements that are rife with factual inaccuracies, misrepresentations, and deceptions.

## THE JCAP REPORT'S FALSITIES

20.     The numerous distortions and flat-out falsities contained in the Report revolve around three central themes: that NOVAGOLD misled investors, that the Donlin Gold project is so remote it will never be built, and that NOVAGOLD's management is dumping its equity in the company.  All are demonstrably false.

***The Report falsely asserts that NOVAGOLD management misleads investors.***

21.     JCAP's distortions start from the first sentence of the Report.  JCAP falsely states that "[f]or the last 15 years, NOVAGOLD's management team has systematically misled investors with subjective presentation of information about a deposit so remote and technically challenging that the mine will never be built."   Most prominently, JCAP asserts that "management's biggest misrepresentation is around the cost to build the pipeline" and then intentionally misrepresents that "[m]anagement continually and deliberately misleads investors on capital costs for Donlin."  According to JCAP, "[m]anagement deliberately misleads investors with custom metrics designed to deceive, directing investors to presentations which claim the deposit will require $6.7 bln in capital, however, the feasibility study clearly shows this number is $8 bln (already, we believe, far too low)."  Elsewhere in the Report, JCAP represents that "[t]he most recent feasibility study, done in 2012, estimated that the initial capex alone, is $8 bln, not $6.7 bln."

22.     These statements are false, misleading, and defamatory, and they are designed to create panic.  NOVAGOLD has clearly and consistently communicated to investors that the estimated initial capital required for the project is $6.7 billion.  This remains true.  The $8 billion figure referenced by JCAP in its Report includes *operating costs* as required under U.S. Generally Accepted Accounting Principles ("US GAAP"), rendering it an apples-and-oranges

comparison to the $6.7 billion figure for *initial capital costs* against which JCAP compares it.  The Feasibility Study plainly explains the difference.

23.     The Report later asserts that "[m]anagement has drilled only 16 holes since 2011 and not even released the modeling results of the last, meager drill assays in 2017."  This too is false and misleading.  Donlin Gold conducted a limited, focused drilling campaign in 2017.  The drill assays were not "meager"; they were proportional to Donlin Gold's goal: namely, to gather additional geochemical and structural data from targeted portions of the defined ACMA and Lewis deposit areas to support ongoing optimization work.  Upon receipt of the assays, and contrary to JCAP's statement, NOVAGOLD disclosed the 2017 drilling results to the public in a press release dated February 20, 2018.

24.     JCAP also falsely asserts that NOVAGOLD misled investors as to the value of the Galore Creek asset—an unrelated mining project owned 50/50 by NOVAGOLD and Teck Resources Limited.  NOVAGOLD sold its interest in Galore Creek in 2018 to focus its efforts and resources on the Donlin Gold project.  In support of its misstatement regarding the value of Galore Creek, JCAP falsely states that one of the current owners of the asset "quietly shut the project down on April 28, 2020."  What the Galore Creek Mining Corporation actually announced to the public on April 28, 2020 was that "due to the COVID-19 pandemic and the resulting economic uncertainties faced by the mining industry, expenditures on the Galore Creek project have been reduced in 2020, deferring the start of the planned Prefeasibility Study."

***The Report falsely asserts that the deposit is so remote and technically challenging that the mine will never be built.***

25.     The Report's second theme is likewise a fiction designed to mislead and defame.  Disregarding the thousands of pages of publicly-available studies supporting the Donlin Gold project, which was granted federal permits by the U.S. Army Corps of Engineers and the

Bureau of Land Management, JCAP misrepresents that "the Donlin deposit . . . is not feasible to put into production at any gold price" and that the project is a "stock promote, not a mining plan." Yet the publicly-available Feasibility Study conducted by credentialed industry-leading professionals goes into exacting detail to demonstrate the economic viability of the deposit at numerous gold prices—including at $1,200 per ounce, which is substantially lower than today's current gold price of approximately $1,700 per ounce—and attractive leverage to a rising gold price. With 39 million ounces of contained gold in measured and indicated resources,[2] Donlin Gold is currently among the largest gold development projects in the world.

26.    Unable to refute the demonstrated value of Donlin Gold's resources, JCAP turns to condemning Donlin Gold's planned infrastructure by falsely representing that "[t]he proposed natural gas pipeline central to powering the project is dead on arrival," and that "[t]he terrain around the Donlin deposit is among the most inhospitable on the planet." But these statements too are demonstrably false.

27.    The feasibility of the Donlin Gold infrastructure project is well-documented in the public Feasibility Study, which details the extensive technical, environmental, and social studies that were conducted by reputable firms to ensure the longevity and viable development of such an important deposit. The pipeline design and analysis are similarly detailed in the publicly-available Plan of Development and Supplemental Pipeline Information. The Plan of Development contains a mile-by-mile accounting of the planned pipeline route: approximately 75 miles of the planned 315-mile route includes rugged mountainous terrain. More than half of the planned route is comprised of lowlands or rolling terrain. NOVAGOLD, Barrick, and their experts have

---

[2]    "Donlin Gold data as per the Second Updated Feasibility Study (as defined herein). Donlin Gold measured resources of approximately 8 Mt grading 2.52 g/t and indicated resources of approximately 534 Mt grading 2.24 g/t, each on a 100% basis and inclusive of mineral reserves. Mineral resources have been estimated in accordance with National Instrument 43-101 – Standards of Disclosure for Mineral Projects ("NI 43-101")."

determined that construction of the pipeline over the entirety of the 315-mile route is commercially, technically, and environmentally feasible.

28.     Taking a new tack on its false representations regarding the proposed pipeline plan, the Report incorrectly states that "[e]ach of the 300 stream crossings will require a temporary bridge, and dam, and two pits, one on either side of the stream, for the drilling equipment to bore a hole under the stream."  Yet again, JCAP willfully disregards the facts contained in published engineering reports in favor of its false and unverified statements.  As described in the Plan of Development and Supplemental Pipeline Information, approximately 7—not 300—stream crossings are proposed for horizontal directional drilling.  The balance of the stream crossings generally only require open cut methods.  No drilling equipment is required to "bore a hole under the stream" for these other 293 crossings.

29.     Moving on from the pipeline, JCAP pulls another falsehood from its grab-bag of lies: that NOVAGOLD intends to "pivot" to barging diesel.  JCAP glibly and incorrectly represents that "[e]ven if NOVAGOLD reduced the mine capacity by half, it could not barge enough diesel to operate the power plant," that "[t]he total diesel that can be barged up the river is at best 253 ML" and that "[u]nder the most optimistic scenario, cutting production to half of what is now planned, the diesel barged in would be sufficient for at most seven months of operations per year, essentially reducing output to a quarter of what is now planned." All demonstrably false.  Barging diesel was always part of the mine plan, and it was detailed extensively in the Feasibility Study.  JCAP's statements on barging capacity misleadingly assume both that Donlin Gold would use only diesel fuel and that current planned barging capacity could not be increased.  The current plan is to use natural gas as fuel for the power plant and to have diesel available as an optional emergency backup.  The barging plan described in the Feasibility Study is based on this current

plan. But, of course, if the plan changed so too would the Feasibility Study. If Donlin Gold needs to transport more diesel, the barging capacity could be readily increased.

30. The JCAP Report goes on to falsely state that the Donlin Gold project's planned power plant "would be the largest power plant in Alaska and increase the electricity produced in that state by about 40%." Official data from the U.S. Department of Energy refutes JCAP's false statement. The U.S. Department of Energy states that annual power generation in Alaska is 6.9TWh, which equates to just under 800 MW average generation. The Donlin Gold power plant would add 153 MW of electricity, increasing the State of Alaska's total output by approximately 20%, not 40%. JCAP's statement that the Donlin Gold power plant would be the largest in Alaska is also false. The Donlin Gold plant would be smaller than Chugach Electric's Beluga power plant with a total capacity of 332MW.

31. In moving rapidly from one falsehood to the next, JCAP's strategy is death by a thousand cuts. The Report lobs lie after lie—both big and small—attacking the feasibility of the Donlin Gold project in an effort to chip away, bit by bit, at investors' confidence in the Donlin Gold project. The resulting damage to NOVAGOLD's reputation occasioned by JCAP's false statements was inevitable and is substantial.

***The Report falsely asserts that management has "voted with their feet" by reducing their share ownership.***

32. To complete its unwarranted attack on NOVAGOLD, JCAP's Report states that "management has been treating this 12-person concept company like an ATM" and that insiders have "voted with their feet" by reducing their share ownership. Not true.

33. JCAP states that management has "awarded themselves base salaries that rival those of the CEO's at Newmont and Barrick." This is demonstrably false. First, NOVAGOLD management does not award compensation to itself. Compensation of

NOVAGOLD management is established by the Compensation Committee of NOVAGOLD's Board of Directors and is duly approved by the entire Board.  It is regularly measured against levels of compensation of a carefully selected peer group of companies.  The base salary of NOVAGOLD's President and CEO is 65% and 42% of the base salaries of the President and CEOs of gold companies Newmont and Barrick, respectively, as per the latest publicly-filed information for each company, a fact that JCAP elected not to disclose in its Report.

34.     The second prong of JCAP's attack on NOVAGOLD management is equally false: there is simply no truth to JCAP's repeated misstatements that NOVAGOLD management has engaged in insider sales, including JCAP's statement that "[s]enior office holders and directors have taken $35 mln in net cash from share sales in the last five years" and that "[s]ome 70% of NG insider share sales were over the last 12 months, as the share price increased by 300%," that "[t]he CFO's stock in the company has halved, from around 2.2 mln shares to 1 mln," that "[t]he CEO has reduced his net position by 26%," and that "[a]fter the 2017 assay, the CEO sold down $2.5 mln in stock."   The Report's false and misleading table purporting to document insider share sales is as follows:

| Insider share sales | Position | Net Cash Sales |
|---|---|---|
| Lang Gregory A | CEO | $15,806,949.19 |
| Ottewell David A | CFO | $9,629,516.76 |
| Walsh Anthony P | Director | $2,271,348.84 |
| Nauman Clynton R | Director | $2,175,710.12 |
| Deisley David | Director | $1,996,975.59 |
| Levental Igor | Director | $1,574,548.27 |
| Dowdall Sharon | Director | $1,067,422.44 |
| Madhavpeddi Kalidas V | Director | $479,210.79 |
| Kaplan Thomas Scott | Chairman | $314,318.38 |
| | | $35,316,000.38 |

35.     All of this is readily contradicted by the truth.   JCAP's statements concerning insider sales deliberately conflate the *sale of shares by insiders* with the *exercise of options by insiders* – two materially different transactions.  The current NOVAGOLD management team has been in place almost eight years and exercised options before they expired (a five-year time limit from the grant date).   Likewise, the information included in the Report's table is demonstrably false.  David Deisley—identified as a "Director"—retired more than a year ago and never served as a director.  None of the other individuals identified in JCAP's table above have sold shares of NOVAGOLD in the most recent 12 months, other than in connection with a stock option exercise, which does not result in a net decrease of shares owned.   And according to publicly-available information through Canada's System for Electronic Disclosure by Insiders ("SEDI") database, NOVAGOLD's Vice President and CFO, David Ottewell, has steadily increased his shareholdings in the company from 35,000 common shares to 617,000 shares during

his tenure.   Similarly, NOVAGOLD's President and CEO, Greg Lang has increased his shareholdings in the company from 116,000 to 1,830,000 shares during his tenure.

### JCAP DOUBLES DOWN ON TWITTER

36.     JCAP magnified the damage caused by the publication of the short and distort Report by re-publishing the Report's false and defamatory statements about NOVAGOLD on Twitter.  On May 28, 2020 and May 29, 2020, JCAP unleashed a barrage of tweets highlighting some of the most spurious and incendiary statements in the Report, including that the natural gas pipeline is not feasible:



37.     JCAP repeated its statement that NOVAGOLD insiders have been selling down their ownership in the company, when the truth is just the opposite:



38.     JCAP also falsely stated in a tweet that NOVAGOLD had perpetrated a "fraud" on the investing public:



39.     JCAP repeated its false statement that NOVAGOLD concealed the amount of initial capital required for the Donlin Gold project:



40.     Finally, JCAP repeated its statement that the pipeline to the site is unreasonable to build:



**NOVAGOLD FIGHTS BACK**

41.     The surprise attack on the reputation of NOVAGOLD and its management team was launched without advance warning to NOVAGOLD or the investing public, with the intended effect of driving down NOVAGOLD's stock price.  Aware of the potential damage JCAP's Report would wreak if left unchecked, NOVAGOLD immediately began to prepare a response as soon as it learned of the Report's publication.  It takes time to craft a comprehensive, fact-based response to each of the Report's false and defamatory statements.  NOVAGOLD asked investors for their patience while it dealt with the Report's "numerous inaccuracies and falsehoods" and promised that a "fulsome response" was forthcoming.

42.     As NOVAGOLD prepared its response, JCAP continued its Twitter attacks:



43.     On June 8, 2020, NOVAGOLD published a comprehensive, 40-page refutation of each of the misstatements contained in the JCAP Report.  In addition, NOVAGOLD's Chairman, Dr. Thomas S. Kaplan, published a detailed statement exposing both JCAP's multitude of falsehoods and outright lies and JCAP's nefarious goal to manipulate NOVAGOLD's stock price and derive a quick profit on the backs of unsuspecting shareholders.

44.     But even after NOVAGOLD demonstrated the falsity of the statements contained in the JCAP Report, JCAP refused to back down:



45.     JCAP's Report does not contain any "serious research and analysis" about NOVAGOLD, and the Report does not demonstrate a factual basis showing that NOVAGOLD stock was overvalued.  JCAP is not a financial analyst, but a market manipulator, and its Report is simply the vehicle through which it simultaneously harms NOVAGOLD's reputation and pockets profits for itself.  JCAP's Twitter campaign served only to amplify its false and defamatory claims regarding NOVAGOLD's management and business.

### DAMAGES

46.     Precisely as JCAP had carefully schemed, the release of the JCAP Report to the market achieved JCAP's intended effect on NOVAGOLD's stock price.  NOVAGOLD shares fell nearly 9% from $10.65 at close of the previous trading day to $9.71 at close on May

28, 2020 on unusually high trading volume.  And the price continued to fall over the next weeks, reaching a low of $7.99 on June 18, 2020.

47.     The damage to NOVAGOLD's reputation is substantial.  JCAP has falsely stated that NOVAGOLD operates fraudulently.   JCAP's Report unscrupulously misstates important facts about NOVAGOLD's business, misrepresents NOVAGOLD's value to shareholders, falsely denigrates the integrity and honesty of NOVAGOLD's management team, and publishes materially false and distorted information about the company and the Donlin Gold project to the investing public.

48.     NOVAGOLD has additionally incurred special damages in the form of expenses necessary to counteract JCAP's defamatory publication.  *See* Restatement (Second) Torts § 633 (1977) (publisher of injurious falsehoods is liable for the expenses reasonably necessary to counteract the publication, including litigation to remove the doubt cast upon a business's value by the disparagement); *Charles Atlas Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 155 (S.D.N.Y. 1983) (relying on Restatement and holding that pleading of special damages in the form of advertising to counteract defamatory publication is sufficient to support trade libel cause of action); *Bose Corp. v. Consumers Union of U.S. Inc.*, 529 F. Supp. 357, 365 (D. Mass. 1981) (awarding special damages calculated as a percentage of employee's salary based on time spent counteracting defamatory statements that otherwise could have been spent on other aspects of plaintiff's business).

49.     NOVAGOLD has gone to great lengths, at great cost, to counteract the effects of JCAP's Report on NOVAGOLD's business.  Immediately after publication of the Report, NOVAGOLD engaged counsel to assist it in analyzing the JCAP Report (including its authors and effects), refuting the misstatements in the Report as described in Paragraph 43 above,

analyzing market activity, and in clearing NOVAGOLD's name.  Fees associated with this work incurred prior to the filing of this suit have cost NOVAGOLD at least $212,000.  NOVAGOLD continues to incur related fees arising from its efforts to mitigate the damage caused by JCAP's Report.  Additionally, NOVAGOLD employees and management have had to spend significant time rebutting the numerous falsehoods and inaccuracies raised in JCAP's Report rather than advancing NOVAGOLD's business.  The distraction caused by JCAP's defamatory Report is ongoing and NOVAGOLD estimates that it has cost at least $201,000 in employee time to date. NOVAGOLD is continuing to analyze the JCAP Report, its effects, those who published it, and market activity concerning NOVAGOLD's securities and may incur additional costs related to these efforts.

## CLAIMS AND CAUSES OF ACTION

**COUNT I: DEFAMATION BY LIBEL, LIBEL PER SE – NEW YORK COMMON LAW**

50.     The allegations contained in paragraphs 1-47 above are incorporated herein by reference.

51.     On May 28, 2020, JCAP published written statements constituting defamation or libel.  JCAP acted with actual malice toward NOVAGOLD.  JCAP knew that its written statements about NOVAGOLD were false or made those statements with reckless disregard as to their veracity.  JCAP's false and defamatory written statements published about NOVAGOLD include both objectively false factual statements and statements which imply the existence of undisclosed defamatory factual predicates.

52.     JCAP's statements were of such a character that they would expose NOVAGOLD to public contempt, ridicule, aversion, or disgrace.

19

53.     JCAP presented its report as "accurate and reliable" and based on "extensive primary research."  JCAP's false and defamatory statements were read by members of the public, including holders of NOVAGOLD stock, and current and prospective business partners of NOVAGOLD and were understood to be assertions of fact or based on undisclosed factual predicates.

54.     JCAP's false and defamatory statements constitute defamation per se because they wrongly accuse NOVAGOLD of untruthfulness, dishonesty, and professional misconduct.

55.     NOVAGOLD suffered harm to its reputation, loss of business, and other monetary harm, including expenses to counteract the publication, as a result of JCAP's publication of false and defamatory written statements.

56.     Monetary damages alone cannot fully compensate for the resulting injuries. JCAP's wrongdoing will continue to cause irreparable harm to NOVAGOLD unless enjoined by this court.

## COUNT II: TRADE LIBEL – NEW YORK COMMON LAW

57.     The allegations contained in paragraphs 1-54 above are incorporated herein by reference.

58.     On May 28, 2020, JCAP published written statements constituting defamation or libel.  JCAP knew that its written statements about NOVAGOLD were false or made those statements with reckless disregard as to their veracity.  JCAP's false and defamatory written statements published about NOVAGOLD include both objectively false factual statements and statements which imply the existence of undisclosed defamatory factual predicates.

59.     NOVAGOLD suffered harm to its reputation, loss of business, and other monetary harm, including expenses to counteract the publication, as a result of JCAP's publication of false and defamatory written statements.

## PRAYER FOR RELIEF

NOVAGOLD prays for judgment against Defendants as follows:

a.     That the Court find, declare and enter judgment that Defendants have willfully, grossly irresponsibly, or negligently published false statements concerning NOVAGOLD in violation of New York defamation law and award damages to compensate NOVAGOLD for the harm incurred;

b.     That the Court enjoin the publication of the libelous allegations and direct Defendants to immediately remove the May 28, 2020 Report and all references to NOVAGOLD and Donlin Gold from its website and social media accounts;

c.     That the Court grant NOVAGOLD such other further relief as may be deemed just, equitable, and appropriate.

## JURY DEMAND

NOVAGOLD demands a trial by jury on all issues so triable.

Dated: November 16, 2020

Respectfully submitted,

*/s/ Seth T. Taube*

**BAKER BOTTS L.L.P.**

Seth T. Taube (1664739)
30 Rockefeller Plaza
New York, New York 10112
Tel: 212.408.2500
Fax: 212.408.2501
*seth.taube@bakerbotts.com*

Jonathan Rubenstein (*adm. pro hac vice* )
Jordan Kazlow (*adm. pro hac vice*)
2001 Ross Avenue
Dallas, Texas 75021
Tel.: (214) 953-6500
Fax: (214) 953-6503
*jonathan.rubenstein@bakerbotts.com*
*jordan.kazlow@bakerbotts.com*

***Attorneys for Plaintiff,***
***NOVAGOLD Resources Inc.***