Seth T. Taube
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
Tel: 212.408.2500
Fax: 212.408.2501
*Attorney for Plaintiff, NOVAGOLD Resources Inc.*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOVAGOLD RESOURCES INC., <br><br> Plaintiff, <br><br> v. <br><br> J CAPITAL RESEARCH USA LLC, <br><br> Defendant. | **CIVIL ACTION NO.: 1:20-cv-02875 (LDH)(PK)** <br><br> **JURY TRIAL DEMANDED** <br><br> **Date of Service: February 3, 2021** |

**PLAINTIFF NOVAGOLD RESOURCES INC.'S MEMORANDUM OF LAW IN**
**OPPOSITION TO J CAPITAL RESEARCH USA LLC'S MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

LEGAL STANDARD ................................................................................................... 7

**JCAP FAILS TO IDENTIFY ANY BASIS FOR DISMISSAL OF NOVAGOLD'S DEFAMATION CLAIM** ............................................................................................... 7

    I.    NOVAGOLD pleads the requisite level of fault ............................................ 7

        a.    New York's recently-enacted anti-SLAPP legislation, and the actual malice standard incorporated therein, is inapplicable. ......................................... 7

            *A full analysis of retroactivity demonstrates that the statute does not apply* ..... 8

            *The "commenced or continuing" language to which JCAP cites does not weigh in favor of retroactive application of the actual malice standard.* ..................... 9

            *The Palin case on which JCAP relies does not weigh in favor of retroactive application of the actual malice standard.* ....................................................... 10

            *If the Court were to find that the new statute is procedural, rather than substantive, it is equally inapplicable to this proceeding.* ............................... 11

        b.    That NOVAGOLD is a publicly-traded company does not per se make it a public figure subject to the actual malice requirement. ...................................... 11

        c.    The FAC—which identifies with specificity JCAP's willful and/or reckless disregard for the truth—adequately pleads actual malice. ........................... 13

    II.    NOVAGOLD identifies actionable defamatory statements. ............................ 15

        a.    JCAP altogether ignores fact statements pleaded in the FAC. ...................... 15

        b.    The conclusions JCAP reaches that rely on false statements of fact are actionable. 16

            *That JCAP is a short seller does not immunize it from liability* ..................... 16

            *Conclusions based on demonstrably false statements of fact are actionable.* . 17

            *That the documents on which JCAP relies are publicly available is of no moment.* ....................................................................................................... 18

        c.    All of the identified statements are both defamatory and pertain to NOVAGOLD. 19

**JCAP FAILS TO IDENTIFY ANY BASIS FOR DISMISSAL OF NOVAGOLD'S TRADE LIBEL CLAIM** .......................................................................................................... 20

    I.    NOVAGOLD pleads an actionable claim for trade libel ................................. 20

    II.    NOVAGOLD establishes special damages. .................................................... 21

        a.    Divestments from a company reliant on investment income establish special damages. ..................................................................................................... 21

        b.    Costs incurred to mitigate or remediate trade libel damages, including legal fees, are independently recoverable as special damages. ..................................... 23

**CONCLUSION** ......................................................................................................... 25

# TABLE OF AUTHORITIES

CASES

*Angio-Med. Corp. v. Eli Lilly & Co.,*
  720 F. Supp. 269 (S.D.N.Y. 1989) ...................................................................20, 23, 24

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................7

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................7

*Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC,*
  151 F. Supp. 3d 287 (E.D.N.Y. 2015) ....................................................................17

*Bernstein v. O'Reilly,*
  17 Civ. 9483 (DAB), 2019 WL 10995110 (S.D.N.Y. Sept. 26, 2019) ...................25

*Bose Corp. v. Consumers Union of U.S., Inc.,*
  57 F.R.D. 528 (D. Mass. 1973) ...............................................................................25

*Chao v. Mount Sinai Hosp.,*
  No. 10 CV 2869(HB), 2010 WL 5222118 (S.D.N.Y. Dec. 17, 2010) .....................23

*Charles Atlas, Ltd. v. Time-Life Books, Inc.,*
  570 F. Supp. 150 (S.D.N.Y. 1983) ..........................................................................24

*Computer Aid, Inc. v. Hewlett-Packard Co.,*
  56 F. Supp. 2d 526 (E.D. Pa. 1999) ........................................................................11

*Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.,*
  No. 1:00CV98K, 2001 WL 670927 (D. Utah Mar. 26, 2001) .................................22

*Drug Research Corp. v. Curtis Publ. Co.,*
  7 N.Y.2d 435 (1960) ................................................................................................25

*Enigma Software Group USA, LLC v. Bleeping Computer LLC,*
  194 F. Supp. 3d 263 (S.D.N.Y. 2016) ...............................................................12, 20

*Erie v. Tompkins,*
  304 U.S. 64 (1938) ...................................................................................................11

*Eros International PLC v. Mangrove Partners,*
  No. 653096/2017, 2019 WL 1129196 (N.Y. Supr. Ct. Mar. 8, 2019) ...............16, 21

*Gorman v. Kings Mercantile Co.,*
  231 N.Y.S.2d 642 (N.Y. Supr. Ct. 1962) ................................................................24

*Henneberry v. Sumitomo Corp. of Am.*,
    415 F. Supp. 2d 423 (S.D.N.Y. 2006) ...................................................................21

*In re Gleason (Michael Vee, Ltd.)*,
    96 N.Y.2d 117 (N.Y. 2001) .............................................................................8

*Intervet, Inc. v. Mileutis, Ltd.*,
    No. 15-1371(FLW), 2017 WL 1528719 (D.N.J. Apr. 27, 2017) ..................... 22, 23

*Jewish People for the Betterment of Westhampton Beach v. Village of Westhampton Beach*,
    778 F.3d 390 (2d Cir. 2015) ...............................................................................7

*Kasada, Inc. v. Access Capital, Inc.*,
    01 Civ. 8893(GBD), 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ...................... 23

*La Liberte v. Reid*,
    966 F.3d 79 (2d. Cir. 2020) ...............................................................................11

*Landgraf v. USI Film Prods.*,
    511 U.S. 244 (1994) ....................................................................................8, 9

*Leonard F. v. Israel Disc. Bank of N.Y.*,
    199 F.3d 99 (2d Cir. 1999) ...............................................................................12

*Liberman v. Gelstein*,
    605 N.E.2d 344 (N.Y. Ct. App. 1992) ................................................................21

*Majewski v. Broadalbin-Perth Cent. Sch. Dist.*,
    696 N.E.2d 978 (N.Y. 1998) .............................................................................8

*MiMedx Grp., Inv. v. Sparrow Fund Mgmt. LP*,
    17-CV-07568 (PGG) (KHP), 2018 WL 847014 (S.D.N.Y. Jan. 12, 2018) ............17

*Mitre Sports Int'l Ltd. v. HBO, Inc.*,
    22 F. Supp. 3d 240 (S.D.N.Y. 2014) .............................................................12, 13

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*,
    723 F.3d 192 (2d Cir. 2013) ...............................................................................7

*Nanoviricides, Inc. v. Seeking Alpha, Inc.*,
    No. 151908/2014, 2014 WL 2930753 (N.Y. Supr. Ct. June 26, 2014) ...................17

*New York v. United Parcel Service, Inc.*,
    15-cv-1136 (KBF), 2016 WL 4094707 (S.D.N.Y. June 10, 2016) ...........................9

*Palin v. N.Y. Times Co.*,
    940 F.3d 804 (2d Cir. 2019) .................................................................13, 14, 19

*Palin v. The New York Times Co.*,
    --- F. Supp. 3d. ---, No. 17-cv-4843-JSR, 2020 WL 7711593 (S.D.N.Y. Dec. 29, 2020)..........
    ......................................................................................................................................10, 11, 14

*Penn Warranty Corp. v. DiGiovanni*,
    10 Misc. 3d 998 (N.Y. Supr. Ct. 2005)...................................................................................25

*Sabratek Corp. v. Keyser*,
    No. 99 Civ. 8589(HB), 2000 WL 423529 (S.D.N.Y. Apr. 19, 2000)......................................17

*Sanchez v. Local 660, United Workers of Am.*,
    25 F. Supp. 3d 261 (E.D.N.Y. 2014) .....................................................................................12

*Schaefer v. IC Sys., Inc.*,
    Case No. 1:17-cv- 01920-FB-SJB, 2018 WL 3094938 (E.D.N.Y. June 22, 2018)................12

*Sherrod v. Breitbart*,
    843 F. Supp. 2d 83 (D.D.C. 2012) .........................................................................................11

*Silsdorf v. Levine*,
    59 N.Y.2d 8 (N.Y. 1983) .......................................................................................................18

*SilverCorp Metals Inc. v. Anthion Mgmt. LLC*,
    59 N.Y.S.2d 92, 2012 WL 3569952 (N.Y. Supr. Ct. Aug. 16, 2012)......................................16

*Yangtze River Port & Logistics Ltd. v. Research*,
    No. 150721/2019, 2020 WL 905770 (N.Y. Supr. Ct. Feb. 25, 2020)......................................16

**STATUTES**

N.Y. Civ. Rights Law § 70-a ................................................................................................10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(d) ...........................................................................................................12

Restatement (Second) of Torts §§ 570–73...........................................................................21

Restatement (Second) Torts § 633 .......................................................................................24

## INTRODUCTION

JCAP inaccurately portrays what it said in its Report, what NOVAGOLD pleaded in its First Amended Complaint [Dkt. 34] ("FAC"), and what the courts said in the cases it cites—creating one straw man after the next against which to argue in its Memorandum of Law in Support of its Motion to Dismiss (the "Motion").  JCAP casts itself as a well-intentioned financial analyst, raising for its readers alternative interpretations of and opinions regarding factual public documents that are critical of NOVAGOLD's future prospects, but not unfairly so.  Unfortunately for JCAP, this self-description is far afield of the facts, as pleaded in the FAC.  JCAP's Report—in contrast to the case law discussed in the Motion—does not merely cite to undisputed facts to reach a conclusion with which NOVAGOLD disagrees.  In its Report, JCAP knowingly, or with reckless disregard to the truth, distorts, misrepresents, and outright lies about the contents of the public documents to which it cites.  FAC ¶¶ 20–35.  The serious—and unfounded—charges JCAP's Report levels against NOVAGOLD and its management have caused NOVAGOLD significant and ongoing reputational and financial harm.  FAC ¶¶ 1, 3, 46–47.  And all in support of JCAP's own nefarious goals: to profit on its short position from the precipitous drop in NOVAGOLD's share price occasioned by the Report.  FAC ¶ 1.  JCAP's calculated attack, carried out under the auspice of legitimate financial reporting, is precisely the sort of wrongdoing defamation actions are intended to protect against.  And when the proper analysis is applied to the allegations in the FAC, JCAP's Motion must fail.

This is not the first time JCAP has brought a similar challenge before the Court.  JCAP re-argues, now for the third time, the same dismissal arguments that it raised in two rounds of letter briefing [Dkt. 18–19, 35–37] and at the parties' pre-motion conference before the Court in November 2020:  *First*, as to the defamation claim—the pleading of which is identical in both the Original Complaint and FAC—JCAP asserts that NOVAGOLD has failed to identify any

actionable statement or plead actual malice.  The Court has already rejected both arguments, finding neither had "any leg" and that it would be a "waste of [Defendant's] time, resources, as well as the Court's to entertain any motion with respect to the defamation claim . . ."  November 2, 2020 Pre-Motion Hearing Transcript ("Hearing Tr.") at 7–8, 18–19.  JCAP nevertheless dedicates a substantial majority of its current briefing to the defamation claim, relying on (1) straw-man distortions of both the FAC and JCAP's Report, and (2) novel interpretations of case law that would effectively immunize short sellers—and many other critics in other forms—from liability, regardless of how far their reports stray from the truth.  The only new argument JCAP has raised to support its challenge to the defamation claim is a scant page and a half on the application of a new anti-SLAPP statute passed by the New York Legislature and enacted *after* NOVAGOLD filed its Original Complaint.  While seemingly the feature of its most recent letter brief requesting a pre-motion conference, this barely-argued and inapplicable new legislation does not entitle JCAP to a second bite at the apple with respect to the defamation claim.  ***Second***, and at the tail-end of its briefing, JCAP challenges NOVAGOLD's sole amendment to the Original Complaint: its pleading of special damages in support of its trade libel claim.  But there, too, JCAP's argument turns on distortions of NOVAGOLD's pleading and the relevant case law—it provides no grounds for dismissal.  JCAP's Motion should be denied in its entirety.

## FACTUAL BACKGROUND

JCAP presents its legal argument divorced from the factual context in which this dispute arises.  But, given the fact-specific nature of defamation claims, the backdrop against which this legal argument is set cannot be ignored.  NOVAGOLD is a publicly-traded precious metals company focused on the development of its 50%-owned Donlin Gold project in Alaska.  FAC ¶ 10.  With approximately 39 million ounces of gold in the measured and indicated mineral resource

categories, inclusive of proven and probable mineral reserves,[1] Donlin Gold is regarded to be one of the largest, highest-grade, and most prospective known open-pittable gold deposits in the world. FAC ¶ 10.  JCAP holds itself out to be a research organization, providing its readers with what it describes as "highly diligenced research reports on publicly traded companies, relying on deep, on-the-ground primary research." FAC ¶ 12.  JCAP traditionally targets Chinese technology and consumer cyclical companies and has only twice before made recommendations in the mining industry.  FAC ¶¶ 2–3, 17–18.  Nevertheless—and despite its inexperience—without warning, on May 28, 2020, JCAP published a 22-page "report" purporting to expose NOVAGOLD and its management, accusing them of misleading investors as to the feasibility of the Donlin Gold project and reducing their equity holdings in the company (the "Report").  FAC ¶¶ 16, 20.  But the very documents on which JCAP relies reveal these conclusions—all built on pages of "facts" derived from JCAP's "highly diligenced" and "on the ground" research—to be false.

As with all projects of such scale, experts have conducted years of research on the feasibility of the Donlin Gold project, documented in thousands of pages of environmental, technical, and social studies.  FAC ¶ 10.  When the JCAP Report cites to these documents—and others—it is not merely relying on the "same facts" contained within those documents to reach a different conclusion.  To the contrary:  JCAP misrepresents and, in some instances, outright lies about the information contained in those documents.  Every conclusion JCAP reaches is built on a foundation of *demonstrably false support*, willfully or recklessly ignoring the *readily-available facts*.  The following is an illustration:

---

[1]      Donlin Gold data as per the "Donlin Creek Gold Project Alaska, USA, NI 43-101 Technical Report on Second Updated Feasibility Study" prepared by AMEC, effective November 18, 2011, as amended January 20, 2012 (the "Feasibility Study").  Donlin Gold measured resources of approximately 8 Mt grading 2.52 g/t and indicated resources of approximately 534 Mt grading 2.24 g/t each on a 100% basis and inclusive of mineral reserves.  Mineral resources have been estimated in accordance with National Instrument 43-101 – Standards of Disclosure for Mineral Projects.

**JCAP's Conclusion:** "[F]or the last 15 years, NOVAGOLD's management team has systematically misled investors with subjective presentation of information about a deposit so remote and technically challenging that the mine will never be built."  FAC ¶ 21.

| Demonstrably False Support used by JCAP for its Conclusion | Readily-Available Facts |
|---|---|
| "[T]he most recent feasibility study, done in 2012, estimated that the initial capex alone is $8 bln, not $6.7 bln." ¶ 21. | The Feasibility Study shows that the estimated *initial capital* required for the project is $6.7 billion.  ¶ 22.  The $8 billion figure includes *operating costs.* ¶ 22. |
| "[M]anagement has drilled only 16 holes since 2011 and *not even released the modeling results* of the last, meager drill assays in 2017." ¶ 23 (emphasis added). | The assays were proportional to Donlin Gold's goal and NOVAGOLD disclosed the 2017 drilling results to the public in a press release dated February 20, 2018. ¶ 23. |
| NOVAGOLD misled investors as to the value of the Galore Creek asset and the current owners of the asset "*quietly shut the project down* on April 28, 2020."  ¶ 24. | The Galore Creek Mining Corporation actually announced on April 28, 2020 that "due to the COVID-19 pandemic and the resulting uncertainties faced by the mining industry, expenditures on the Galore Creek project have been reduced in 2020, deferring the start of the planned Prefeasibility Study."  ¶ 24. |

**JCAP's Conclusion:** "[the Donlin deposit] is a stock promote, not a mining plan." FAC ¶ 25.

| Demonstrably False Support used by JCAP for its Conclusion | Readily-Available Facts |
|---|---|
| "[T]he Donlin deposit . . . is not feasible to put into production at any gold price" ¶ 25. | The Feasibility Study demonstrates the economic viability of the deposit at numerous gold prices—including at $1,200 per ounce, which is substantially lower than the gold price as of the publication of JCAP's Report.  ¶ 25. |
| "[T]he terrain around the Donlin deposit is among the most inhospitable on the planet."  ¶ 26. | The publicly-available Feasibility Study and Plan of Development document that the construction of the pipeline over the entirety of the 315-mile route is commercially, technically, and environmentally feasible.  ¶ 27. |
| "[E]ach of the 300 stream crossings will require a temporary bridge, and dam, and two pits, one on either side of the stream, for the drilling equipment to bore a hole under the | As described in the Plan of Development— approximately *7* of the stream crossings are proposed for horizontal directional drilling. FAC ¶ 28.  The remaining *293* stream |

4

| | |
|---|---|
| stream." ¶ 28. | crossings generally only require open cut methods and no drilling equipment is required to "bore a hole under the stream." ¶ 28. |
| "[E]ven if NOVAGOLD reduced the mine capacity by half, it could not barge enough diesel to operate the power plant." ¶ 29. | JCAP's statements on barging capacity misleadingly assume both that Donlin Gold would only use diesel fuel and that current barging capacity could not be increased.  ¶ 29. |
| The Donlin Gold project's planned power plant "would be the largest power plant in Alaska and increase the electricity produced in that state by about 40%." ¶ 30. | Publicly-available data states that annual power generation in Alaska is 6.9TWH, which equates to just under 800MW average generation.  The Donlin Gold power plant would add 153MW of electricity, increasing Alaska's total output by approximately 20%. ¶ 30.<br><br>The planned power plant's 153MW of electricity would be far smaller than Chugach Electric's Beluga power plant in Alaska with a total capacity of 332MW.  ¶ 30. |

**JCAP's Conclusion:** "[M]anagement has been treating this 12-person concept company like an ATM" and Insiders have "voted with their feet" by reducing their share ownership.  FAC ¶ 32

| Demonstrably False Support used by JCAP for its Conclusion | Readily-Available Facts |
|---|---|
| Management has "awarded themselves base salaries that rival those of the CEO's at Newmont and Barrick." ¶ 33. | The base salary of NOVAGOLD's President and CEO is 65% and 42% of the base salaries of the President and CEOs of gold companies Newmont and Barrick, respectively, as per the latest publicly filed information for each company at the time of the Report.  ¶ 33. |
| "[S]enior office holders and directors have taken $35 mln in net cash from share sales in the last five years" ¶ 34.<br><br>"[S]ome 70% of NG insider share sales were over the last 12 months, as the share price increased by 300%." ¶ 34. | *None* of the current senior office holders or directors JCAP identifies sold shares in the most recent 12 months leading up to publication of the report, other than in connection with a stock option exercise, *which did not result in a net decrease of shares owned.* ¶ 35. |
| "[T]he CFO's stock in the company has halved, from around 2.2 mln shares to 1 mln." ¶ 34. | According to publicly-available information through Canada's System for Electronic Disclosure by Insiders database, |

|  | NOVAGOLD's Vice President and CFO, David Ottewell, has increased his shareholdings in the company from 35,000 common shares to 617,000 shares during his tenure. ¶ 35. |
|---|---|
| "[A]fter the 2017 assay, the CEO sold down $2.5 mln in stock." ¶ 34. | NOVAGOLD's President and CEO, Greg Lang, has increased his shareholdings in the company from 116,000 to 1,830,000 shares during his tenure. ¶ 35. |

JCAP of course did not stop at publication of its factually-inaccurate and defamatory Report—in the days that followed, JCAP rebroadcast its spurious claims on Twitter.  FAC ¶¶ 36–40.  While NOVAGOLD worked to counter the attack—engaging legal counsel and dedicating the majority of its management team to the effort—the intended damage to NOVAGOLD's reputation was wrought.  FAC ¶¶ 41, 46–49.  The substantial damage to NOVAGOLD's reputation is perhaps most clearly illustrated by the market reaction to the Report: on publication of the Report, NOVAGOLD shares fell nearly 9% from $10.65 at close of the previous trading day to $9.71 at close on May 28, 2020, on unusually high trading volume.  FAC ¶ 46.  And the price continued to fall over the next weeks, reaching a low of $7.99.  FAC ¶ 46.  That investors lost confidence in NOVAGOLD is demonstrable.  And that is not the only damage JCAP's Report caused.  The Report disparaged NOVAGOLD's primary asset: its property interest in the Donlin Gold project and its future goods—the gold it intends to mine from that project.  FAC ¶ 47.  The loss of investment does not just evidence the damage to NOVAGOLD's reputation, it also represents a decrease in the necessary capital available to NOVAGOLD to develop its product.  FAC ¶ 46.  Further, NOVAGOLD has suffered measurable losses in the form of the substantial expenses that it has incurred to combat JCAP's defamatory publication.  FAC ¶¶ 48–49.  These ongoing losses are well-documented and well-pleaded.

**LEGAL STANDARD**

JCAP tellingly avoids discussing the standard of review for its 12(b)(6) motion.  The FAC

must survive dismissal if it "state[s] a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"Determining plausibility is a context specific endeavor that requires the court to draw upon its

experience and common sense."  *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723

F.3d 192, 197 (2d Cir. 2013) (internal citations omitted).  But in all events, "fact-based arguments

are insufficient at the pleadings stage, in which [the court] must assume the truth of plaintiffs'

well-pleaded factual allegations."  *Jewish People for the Betterment of Westhampton Beach v.*

*Village of Westhampton Beach*, 778 F.3d 390, 394 (2d Cir. 2015).

**JCAP FAILS TO IDENTIFY ANY BASIS FOR DISMISSAL OF NOVAGOLD'S
DEFAMATION CLAIM**

**I.      NOVAGOLD pleads the requisite level of fault.**

JCAP argues again that NOVAGOLD fails to plead actual malice, as is required of a public

figure.  Mtn. 15–16.  But on the same pleaded facts before it now, the Court rejected that argument,

holding that the FAC did not contain "allegations that might support the notion that the plaintiff is

either a public figure or a limited purpose public figure."  Hearing Tr. at 4.  The only new facet of

JCAP's argument stems from a recently-enacted New York anti-SLAPP law, which significantly,

JCAP has failed to show would apply *retroactively* to this action in a *federal* court sitting in

diversity.  In any event, NOVAGOLD has adequately pleaded actual malice in factual detail going

well beyond actual malice "buzzwords."  Mtn. 18.  The FAC describes how, time and again, JCAP

either willfully ignored the truth or recklessly disregarded it.

> **a.  New York's recently-enacted anti-SLAPP legislation, and the actual malice
> standard incorporated therein, is inapplicable.**

Despite that the legislation on which it relies was enacted *after* the filing of NOVAGOLD's

action, JCAP provides only a cursory bullet-point analysis of whether it is appropriate to apply the statute in this instance.  Mtn. 15.  It is well-established under New York law that "retroactive operation is not favored by courts and statutes will not be given such construction unless the language expressly or by necessary implication requires it."  *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 696 N.E.2d 978, 980 (N.Y. 1998) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").  In determining whether a statute should apply retroactively, courts primarily consider whether the statute is remedial in nature and look to "[1] whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; [2] whether the statute was designed to rewrite an unintended judicial interpretation; and [3] whether the enactment itself reaffirms a legislative judgment about what the law in question should be."  *In re Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122 (N.Y. 2001).  Notably, JCAP fails to even mention caselaw on the retroactive application of legislation.  Instead—without analysis—JCAP attempts to establish retroactivity by pointing to (1) the text of a provision of the statute unrelated to actual malice, and (2) a single inapposite case.

 ***A full analysis of retroactivity demonstrates that the statute does not apply.***  JCAP has not identified any specific pronouncement of the Legislature conveying either retroactive effect or a sense of urgency, any unintended judicial interpretation the new legislation corrected, or any affirmation of the Legislature about what the law should be.  *Cf. Gleason*, 96 N.Y.2d at 122 (holding that law applied retroactively where the court acted swiftly to reverse an unintended judicial interpretation and to clarify what the law was always meant to say).  Separate from its statements on retroactivity, JCAP notes that the new law was "effective immediately."  Mtn. 15.

To the extent that JCAP intends to argue that this feature evidences any legislative intent on retroactivity, New York courts have long held that the meaning of that phrase "is equivocal in an analysis of retroactivity" and that "identical language in other acts has not been enough to require application to pending litigation." *Majewski*, 91 N.Y.2d at 583.

Here, the Legislature could not have felt any urgent need to correct the law where New York's previous (far narrower) version of the anti-SLAPP statute remained unchanged for nearly *30 years*. Further, and more fundamentally, JCAP states that the new actual malice provision alters the parties' substantive rights. Mtn. 15. In that instance, the statute does not apply retroactively for the additional reason that such application "would produce an impermissible retroactive effect," as any change in the parties' substantive rights impairs vested rights. *See New York v. United Parcel Service, Inc.*, 15-cv-1136 (KBF), 2016 WL 4094707, at *3 (S.D.N.Y. June 10, 2016) ("The logic underpinning the presumption is that settled expectations should not be lightly disrupted . . . [A] statute has impermissible retroactive effect when it takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." (internal quotations omitted) (citing *Landgraf*, 511 U.S. at 265)). JCAP has provided no reason why the anti-SLAPP statute would apply retroactively, and it is clear that the statute would *not* apply retroactively under the well-settled case law governing this question.

**The "commenced or continuing" language to which JCAP cites does not weigh in favor of retroactive application of the actual malice standard.** In a one-sentence argument, JCAP asserts that the new law "applies expressly to anyone who has commenced or continued such an action." Mtn. 15. Presumably, this argument is intended to explain why the actual malice standard should apply retroactively to NOVAGOLD. But, *first*, the language on which JCAP relies is pulled

9

from a completely separate provision of the statute unrelated to actual malice.  The legislation's actual malice standard is contained in N.Y. Civil Rights Law Section 76-a.  The language on which JCAP relies is found in Section 70-a and expressly pertains to a defendant's ability to recover damages: "a defendant in an action involving public petition and participation, as defined in paragraph (a) of subdivision one of section seventy-six-a of this article, *may maintain an action, claim, cross claim or counterclaim to recover damages*, including costs and attorney's fees, *from any person who commenced or continued such action*."  N.Y. Civ. Rights Law § 70-a.  No similar "commenced or continued" language is found in the actual malice provision.  *Second*, no language is found *anywhere* in the statute—including in the damages provisions—to suggest that either all or part of it is to apply *retroactively*.  Even the "commenced or continued" language to which JCAP points would, as properly analyzed, only apply to causes of action filed *after* the statute was enacted.  If the Legislature wanted the statute to apply retroactively it would have included language to that effect.

> ***The Palin case on which JCAP relies does not weigh in favor of retroactive application of the actual malice standard.***  JCAP's only other argument on retroactivity cites—again without explanation or illustration—to a recent Southern District of New York case that JCAP asserts answers the retroactivity question in its favor.  Mtn. 15 (citing *Palin v. The New York Times Co.*, --- F. Supp. 3d. ---, No. 17-cv-4843-JSR, 2020 WL 7711593, at *5 (S.D.N.Y. Dec. 29, 2020)).  JCAP's reliance on *Palin*, however, is misplaced.  Having *assumed* that the new anti-SLAPP law applies in federal court, the thrust of the *Palin* court's reasoning turned on its view that the reliance interests underpinning the presumption against retroactive applications of substantive law were inapplicable where a public figure, like the plaintiff there, "would have already had to prove actual

malice under the federal Constitution." *Palin*, 2020 WL 7711593, at \*4–5.[2]  But unlike Palin*,* NOVAGOLD is not a "public figure," as it has not voluntarily thrust itself to the forefront of the public controversy that is the subject of the complained of speech.  *See* Section I(b) below.

     ***If the Court were to find that the new statute is procedural, rather than substantive, it is equally inapplicable to this proceeding.***  As the Second Circuit recently made clear, state anti-SLAPP provisions in conflict with the Federal Rules of Civil Procedure are inapplicable in federal court.  *La Liberte v. Reid*, 966 F.3d 79, 88 (2d. Cir. 2020).  Indeed, other courts considering whether similar anti-SLAPP legislation should be applied retroactively have recognized the "Catch-22" in which defendants arguing for such position find themselves: "*either* the statute is partially substantive (or has substantive consequences) and is therefore not retroactive . . . *or* it is purely procedural and inapplicable in federal court under *Erie*." *Sherrod v. Breitbart*, 843 F. Supp. 2d 83, 85 (D.D.C. 2012) (citing *Erie v. Tompkins*, 304 U.S. 64 (1938)).

### b. That NOVAGOLD is a publicly-traded company does not per se make it a public figure subject to the actual malice requirement.

     JCAP  boldly  asserts  that  "[f]or  NG  to  claim  private  figure  status  is  more  than disingenuous," Mtn. 16, apparently ignoring that the Court has already found that, based on the facts *as pleaded*, the allegations did not "support the notion that the plaintiff is either a public figure or a limited purpose public figure, and their status as a corporation alone is not sufficient." Hearing Tr. at 4.  Whether NOVAGOLD is run "quietly" in a "little known backwater of an industry," Mtn. 16, or a publicly-traded corporation is of little importance.  *See Computer Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999) (applying New York law and rejecting argument that plaintiff was a public figure based on its status as "one of the largest and

---

[2]     The *Palin* court considers whether the statute is remedial in nature, but its holding does not turn on this question.  2020 WL 7711593 at \*3.  And, as described above, the *Palin* court's analysis—which highlights the phrase "effective immediately" in the statute—is at odds with long-standing precedent.

most influential corporations in the world with one of the most actively traded stocks on the New York Stock Exchange"). The question that matters (and one that JCAP spends only a sentence analyzing) is whether NOVAGOLD has voluntarily thrust itself to the forefront of the particular public controversy—"a topic upon which sizeable segments of society have different, strongly held views"—that is the subject of the complained-of speech. *See Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 289 (S.D.N.Y. 2016); *Mitre Sports Int'l Ltd. v. HBO, Inc.*, 22 F. Supp. 3d 240, 252 (S.D.N.Y. 2014).

Aside from NOVAGOLD's status as a public company, JCAP only attempts to augment its public-figure argument by pointing to (1) the fact that the mine and corresponding pipeline require permits, and (2) a seemingly irrelevant and outside-the-pleadings statement[3] by NOVAGOLD's chairman about Warren Buffet. Mtn. 16. From these random data points, it is not entirely clear what JCAP believes the public controversy at the center of its argument to be, much less how NOVAGOLD has thrust itself to the center of that controversy. In *Mitre Sports*, a case involving defamation claims raised by Mitre against HBO for alleged defamatory statements falsely portraying that Mitre employs child labor in the manufacture of soccer balls, the Court rejected HBO's argument that news reports by other sources on child labor in the manufacture of soccer balls mentioning Mitre might constitute Mitre having injected itself into the public controversy. 22 F. Supp. 3d at 252. The Court also rejected HBO's argument that Mitre's role in the international effort to eliminate child labor—including Mitre sponsoring an industry

---

[3]     JCAP inappropriately attaches to its Motion and relies on articles and news reports neither incorporated by reference in nor essential to the FAC. *See* Ex. B (Fact Matrix response to JCAP's Report); Ex. C (statement of NOVAGOLD Chairman Thomas Kaplan); Ex. D (June 17, 2020, Alaska Public Media article); Ex. E (August 23, 2020 Business Insider article). The Court need not consider such documents. *See* Fed. R. Civ. P. 12(d); *Schaefer v. IC Sys., Inc.*, Case No. 1:17-cv- 01920-FB-SJB, 2018 WL 3094938, at *2 (E.D.N.Y. June 22, 2018) (citing *Leonard F. v. Israel Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999)) ("[F]actual assertions outside the pleadings . . . may not be considered on a motion to dismiss under Rule 12(b)(6)."); *Sanchez v. Local 660, United Workers of Am.*, 25 F. Supp. 3d 261, 266 n.3 (E.D.N.Y. 2014) (Consideration of material "outside of the pleadings [is] inappropriate at the motion to dismiss stage.").

conference, creating a hotline for consumers to learn which brands had committed to a pledge to not to use child labor, and publishing to its website and in press releases a denouncement of child labor—evidenced Mitre thrusting itself into a controversy.  *Id.*  In short, nothing to which HBO cited met the required threshold of "affirmative step [or] purposeful activity" with an "aim[] to influence the public's views on the controversy."  *Id.*  JCAP's allegations—that NOVAGOLD applied for required permits and that its Chairman made a comment about the value of the Company to an unaffiliated business journal—fall well short of suggesting that NOVAGOLD aimed to influence any public views on any controversy.

### c.   The FAC—which identifies with specificity JCAP's willful and/or reckless disregard for the truth—adequately pleads actual malice.

In any event, the FAC adequately pleads that JCAP acted with actual malice.  JCAP continues to assert that NOVAGOLD "rel[ies] on the allegation that JCAP's 'intent' in publishing the Report was to 'profit on short positions.'"  Mtn. 17.  But as NOVAGOLD highlighted for both JCAP and the Court in its December 16 letter [Dkt. 36], this is demonstrably false.  From the first paragraphs, the FAC is replete with allegations that JCAP's work is "deliberately indifferent to the truth" (FAC ¶ 12), and that it ignored readily-available facts contradicting its Report (FAC ¶¶ 11, 22–24, 25, 27–30) in order to "scare investors into selling NOVAGOLD stock so that JCAP could profit" (FAC ¶¶ 2, 45–46).

"[A] public figure plaintiff must prove that an allegedly libelous statement was made with actual malice, that is, made with knowledge that it was false or with reckless disregard of whether it was false or not."  *Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) (internal citations omitted)..  The FAC describes in detail how JCAP strayed far from its traditional targets—Chinese technology and consumer cyclical companies—to write a report on the highly technical and specialized industry with which it had little knowledge or experience: gold exploration and

development.  FAC ¶¶ 2–3, 18–19.  Despite JCAP's inexperience, it made only a single call to NOVAGOLD and refused NOVAGOLD's offer to place JCAP in touch with subject matter experts.  FAC ¶ 11.  And, as the FAC sets out, JCAP does not appear to have conducted independent research to fill in its knowledge gap, as JCAP's Report is refuted by thousands of pages of public documents.  Indeed—as illustrated in the Factual Background above—the FAC pleads that JCAP either willfully ignored, or recklessly failed to read in their entirety, the very public documents to which the Report references.  FAC ¶¶ 10, 22–24, 25, 27–30.  The FAC further details that this is not the first time someone has raised questions regarding the transparency and responsibility of JCAP's journalism: over the past decade JCAP has repeatedly been critiqued on these same grounds.  FAC ¶¶ 13–15.

NOVAGOLD's allegations rise well above the pleading threshold it must meet at this stage.  In *Palin v. N.Y. Times Co.,* the Second Circuit held that the plaintiff had "plausibly state[d] a claim for defamation and [could] proceed to full discovery."  940 F.3d 804, 808 (2d Cir. 2019).  In assessing whether the plaintiff had validly pleaded actual malice, the Second Circuit noted that the pleadings alleged that the defendant had a "'pre-determined' argument he wanted to make in the editorial" at issue, which "led him to publish a statement about [the plaintiff] that he either knew to be false, or at least was reckless as to whether it was false."  *Id*. at 813.  The Court held that the plaintiff's allegations "paint[ed] a plausible picture of this actual-malice scenario" in several respects, including because the editorial included a hyperlink to information "that contradicted the argument of [the] editorial," plausibly demonstrating that the defendant had "willfully disregarded the truth."  *Id*. at 813–15.  NOVAGOLD's allegations of actual malice bear a striking similarity to those the Second Circuit held to be sufficient in *Palin*.  Here, as in *Palin*, NOVAGOLD has identified a pre-determined argument JCAP intended to make (that

NOVAGOLD's shares were over-valued).  And here, as in *Palin*, NOVAGOLD has identified documents contradicting JCAP's Report that JCAP admits it relied on—and in which it therefore either recklessly failed to read or willfully ignored the truth.  NOVAGOLD's allegations give rise to a plausible inference that JCAP acted with actual malice.

## II.      NOVAGOLD identifies actionable defamatory statements.

In Response to each of the defamatory statements NOVAGOLD identifies across seven pages of the FAC, JCAP offers one of three responses, it either: (1) ignores the statement entirely; (2) attempts to sweep it under a broad header of "opinion" and disclaim liability; or (3) broadly asserts, without explanation, that the statement is either true or does not pertain to NOVAGOLD. JCAP's Motion raises *no* new arguments from those it has already raised twice before this Court and which this Court rejected at the parties' pre-motion conference.  The Court's initial ruling was correct: JCAP has not raised any basis for dismissing NOVAGOLD's defamation claim.

### a.   JCAP altogether ignores fact statements pleaded in the FAC.

With the exception of a confusing catchall at the end of its Motion intended to sweep in an unidentified number of statements in the FAC, JCAP makes no mention of its demonstrably false statements concerning the following topics:

- Management's reporting of the 2017 drilling results, FAC ¶ 23;

- The status of the Galore Creek project, FAC ¶ 24;

- The engineering requirements of the stream crossings, FAC ¶ 28;

- The power requirements of the Donlin Gold power plant, FAC ¶¶ 28–29;

- The CFO and CEO's purported share holdings and sales, FAC ¶¶ 34–35.

On this basis alone, JCAP's motion to dismiss the defamation claim should be denied as it has apparently conceded that at least some statements in the Report are defamatory.  *See* Hearing Tr.

at 7 ("THE COURT: . . . you would agree so long as there is any statement in here that the Court would deem to be factual and not opinion and otherwise actionable, the claim survives.  Yes?  MR. KORZENIK: I would think so.").

### b. The conclusions JCAP reaches that rely on false statements of fact are actionable.

JCAP's Motion identifies a wide range of statements that NOVAGOLD has pleaded are defamatory and declares them inactionable opinion either because (1) JCAP is a short seller; (2) the statement is a conclusion (ignoring the inaccurate statements of fact on which the statement is based); or (3) the document on which the statement is based is publicly available.  None of these attacks states a proper basis for dismissal.

*That JCAP is a short seller does not immunize it from liability.*  JCAP's primary attack identifies what it describes as the "*Silvercorp/Yangtze*" line of short seller cases and then proposes that because it—like the defendants in those cases—is a short seller, it too should escape liability. Mtn. 1, 4–9.  But the "*Silvercorp/Yangtze*" line of cases on which JCAP relies stand only for the unremarkable proposition that short sellers—like speakers of any kind—are not liable for defamation claims arising from statements of pure opinion.

- In *SilverCorp Metals Inc. v. Anthion Mgmt. LLC*, the plaintiff did not "allege any facts contradicting the challenged statements."  959 N.Y.S.2d 92, 2012 WL 3569952, at *3 (N.Y. Supr. Ct. Aug. 16, 2012).

- In *Yangtze River Port & Logistics Ltd. v. Research*, "Plaintiff's allegations [failed] to demonstrate any instance of defamatory opinion.  A 'defamatory opinion' is a statement of opinion based on disclosed facts that are false to such a degree that the difference between the stated facts and the truth would cause a reader to question the opinion's validity . . . because [the] plaintiff denie[d] that [its] financial filings and public records [were] themselves falsely represented or grossly distorted, [its] claim of defamatory opinion ha[d] no merit."  No. 150721/2019, 2020 WL 905770, at *8 (N.Y. Supr. Ct. Feb. 25, 2020)

- In *Eros Int'l PLC v. Mangrove Partners*, "the [plaintiff] target[ed] the articles' conclusions and critique[d] their authors' methodologies but d[id] not dispute the underlying facts."  No. 653096/2017, 2019 WL 1129196, at *8 (N.Y. Supr. Ct. Mar. 8, 2019).

- In *MiMedx Grp., Inv. v. Sparrow Fund Mgmt. LP*, the alleged statement related to "allegations leveled by MiMedx's former employees in a lawsuit against MiMedx"— although MiMedx disagreed with the conclusions drawn from those allegations, it did not deny that the allegations had been made.  17-CV-07568 (PGG) (KHP), 2018 WL 847014, at *7 (S.D.N.Y. Jan. 12, 2018).

- Despite its inclusion in this purported line of short seller cases, *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC* did not involve a short seller—or financial analyst of any sort. The case is inapposite—defendant's statements were "founded in rumor" not false and misleading statements about the contents of publicly-available documents.  151 F. Supp. 3d 287, 295–96 (E.D.N.Y. 2015).

- In *Nanoviricides, Inc. v. Seeking Alpha, Inc.*, the plaintiff likewise did not dispute the underlying "facts" supporting the article's conclusions.  Further—unlike here—"the author . . . [did] not imply that his opinion is shared by other anonymous individuals to give the implication that there are more unstated facts supporting his position."  No. 151908/2014, 2014 WL 2930753, at *5–6 (N.Y. Supr. Ct. June 26, 2014).

- Finally, in *Sabratek Corp. v. Keyser*, the defendant "disclosed the underlying facts and circumstances on which he based [his] opinion" and plaintiff did not challenge those underlying facts.  No. 99 Civ. 8589(HB), 2000 WL 423529, at *7 (S.D.N.Y. Apr. 19, 2000).

*None* of those cases involved a Report like JCAP's, founded on inaccurate, misleading, and plainly false representations of the public documents on which it relied.  And *none* relied on the demonstrably inaccurate opinions of an anonymous "expert."  Here—as demonstrated in the Factual Background section above—unlike in any of the cases on which JCAP relies, JCAP's defamatory statements are built on demonstrably false statements of fact.  Every conclusion drawn by JCAP required it to ignore the content of the very documents on which it purported it to rely.

***Conclusions based on demonstrably false statements of fact are actionable.***  *Immuno AG*—which JCAP identifies as the "leading New York State Court of Appeals ruling on opinion," Mtn. 13—reveals the critical distinction between JCAP and the defendants to which it compares itself.  In *Immuno AG*, the court held—*on summary judgment*—that a letter to the editor constituted protected opinion *after* the lower court had conducted a thorough analysis of the underlying express and implied statements of fact and determined that the plaintiff had failed to raise a triable

issue on falsity.  77 N.Y.2d 235, 255 (N.Y. 1991).  In reaching its conclusion, the court made clear:

"***A media defendant surely has no license to misportray facts; false statements are actionable when they would be perceived as factual by the reasonable person.***"  *Id*. at 254.  JCAP refuses to acknowledge that the heart of NOVAGOLD's FAC is not the conclusions JCAP reaches in the Report but the numerous demonstrably false express and implied facts on which those opinions are based.  Whether JCAP is a media defendant or not "it has no license to misportray facts."  *Id*.

     ***That the documents on which JCAP relies are publicly available is of no moment.*** Raising yet another straw-man argument, JCAP characterizes the FAC as a spirited debate as to the meaning of the public documents on which JCAP relies.  But the dispute driving the FAC is not "point/counterpoint," Mtn. 12, it is fiction/fact.  The law may well protect someone who declares to the world that "Smith is a bad person"—regardless of whether Smith would say the same about himself.  And those protections may be more forceful where that person makes such a declaration on an internet blog or some other characteristically "opinionated" forum.  But the law does not protect someone who declares that "Jones is a bad person because he murdered his wife," where it is demonstrably false that Jones did any such thing and, in fact, his wife is alive and well. *See Silsdorf v. Levine*, 59 N.Y.2d 8, 10 (N.Y. 1983) ("The complained of statements, although constituting opinions and therefore entitled to a measure of constitutional protection, may nevertheless form the basis for a defamation claim, inasmuch as plaintiff has alleged that the facts set forth by defendants in support of their opinions are false.").  Here, JCAP *does not deny* that the Report falsely stated the results of the Feasibility Study, the reported initial capital costs,[4] and whether or not NOVAGOLD directors and executives reduced their holdings of NOVAGOLD

---

[4]     As JCAP—a purported financial analyst—should be well aware, the difference between initial capital (the amount required before the project can even get off the ground) and operating capital (the amount required to sustain the project after development) is of great importance to investors.  For JCAP to blithely retort that "cash is cash," Mtn. 11, is more than disingenuous.

shares—instead it remarkably asserts that the false statements of fact found in its report are "opinion" because the reader could simply "look up the truth himself."  JCAP has cited no case placing the burden to determine fact from fiction on the reader.  JCAP asks the Court to look only at those statements that it characterizes as opinion and ignore the pages of factual misstatements, inaccuracies, and outright fictions upon which those "opinions" are built.  This is not what the law requires, and it provides no basis for dismissing NOVAGOLD's defamation claim.

### c.  All of the identified statements are both defamatory and pertain to NOVAGOLD.

In a last-ditch effort to escape liability, JCAP confusingly lumps together an unidentified number of statements pleaded in the Complaint and asserts that "most" of them "lack any defamatory meaning" or "are not 'of or pertaining' to" NOVAGOLD.  Mtn. 13.  JCAP provides no explanation at all as to how any of the statements identified "lack defamatory meaning." JCAP's own say-so is not a ground for dismissal.  To the extent that JCAP intends to suggest that certain factual inaccuracies identified in the FAC are of smaller moment than other, such argument misses the point.  As pleaded in the FAC, even the "small" falsehoods are injurious: each falsehood chips away at investors' confidence in the Donlin Gold project causing NOVAGOLD to suffer death by a thousand cuts.  FAC ¶ 31.  In support of its argument that other statements do not "pertain" to NOVAGOLD, JCAP states only that those statements are about "Alaska, the river conditions during the winter as well as electric power needs."  Mtn. 13–14.  But false statements about the conditions in which NOVAGOLD operates intended to impugn the feasibility of NOVAGOLD's entire business model undoubtedly "pertain" to NOVAGOLD.  As noted by the Second Circuit in *Palin*, "the bar to [allege that the challenged statements are of and concerning the Plaintiff] is low."  *Palin*, 940 F.3d at 816 (internal citations omitted).  JCAP's vague attempt at a "catchall" – unsupported by case law – describes no ground for dismissal.

**JCAP FAILS TO IDENTIFY ANY BASIS FOR DISMISSAL OF NOVAGOLD'S TRADE LIBEL CLAIM**

JCAP's Motion asks the Court to strike NOVAGOLD's trade libel claim and related damages.  JCAP's arguments, however, misconstrue New York law and should be rejected.

## I.    NOVAGOLD pleads an actionable claim for trade libel.

JCAP asserts that trade libel is "confined" to denigrating the quality of a business's "goods or services." Mtn. at 19–20.  To the contrary, courts have recognized that a trade libel claim can extend beyond denigrations of "goods or services," including to denigrations of "property."  *See, e.g.*, *Bleeping Computer LLC*, 194 F. Supp. 3d at 291 ("Under New York law, '[t]rade libel or product disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product *or property*.'" (quoting *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (emphasis added))).

As detailed in the FAC, NOVAGOLD is a 50% owner of the Donlin Gold project in Alaska. FAC ¶ 10.  With approximately 39 million ounces of gold in the measured and indicated mineral resource categories, inclusive of proven and probable mineral reserves, the Donlin Gold project is regarded to be one of the largest, highest-grade, and most prospective known open-pittable gold deposits in the world.  *Id.*  Nevertheless, JCAP's Report falsely describes the Donlin Gold project as "so remote and technically challenging that the mine will never be built."  FAC ¶¶ 19, 20–21. Disregarding thousands of pages of publicly-available studies and other materials supporting the Donlin Gold project, JCAP falsely represented the following (among other misrepresentations):

- "[T]he terrain around the Donlin deposit is among the most inhospitable on the planet" FAC ¶ 26.

- "[E]ach of . . . 300 stream crossings will require a temporary bridge, and dam, and two pits, one on either side of the stream, for the drilling equipment to bore a hole under the stream." FAC ¶ 28.

- "Even if NOVAGOLD reduced the mine capacity by half, it could not barge enough diesel

to operate the power plant." FAC ¶ 29.

Those allegations distinguish this case from others cited in JCAP's motion: *Eros International PLC v. Mangrove Partners*, 2019 WL 1129196 (N.Y. Supr. Ct. Mar. 8, 2019), and *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423 (S.D.N.Y. 2006). In *Eros*, the court dismissed a trade libel claim against short sellers because although they had denigrated Eros International's product, they did so only "in the context of critiquing how the company valued, reported, and accounted for the product." 2019 WL 1129196, at *13. And in *Henneberry*, a trade libel claim was dismissed where "the same statements [were] used in support of plaintiff's defamation [and trade libel] claim[s]," and those "statements concern[ed] [Henneberry's] 'integrity or business methods,'" as opposed to its property. 415 F. Supp. 2d at 472. In contrast, JCAP's Report not only impugned the company's integrity, which is addressed in NOVAGOLD's defamation claim, but it separately disparaged the value of NOVAGOLD's property. The trade libel cause of action extends to denigrations of a business's property, including JCAP's false statements disparaging NOVAGOLD's most significant asset—the Donlin Gold project.

## II.   NOVAGOLD establishes special damages.[5]

### a.   Divestments from a company reliant on investment establish special damages.

Following its publication, the JCAP Report's spurious derogation of the Donlin Gold project rippled across the market, driving down NOVAGOLD's share price from $10.65 at close of the previous trading day to $9.71 at close on May 28. FAC ¶ 46. Ultimately the value of NOVAGOLD's shares sank as low as $7.99 in the period immediately following the Report, and

---

[5]   JCAP's Motion appears to challenge only NOVAGOLD's damages in support of its trade libel claim. To the extent that JCAP intends to challenge NOVAGOLD's general defamation damages in its brief allegations relating to the stock price decline, Mtn. 25, that challenge provides no ground for dismissing the defamation claim. *First*, as described below, NOVAGOLD has identified economic harm. *Second*, NOVAGOLD has pleaded that JCAP's statements constitute libel per se as they injure NOVAGOLD in its "trade, business, or profession." *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. Ct. App. 1992) (citing Restatement (Second) of Torts §§ 570–73). Economic damages in support of a defamation claim are not required where the statements constitute libel per se. *Id*.

NOVAGOLD continues to feel the effect of JCAP's Report on its investment prospects. FAC ¶ 46. JCAP suggests that investor flight from NOVAGOLD—as reflected in the company's share price and market capitalization—cannot qualify as special damages. Mtn at 25. In support of its position, JCAP cites to Utah law. *Id.* (citing *Computerized Thermal Imaging, Inc. v. Bloomberg, L.P.*, No. 1:00CV98K, 2001 WL 670927, at *4 (D. Utah Mar. 26, 2001)). Although it is true that New York does not appear to have addressed this issue squarely, more instructive is a recent case decided in the United States District Court for the District of New Jersey, which interpreted an analogous cause of action to New York trade libel and explained that a loss of investors is sufficient to demonstrate special damages.

In *Intervet, Inc. v. Mileutis, Ltd.*, Mileutis filed a counterclaim for trade libel under New Jersey law, alleging that Intervet's false and disparaging statements had caused Mileutis to suffer special damages in the form of lost potential investors. Civil Action No. 15-1371(FLW), 2017 WL 1528719, at *4 (D.N.J. Apr. 27, 2017). "[U]nlike ordinary defamation actions, an action for product disparagement" under New Jersey law—like New York law—"requires special damage in all cases . . . [and] because this cause of action is designed to protect the economic interests of a vendor, the plaintiff must plead and prove special damages with particularity." *Id.* at *5. Denying Intervet's motion to dismiss, the Court held that "loss of sales or the loss of prospective customers . . . is only one method of showing damages." *Id.* And that loss of "investment income from investors who provide the necessary monetary capital for Defendant to develop its products" also satisfies the special damages requirement. *Id.* Consequently, the court denied Intervet's motion, holding that Mileutis had adequately alleged special damages. *Id.*

Under New York law, as under New Jersey law, "a claim for trade libel or injurious falsehood[] . . . requires the 'knowing publication of false matter derogatory to the plaintiff's

business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relation with others, to its detriment.'" *Chao v. Mount Sinai Hosp.*, No. 10 CV 2869(HB), 2010 WL 5222118, at *12 (S.D.N.Y. Dec. 17, 2010) (quoting *Kasada, Inc. v. Access Capital, Inc.*, 01 Civ. 8893(GBD), 2004 WL 2903776, at *15 (S.D.N.Y. Dec. 14, 2004)).  And in both jurisdictions, "[c]ertainly[] . . . that broad proposition[] . . . does not foreclose the possibility that the damages requirement can be met by alleging that [one party's] libelous conduct prevented business investors from dealing with [the other party]."  *See Intervet*, 2017 WL 1528719, at *5. The special damages requirement may therefore be satisfied when one party alleges that another's trade libel caused it to lose "investment income from investors who provide the necessary monetary capital . . . to develop its products."  *See id.*

As JCAP states in its Motion, NOVAGOLD does not yet have goods or services.  Mtn. 20. It is reliant on "investment income from investors who provide the necessary monetary capital . . . to develop" its primary asset—the Donlin Gold project.  And as more fully described in the FAC, JCAP's "Report lobs lie after lie—both big and small—attacking the feasibility of the Donlin Gold project in an effort to chip away, bit by bit, at investors' confidence in the Donlin Gold project," causing "inevitable" and "substantial" damage.  FAC ¶ 31.  The plunge in share price described in the FAC did not occur in a vacuum—it was a natural, immediate consequence of JCAP's false and derogatory Report, which convinced investors to divest from NOVAGOLD.  FAC ¶ 46.

### b.  Costs incurred to mitigate or remediate trade libel damages, including legal fees, are independently recoverable as special damages.

JCAP argues that *Angio-Medical Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269 (S.D.N.Y. 1989), stands for the proposition that legal fees expended for the purpose of mitigating or remediating trade libel damages cannot be recovered as special damages.  Mtn. 23.  Not true.  The rule *Angio-Medical* outlined was that "attorney's fees for the commencement of [an] action . . . do

23

not constitute an item of [special damages] in a libel action." *Id.* at 274 (quoting *Wallace v.* Weiss, 372 N.Y.S.2d 416, 421 (N.Y. Supr. Ct. 1975)).  Properly contextualized, when the court later stated that, "legal fees and executive time, *standing alone* do not comprise special damages," *id.* at 274, the statement apparently referred to the legal fees and executive time attendant to commencing a legal action that were being sought in that matter.  *See id.* (citing *Gorman v. Kings Mercantile Co.*, 231 N.Y.S.2d 642 (N.Y. Supr. Ct. 1962) ("Generally, legal expenses incurred in an action are not recoverable as special or general damages.")).  These are not the types of attorney's fees and executive time that NOVAGOLD seeks here.  NOVAGOLD has sought and is entitled to seek compensation for legal fees and executive time it was forced to expend to remedy JCAP's false and disparaging statements prior to initiating this legal action.

JCAP asks this Court to adopt an interpretation of *Angio-Medical* that would disqualify from consideration as special damages *any* legal fees or employee time expended to counteract disparaging statements.  Mtn. 20–25.  But as explained above, such an interpretation is inconsistent with *Angio-Medical*'s reasoning.  And it would contradict long-standing defamation law, which recognizes that disparagement plaintiffs may recover legal fees and employee time expended to refute misstatements and mitigate their consequences.  *See Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 155 (S.D.N.Y. 1983) ("Included among the losses deemed to constitute special damages are the expenses necessary to counteract the alleged . . . disparagement." (citing, *inter alia*, Restatement (Second) Torts § 633 (1977)); *see also* Restatement (Second) of Torts § 633(1)(b) (recognizing that the "pecuniary loss for which a publisher of injurious falsehood is subject to liability" extends to "the expense of measures reasonably necessary to counteract the publication . . . ."); *see also Angio-Medical*, 720 F. Supp. at 272 (applying the Restatement).

As detailed in its FAC, prior to initiating this suit, NOVAGOLD incurred at least $212,000

in legal fees related to analyzing the JCAP Report (including its authors and effects), refuting the misstatements in the Report, analyzing market activity, and clearing NOVAGOLD's name prior to the institution of any legal action.  FAC ¶ 49.  Although the distraction caused by JCAP's defamatory Report is ongoing, at the time of filing its First Amended Complaint, NOVAGOLD estimated that it had cost at least $201,000 in employee time.  *Id.*  JCAP's motion complains that those figures are insufficiently itemized to withstand scrutiny, but the cases it cites in support of that argument either involved plaintiffs who had failed to allege such calculations at all, *Penn Warranty Corp. v. DiGiovanni*, 10 Misc. 3d 998, 1005 (N.Y. Supr. Ct. 2005), or included in their calculations "prejudice to plaintiff's name and business reputation," *Drug Research Corp. v. Curtis Publ. Co.*, 7 N.Y.2d 435, 439, 441 (1960), "medical treatment," *Bernstein v. O'Reilly*, 17 Civ. 9483 (DAB), 2019 WL 10995110, at *5 (S.D.N.Y. Sept. 26, 2019), or "lost profits from sales," *Bose Corp. v. Consumers Union of U.S., Inc.*, 57 F.R.D. 528, 530 (D. Mass. 1973).  Unlike the cases JCAP cites, NOVAGOLD itemized its costs by attorney's fees and employee time.

Finally, JCAP argues that NOVAGOLD must distinguish all legal fees incurred to further this litigation from those incurred separately.  Mtn. 24.  But that argument overlooks the overlapping nature of NOVAGOLD's efforts to analyze JCAP's claims, respond to concerns of the investing public, and seek remedies against JCAP.  JCAP essentially argues that any costs incurred by engaging in activities that would otherwise qualify as special damages are immediately, indiscriminately disqualified if some of the fruit of that labor is eventually used for litigation purposes.  JCAP cites no authority to support that proposition.  The Motion to Dismiss NOVAGOLD's trade libel cause of action and strike related damages claims should be denied.

## CONCLUSION

For the reasons stated above, NOVAGOLD respectfully requests that the Court deny JCAP's Motion to Dismiss.

Dated:  February 3, 2021

/s/ Jonathan Rubenstein

**BAKER BOTTS L.L.P.**

Seth T. Taube (1664739)
30 Rockefeller Plaza
New York, New York 10112
Tel: 212.408.2500
Fax: 212.408.2501
seth.taube@bakerbotts.com

Jonathan Rubenstein (adm. pro hac vice)
Jordan Kazlow (adm. pro hac vice)
2001 Ross Avenue
Dallas, Texas 75021
Tel.: (214) 953-6500
Fax: (214) 953-6503
jonathan.rubenstein@bakerbotts.com
jordan.kazlow@bakerbotts.com

*Attorneys for Plaintiff,*
*NOVAGOLD Resources Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2021, a true and correct copy of the foregoing was served on all counsel of record via email.

/s/ Jonathan Rubenstein
Jonathan Rubenstein