UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X

NOVAGOLD RESOURCES, INC.  **Oral Argument Requested**

       Plaintiff,                                 Index No. 1:20-cv-02875-LDH-PK

  - against -

J CAPITAL RESEARCH USA, LLC,

       Defendant.

-------------------------------------------------------X

### DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Dated: New York, New York      MILLER KORZENIK SOMMERS RAYMAN LLP
       February 10, 2021

                                                By: /s/ David S. Korzenik
                                                David S. Korzenik
                                                dkorzenik@mkslex.com
                                                Terence P. Keegan
                                                tkeegan@mkslex.com
                                                1501 Broadway, Suite 2015
                                                New York, New York 10036
                                                Phone: (212) 752-9200

                                                *Attorneys for Defendant J Capital Research USA, LLC*

**Date of Service: February 10, 2021**

**TABLE OF CONTENTS**

ARGUMENT .................................................................................................................... 1

    I.    NG'S OPPOSITION – MOST NOTABLY ITS CHART – SHOWS WHY ALLEGEDLY "FALSE" STATEMENTS ARE NON-ACTIONABLE OPINION ........................................... 1

    II.    NG IS A PUBLIC FIGURE: IT VOLUNTARILY PROMOTES ITS FEASIBILITY STUDY IN A COMPLEX GRID OF REGULATIONS AND PUBLIC CONCERN ............... 5

    III.    NEW YORK'S ANTI-SLAPP AMENDMENTS APPLY TO THIS CASE ................... 6

    IV.    NG HAS FAILED TO PLEAD ACTUAL MALICE, AS IT MUST .............................. 8

    V.    NG'S TRADE LIBEL AND DAMAGES CLAIMS SHOULD BE STRICKEN ........... 9

CONCLUSION ............................................................................................................... 10

**TABLE OF AUTHORITIES**

**Cases**

*Biro v. Conde Nast*, 963 F. Supp. 2d 255 (S.D.N.Y. 2013),
    *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015) .................... 5, 6

*Chau v. Lewis*, 771 F.3d 118 (2014) .................................................................................................. 3

*Drug Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435 (1960) ................................................. 10

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ....................................................... 10

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
    194 F. Supp. 3d 263 (S.D.N.Y. 2016) .......................................................................................... 9

*Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989) ............................................ 8

*Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423 (S.D.N.Y. 2006) ............................. 9

*Intervet, Inc. v. Mileutis, Ltd.*, No. CV 15-1371(FLW),
    2017 WL 1528719 (D.N.J. Apr. 27, 2017) ............................................................................... 10

*Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577 (1998) ......................................... 8

*Matter of Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117 (2001) ...................................................... 7

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17-cv-07568,
    2018 WL 847014 (S.D.N.Y. Jan. 12, 2018) ............................................................................... 4

*Palin v. New York Times Co.*, --- F. Supp. 3d ----,
    2020 WL 7711593 (S.D.N.Y. Dec. 29, 2020) ..................................................................... 6, 7, 8

*Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32 (1st Dep't 2011) ................................. 10

**Other Authorities**

1992 McKinney's Session Laws of N.Y., Ch. 767 (A. 4299), § 1 .................................................. 7

New York Assembly Bill 5991-A .................................................................................................... 7

Sponsor Mem. of Sen. Hoylman (July 22, 2020) ("Sponsor Mem."), *available at*
    https://www.nysenate.gov/legislation/bills/2019/s52 ......................................................... 7, 8

**Rules**

Fed. R. Evid. 201 ................................................................................................................ 6

**Treatises**

Robert D. Sack, Sack on Defamation: Libel, Slander and Related Problems,
   (5th Ed. 2020) ............................................................................................................ 5, 6, 9

Defendant J Capital Research USA LLC ("JCap") submits this Reply Memorandum of Law in further support of its Motion to Dismiss the First Amended Complaint ("FAC") of Plaintiff Novagold Resources Inc. ("Novagold" or "NG").  Dismissal is warranted because:

> 1) The JCap Report ("Report") cites to, links to and relies on NG's "Feasibility Study" so rendering it non-actionable opinion: NG's repetitive reliance on the Feasibility Study in its FAC and motion opposition ("Opp.") is likewise an admission that the statements at issue are non-actionable opinion;
>
> 2) The FAC fails to plead actual malice, as it must under New York and federal law: a publicly traded company that needs 100 permits for environmental impact, hazardous materials management and other activities; that proposes permanent alteration of Indigenous lands; that voluntarily submits its Feasibility Study for public scrutiny; and that regularly fends off questions about the feasibility of its project in statements to analysts and the media – is a public figure; and
>
> 3) The FAC fails to state a claim for trade libel, so its putative special damages are not even in play: neither NG's Complaint amendments, nor its opposition's new theories, plead any damages that are cognizable under standard libel theory, or that are actual, "realized" and caused by the JCap Report.

## ARGUMENT

**I.   NG'S OPPOSITION – MOST NOTABLY ITS CHART – SHOWS WHY ALLEGEDLY "FALSE" STATEMENTS ARE NON-ACTIONABLE OPINION**

Novagold's Chart (Opp. 4-6) reinforces JCap's argument.  It shows how the statements NG tries to put at issue are nothing short of opinion: The right-hand column of the Chart repeatedly references NG's 8-year-old Feasibility Study.  Specifically, NG refers to its Feasibility Study and other NG documents as the "Readily-Available Facts."  But, the Feasibility Study is included in the Report as a hyperlink, and is cited repeatedly throughout.  Hence, the Report discloses the basis of its conclusions; and that renders its statements pure opinion.  *See* JCap Moving Memorandum of Law ("Mem.") at 9.  NG's Chart, like its FAC, simply *argues* with the Report over how one should read its Feasibility Study.

The ***first row*** (Opp. 4) complains about how JCap characterizes the costs described in the Feasibility Study.  To prove JCap's conclusion wrong NG cites . . . *the Feasibility Study*.  NG

1

quibbles over whether the costs should be regarded as initial capital costs or operating cost. But the Report – linking to NG's SEC filings – contends that "capitalized opex was included in the capital costs to build the mine in the first feasibility study in 2009." Korzenik Decl. Ex. A, at 16. The Report even reprints a cashflow table from the Feasibility Study to illustrate why, in its view, some $1.4 billion in cost to remove "overburden" – the earth that sits on top of the gold deposits – should still be considered an "initial" cost. *See id.* at 15-16. NG does not dispute the authenticity of the table reprint. *See* Mem. 10. That is pure opinion.

      The ***second row*** (Opp. 4) complains about what JCap has to say about drilling and modeling results. "*Drilling results*" are not the same as "*modeling results*." Modeling is about the structure and nature of the underlying rock formation. Drilling samples do not necessarily establish the modeling of the rock formation below. How many drill samples are enough is a question of opinion and judgment. So, what does NG have to say in its Chart? That its drilling "assays were *proportional* to Donlin Gold's *goal*." *Id.* But whether something is "proportional" to someone's "goal," or "meager" (Korzenik Decl. Ex. A, at 3), is not "true" or "false."

      The ***third row*** (Opp. 4) complains about the Report's reference to the Galore Creek Mine and the statement that its current owner "quietly shut the project down." First of all, NG does not own Galore. It sold Galore, as the Report noted (and the truth of which NG does not dispute). Korzenik Decl. Ex. A, at 14. So, the statement is not "pertaining to" NG (Opp. 19). Nor is it defamatory. NG claims that Galore's current owner did not "shut the project down"; instead, it "deferr[ed] the start of the planned Prefeasibility Study." Opp. 4. So Galore, not NG, does not even have a feasibility study, and does not even have a PRE-feasibility study – it once planned to have one but has *deferred* that. By NG's account, the Report is substantially correct.

2

Next is NG's grievance with the line: Donlin "is a stock promote, not a mining plan." Opp. 4. Such an insult, as *Chau* noted, "is not itself a fact." *See* Mem. at 6 n.3.

The ***fourth row*** (Opp. 4) complains about the Report's claim that Donlin "is not feasible to put into production at any gold price." Korzenik Decl. Ex. A, at 2. First, that is a straight opinion, a *bet against* the project just as the assertion that it **is** "feasible at $1200 per ounce" is a *bet for* the project. NG does not challenge the Report's observation that Barrick, NG's partner in Donlin, does not even list it in its own 10-year program, because its standard for a project is that it must be feasible at least $1,200 per ounce. *See* Korzenik Decl. Ex. A, at 3. And the managers of the Pebble Mine, a similar and bigger project, also assessed Donlin's prospects as dim. *See* Korzenik Reply Declaration ("Korzenik Rep.") ¶2(a) & Ex. A. These are straight opinions; not unique to JCap. Unwelcome by NG, no doubt, but opinions all the same.

The ***fifth row*** (Opp. 4) complains that the Report calls "the terrain around the Donlin deposit . . . among the most inhospitable on the planet." *See* Korzenik Decl. Ex. A, at 2. That is straight opinion. NG attempts to contest it with its own view of the Feasibility Study. Yet the FAC concedes that "approximately 75 miles of the planned 315-mile [pipeline] route includes rugged mountainous terrain" (¶27); and it does not challenge the Report statement that the pipeline route is "frozen for seven months of the year." Korzenik Decl. Ex. A, at 7; Ex. B, at 18. The ***sixth row*** (Opp. 4) complains over the Report statement that each of 300 stream crossings will require a temporary bridge and dam and two pits . . . ." Yet NG admits it will need to run a pipeline *315 miles* into the wilderness, and make *300 stream crossings*. To dispute the level of complexity the stream crossings will "generally" require (Opp. 4) pleads no "fact."

The ***seventh row*** (Opp. 5) complains that the Report argues NG "could not barge enough diesel to operate the power plant." The Report sources a table of figures to NG's own

3

Environmental Impact Statement. *See* Korzenik Decl. Ex. A, at 9-10. NG does not challenge the authenticity of the figures. Instead, it faults the Report for "assum[ing]" that NG couldn't revise those figures in the future. Opp. 5.

The ***eighth row*** (Opp. 5) complains that the Report says that Donlin's planned power plant "would be the largest" in Alaska and increase electricity in that state "by about 40%." First, that is not a defamatory statement. Second, and incredibly, NG quibbles that its plant will only "increas[e]" *the entire state's total electricity output* "by approximately 20%." Opp. 5. Next comes NG's grievance over the Report's statement that management treats the company "like an ATM" and that insiders have "voted with their feet" by selling shares (Opp. 5). First, "even if deprecating the plaintiff," such "figurative or hyperbolic statements," are not actionable. *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, No. 17-cv-07568, 2018 WL 847014, at *6 (S.D.N.Y. Jan. 12, 2018) (Mem. at 2 n.1, 4).

The ***ninth row*** (Opp. 5) complains over the Report's statement that management awarded themselves base salaries that "rival those of the CEO's at Newmont and Barrick." NG then admits that its CEO's salary is 65% and 42% of the base salaries of the CEOs at Newmont and Barrick, respectively. First, it is not defamatory to say that the NG CEO's salary "rivals" that of Barrick's CEO. Second, to say that a salary of one CEO "rivals" another's is opinion. *See also* Korzenik Decl. Ex. A, at 17 (Report charting seven-figure annual compensations of NG's CEO and CEOs of the "the two largest mining companies in the world" – *not challenged* by NG).

The ***remaining several rows*** (Opp. 5-6) carry NG's most disingenuous contention: that its insiders did not sell shares, but rather simply *exercised options*. Yet options are "exercised" by turning them into shares, which the holder then takes to market and sells for profit. NG does not dispute that its insiders netted $35 Million doing this. *See* FAC ¶35. The Report notes these

4

sales to support its opinion that NG is a "stock promote." *See* Korzenik Decl. Ex. A, at 2, 3. NG attempts to obfuscate this activity with a completely different point: that its office holders and directors have increased their share holdings. *See* Opp. 5-6. No defamation claim should stand on this kind of charade.

**II.     NG IS A PUBLIC FIGURE: IT VOLUNTARILY PROMOTES ITS FEASIBILITY STUDY IN A COMPLEX GRID OF REGULATIONS AND PUBLIC CONCERN**

Novagold seeks to shake off the Actual Malice burden with the argument that just because NG is a corporation, it is not *necessarily* a public figure. JCap does not pin "public figure" on NG's status as a publicly traded company – though it appears from Judge Sack's treatise that in New York, it alone would suffice. *See* Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS ("SACK"), § 5:3.7, at 5-52 – 5-53 (5th Ed. 2020):

> Decisions holding that any publicly held corporation is a public figure for purposes of commentary about its corporate affairs are persuasive. When a corporation "goes public" by publicly offering its securities, it has taken a specific, voluntary action, the known result of which will be mandatory, increased public scrutiny. The necessary consequence is publicity. It is consistent with both First Amendment policy and the aims of federal and state securities laws that commentary on such entities be encouraged and protected.

Sack goes on to say that other forms of regulation will further enhance this conclusion: "Corporations subject to regulation by state or federal authorities are similarly 'public,' again inviting public scrutiny by voluntarily entering such businesses." *Id.*; *see* Mem. 16-17.

The *Biro* court suggested that the "public figure" test should not be viewed restrictively. It recognized Judge Sack's observation that "[s]o long as the 'voluntary' and 'public' criteria have been met, whether there is what can properly be called a 'controversy' or a 'public question' seems irrelevant unless First Amendment protections are to be drawn tight and literally around public debate." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 273 n.10 (S.D.N.Y. 2013), *citing* SACK, at § 5:3:11[B], 5-58.

5

NG has an unusual position in the complex grid of state, federal and local regulations that required the mine to obtain some 100 government permits – many of them environment-related. NG also needs permits for its processing of cyanide, arsenic, mercury, sulfur and other toxic pollutants. And it plans to use local waters to isolate its gold out of the slag, leaving vast "tailings" that have to be permanently stored in a pit near the mine and then covered over in a process that NG calls "reclamation." [1] Add to that the fact that they will operate on Indigenous lands under contract with "Native Corporation partners" that engage a regulatory framework of more than usual public concern. [2] *See, e.g.*, Korzenik Rep. ¶¶2-3 & Exs. B & C (news articles on Pebble Mine project). All these activities and permits are set forth in the Feasibility Study and NG's website – which this Court can and should consider on this motion. [3] NG "invit[es] public scrutiny by voluntarily entering such business." SACK, §5:3.7, at 5-52.

## III.  NEW YORK'S ANTI-SLAPP AMENDMENTS APPLY TO THIS CASE

New York's Anti-SLAPP amendments (Mem. 14-15) are "remedial" in nature. *See Palin v. New York Times Co.*, --- F. Supp. 3d ----, 2020 WL 7711593, at *3 (S.D.N.Y. Dec. 29, 2020) (Mem. 15). The new provisions further protect JCap's "substantive" and "vested" right of free speech, which New York State legislature expressly recognized when it enacted its first anti-SLAPP statute nearly 30 years ago. *Cf.* Opp. 9.

---

[1] *See, e.g.*, Feasibility Study §§ 17.1.11 ("Cyanide Destruction System"), 17.1.13 ("Mercury Abatement Systems"), *available at* https://www.sec.gov/Archives/edgar/data/1173420/000120445912000056/exhibit99-1.htm; "Donlin Gold Project Summary" video, at 9:29, *available at* https://www.novagold.com/properties/donlin_gold/overview/ (scroll down for video) (outlining reclamation). *See also* Letter of Gregory A. Lang to Shareholders dated Feb. 12, 2018, at 2, NOVAGOLD, https://www.novagold.com/_resources/hcka_NG_2017_021318_SH-letter-CEO.pdf ("Donlin Gold will be obtaining over 100 permits, most of which are to be issued by the State of Alaska.").

[2] *See* "Q&A," NOVAGOLD, https://www.novagold.com/investors/questions/ (click on "Why should I be interested in NOVAGOLD today?") ("NOVAGOLD.COM Q&A").

[3] Such materials are hardly "inappropriate" (Opp. 12 n.3). The Court can consider "any documents that are 'integral' to the plaintiff's allegations, even if not explicitly incorporated by reference, and facts of which the Court may take judicial notice." *Biro*, 963 F. Supp. 2d at 264. Statements to analysts, media, and the public by NG can hardly be "subject to reasonable dispute." *See* Fed. R. Evid. 201; *Biro*, 963 F., Supp. 2d at 264-65.

As State Senator Brad Hoylman, the Senate sponsor of the Civil Rights Law amendments, explained – and as the district court in *Palin* court recently noted:

> "By revising the definition of an 'action involving public petition and participation,' this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law" – namely, "to provide the utmost protection for the free exercise o[f] speech, petition, and association rights, particularly where such rights are exercised in a public forum with respect to issues of public concern."

*Id.* at *3, *citing* Sponsor Mem. of Sen. Hoylman (July 22, 2020) ("Sponsor Mem."), *available at* https://www.nysenate.gov/legislation/bills/2019/s52; *see also* 1992 McKinney's Session Laws of N.Y., Ch. 767 (A. 4299), § 1.

Additionally, the *Palin* court found it "clear" that the actual malice amendment was a "remedial statute" that "'should be given retroactive effect in order to effectuate its beneficial purpose,'" per the very case on which NG relies. 2020 WL 7711593, at *3, *citing Matter of Gleason (Michael Vee, Ltd.)*, 96 N.Y.2d 117, 122 (2001); *see* Opp. 8. First, the New York legislature "conveyed a sense of urgency" as per the New York Court of Appeals decision in *Gleason*, "by directing that the amendment was to 'take effect immediately." *Palin*, 2020 WL 7711593, at *3, *citing Gleason*, 96 N.Y.2d at 122, *and* A.B. 5991-A § 4; *see* Mem. 15. Second, the *Palin* court noted that "the amendments were intended to correct the narrow scope of New York's prior anti-SLAPP law," per the *Gleason* decision's inquiry into "whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." *Palin*, 2020 WL 7711593, at *3, *citing Gleason*, 96 N.Y.2d at 122.

As Senator Hoylman emphasized in his Sponsor Memo, the prior statute, in practice, had been "strictly limited to cases initiated by persons or business entities that are embroiled in controversies over a public application or permit, usually in a real estate development situation."

7

*Palin*, 2020 WL 7711593, at *3, *citing* Sponsor Mem. The broadening of the statute's ambit, Senator Hoylman stated, "will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law" – purposes that the prior law, "as drafted, and as narrowly interpreted by the courts . . . failed to accomplish." Sponsor Mem.; *Palin*, 2020 WL 7711593, at *3.

NG has no comment on the Sponsor Memo, and it omits the *Palin* court's consideration of it entirely. *See* Opp. 8, 11 n.2. Such an unequivocal pronouncement distinguishes this case from *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 91 N.Y.2d 577 (1998) (Opp. 8-9). There, all the court could discern from legislative reports and memoranda was that "various people had various views" on retroactivity of amendments to the Workers' Compensation Law. 91 N.Y.2d at 586. The Court should follow what the Court of Appeals in *Majewski* nonetheless recognized as a "settled maxim": that "remedial legislation" should be applied retroactively. *Id.* at 584.

NG contends the *Palin* decision is "inapposite" because "it is not a 'public figure.'" Opp. 8, 11. However, as discussed in JCap's moving Memorandum and above, the "remedial" purpose of the Civil Rights Law amendments is to protect speakers from suit by public *or* private figures. *See* Mem. 14-15. NG *is* a public figure in any event. Mem. 16; Point II, *supra*.

IV.   **NG HAS FAILED TO PLEAD ACTUAL MALICE, AS IT MUST**

Pleading actual malice *plausibly* under *Iqbal* is very hard. *See* Mem. 17. Plaintiffs like NG try to twist the phrase "reckless disregard" and read it to mean something like negligence or gross negligence. That is what NG's opposition is about. *See* Opp. 1, 13. But the Supreme Court does not define it that way. *See Harte-Hanks Commc'ns, Inc. v. Connaughton,* 491 U.S. 657, 688 (1989) ("reckless disregard" means a "high degree of awareness of [the statement's] probable falsity"). As the Sack treatise emphasizes: "recklessness" as used by the Supreme Court in these cases has little relationship to "recklessness" in its common-law meaning of

8

wanton or grossly negligent behavior. SACK §5:5.1[A] at 5-56. NG does not recognize that and pleads nothing close to what New York and federal law require.

**V.     NG'S TRADE LIBEL AND DAMAGES CLAIMS SHOULD BE STRICKEN**

NG *agrees* with JCap that it has no alleged "goods or services" to denigrate. *See* Opp. 23, *citing* Mem. 20. Thus, it concedes that the core basis for a trade libel claim in New York is absent. *See* Mem. However, for the first time in its opposition brief, NG attempts to shift its trade libel focus to denigration of a supposed "property." Opp. 20, 21. This is not legal distinction. It's more PR spin – and the Court should reject it.

First, NG makes no mention of "property" in either its original Complaint or its FAC. To be clear, neither NG nor the Donlin Gold project itself own the land that would be the site of the mine. Rather, NG is "partners" with two "Native Corporations" that "own[ ]" the mineral and surface rights" in the land. *See* NOVAGOLD.COM Q&A. Nothing in the FAC suggests NG's contractual interests with its land "partners" have been impaired. Second, the three Report statements that NG now holds up as denigrations of its "property" (Opp. 20-21) do not misreport the underlying facts of the future mine or pipeline location. *See* pp. 3-4 *supra*. NG's new attempt at trade libel is no more "colorable" than in *Henneberry v. Sumitomo Corp. of Am.*, 415 F. Supp. 2d 423, 472 (S.D.N.Y. 2006) (Mem. 20), where the same statements allegedly defaming the plaintiff's "integrity or business methods" could not sustain a trade libel claim.

Nor does NG succeed in salvaging the FAC's vague allegations of "unusually high trading volume" (¶46) – unchanged from its original Complaint – into a "loss of investors" basis for special damages (Opp. 22; *see* Mem. 25). Per NG's own authority, "If the special damage was a loss of customers ... the persons who ceased to be customers, or who refused to purchase, must be named .... [I]f they are not named, no cause of action is stated." *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 292 (S.D.N.Y. 2016), *citing Drug*

9

*Research Corp. v. Curtis Publ'g Co.*, 7 N.Y.2d 435, 441 (1960) (dismissing trade libel claim); *see* Opp. 20. The FAC names no persons who "ceased to be" investors, or "refused to purchase" NG shares. *Cf. Intervet, Inc. v. Mileutis, Ltd.*, No. CV 15-1371(FLW), 2017 WL 1528719, at *4 n.3, 5 (D.N.J. Apr. 27, 2017) (Opp. 22) (plaintiff met New Jersey requirement to identify individual investors it lost). Nor does the FAC allege any loss of "monetary capital" from investors. Opp. 22; *see* Mem. 25. [4] JCap does not cite to "Utah law" from the *CTI* case (Opp. 22, *see* Mem. 25) as much as the legal principles recognized by the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-48 (2005) – a case that NG ignores. [5]

NG appears to concede that claims for fees and expenses "attendant to commencing a legal action" cannot survive as a damages claim or trade libel basis. Opp. 24. It claims not to be seeking them (*id.*). Yet it gamely claims – citing to no authority – that the law indulges the "overlapping nature" of PR and investor relations expenses and litigation fees. Opp. 25. NG's FAC does not even try to quantify how much "overlap" there is in the roughly $413,000 in attorney fees and executive/employee time it seeks to recover (¶49). Yet as a comparison between NG's "Fact Matrix" and its Complaint/FAC allegations show, NG's PR and litigation work product have been largely one and the same. *See* Mem. 24; Korzenik Decl. Ex. B.

## CONCLUSION

The Court should dismiss the FAC in its entirety with prejudice.

---

[4] In fact, NG touts on its website that it is "strong financially," with "a treasury of $126.3 million as of August 31, 2020. . . . [W]e're in a strong financial position to carry out all requisite activities at Donlin Gold and meet all of our financial obligations – without going back to shareholders for more funding." *See* NOVAGOLD.COM Q&A.

[5] "While a pleading of special damages is not necessary in a case of defamation per se, there must be something that addresses the element of injury to reputation . . . . [W]here the plaintiff is a corporation, a cause of action for libel per se requires the plaintiff to establish that the publication injured its business reputation or its credit standing." *Sandals Resorts Int'l Ltd. v. Google, Inc.*, 86 A.D.3d 32, 39 (1st Dep't 2011).

10

| | |
|---|---|
| Dated: New York, New York<br>February 10, 2021 | MILLER KORZENIK SOMMERS RAYMAN LLP<br><br>By: /s/ David S. Korzenik<br>David S. Korzenik<br>dkorzenik@mkslex.com<br>Terence P. Keegan<br>tkeegan@mkslex.com<br>1501 Broadway, Suite 2015<br>New York, New York 10036<br>Phone: (212) 752-9200<br><br>*Attorneys for Defendant J Capital Research USA, LLC* |