# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
NOVAGOLD RESOURCES INC.,        : 20-cv-02875-LDH-PK
                  Plaintiff,    :
                                :
     - versus -                 : U.S. Courthouse
                                : Brooklyn, New York
                                :
                                :
J. CAPITAL RESEARCH USA, LLC.   : September 30, 2020
                  Defendants    : 10:07 AM
------------------------------X

     TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
            BEFORE THE HONORABLE PEGGY M. KUO
            UNITED STATES MAGISTRATE JUDGE

**A   P   P   E   A   R   A   N   C   E   S:**


**For the Plaintiff**:        **Jonathan Rubenstein, Esq.**
                              **Jordan Kazlow, Esq.**
                              Baker Botts L.L.P.
                              2001 Ross Avenue
                              Ste 900
                              Dallas, TX 75201

**For the Defendant**:        **David Korzenik, Esq.**
                              **Terence Keegan, Esq.**
                              Miller Korzenik S
                              Sommers Rayman LLP
                              488 Madison Avenue
                              Suite 1120
                              New York, NY 10022



**Transcription Service**:    **Transcriptions Plus II, Inc.**
                              61 Beatrice Avenue
                              West Islip, New York 11795
                              laferrara44@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE CLERK:  This is an Initial Conference in

2     the matter of NOVAGOLD Resources Inc. v. J Capital

3     Research USA, LLC, docket number 20-cv-2875.  Magistrate

4     Judge Peggy Kuo presiding.

5          Will the parties please state their

6     appearances, starting with plaintiffs?

7          MR. RUBENSTEIN:  Good morning, your Honor.

8          Jonathan Rubenstein on behalf of plaintiff,

9     NOVAGOLD Resources Inc., and with me is my colleague,

10    Jordan Kazlow.

11         MR. KORZENIK:  And on behalf of defendant, J

12    Capital Research, David Korzenik of Miller Korzenik

13    Rayman, and with me my colleague, Terence Keegan.

14         THE COURT:  All right.  Good morning, everyone.

15         So this is an Initial Conference, and it's an

16    opportunity for the parties to inform the Court a little

17    bit more about your respective cases, and then also to

18    set a plan for going forward.

19         Now I know that the defendants have asked for a

20    pre-motion conference before the district judge with

21    regard to a proposed motion to dismiss, and I believe

22    that is coming up in October, October 13th.  So Judge

23    DeArcy Hall will decide at that point whether the motion

24    can go forward, and in the meantime, defendant has

25    requested a stay of discovery, assuming that the motion

Proceedings

1  to dismiss goes forward.

2          I don't want to get too much into the weeds on

3  the motion to dismiss because that's for Judge DeArcy to

4  decide, but we may need to talk a little bit about what

5  that will entail because that will inform my decision

6  about whether to stay discovery, or let it go forward.

7          So Mr. Rubenstein, why don't you just start --

8  I understand that this is a defamation lawsuit in two

9  parts, one is defamation by libel, the other is trade

10 libel, both under New York Common Law.

11         I understand that the defamation at issue is

12 related to a report, and then also some Twitter -- some

13 Tweets.  And so you don't need to rehash the complaint,

14 but you can point out the important parts, and maybe a

15 little bit as to why you need discovery, and what kind of

16 discovery you're anticipating, okay?  Mr. Rubenstein, go

17 ahead.

18         MR. RUBENSTEIN:  (Audio interference).  As your

19 Honor pointed out yes, (audio interference) --

20         THE COURT:  Mr. Rubenstein, let me stop you

21 there.  I'm sorry.  Your phone line is cutting out.

22         MR. RUBENSTEIN:  Oh.  Oh, I'm sorry.

23         THE COURT:  It's uneven in terms of picking up

24 your voice and words.

25         MR. RUBENSTEIN:  Oh, I'm sorry, is it better

1   now?

2              THE COURT:  This is much better.

3              MR. RUBENSTEIN:  Okay.  Thank you, your Honor.

4   Sorry about that.

5              As you mentioned we have a sort of two causes

6   of action for libel, each of which arises under the same

7   set of facts.  This case is a clear short and distort

8   scheme.  My client, NOVAGOLD is a gold exploration and

9   mining company.  It's based in Canada but the gold assets

10  exist in Alaska.

11             The defendant, J Cap brands itself as a market

12  research firm, and its historical focus has been in the

13  tech sector, with a strong geographical focus on

14  companies based in China, or that do significant business

15  in China.

16             On May 28th, J Cap issued what it titled a

17  research report on my client, NOVAGOLD, and the report is

18  22 pages long, and nearly every sentence in the report

19  contains an either false or misleading statement of fact,

20  and many times both.  And these false and misleading

21  statements fall into three broad categories.  I'm not

22  going to go through all of the statements, but broadly

23  speaking, we're talking about allegations about how

24  NOVAGOLD has misled its investors, about costs of its

25  significant gold exploration and mining project in

Alaska, misrepresentation concerning the logistics of building that mine, and false statements about company insiders dumping shares of the company, and reducing their equity in the company.

And when this report was released on May 28th, NOVAGOLD shares tumbled, and they lost a substantial amount of market share as the market reacted to the J Cap report.

Now J Cap made no secret of the fact that it had a short position in my client, but publishing outright falsities about my client in order to push down the stock price and cover a short is improper, and it's illegal, and that's why we're here.

NOVAGOLD has been left with a muddied reputation, to say the least, and forced to constantly attempt to regain market's trust by showing that J Cap's report was false, and misleading, and really nothing more than a hit piece.

NOVAGOLD believes that this plan by J Cap to create a report that was chock-full of falsities and misleading statements, was -- and dump it on the market in an attempt to cover a short position was in place for many months, and that NOVAGOLD believes that the facts will show that J Cap didn't act alone.

So with its damaged reputation, and a

1 significant amount of money already out-of-pocket on

2 account of the J Cap report, NOVAGOLD comes here to hold

3 it, and whomever was working with it, responsible.

4          So that's a bit about the background of the

5 case.  I'm happy to answer any other questions about the

6 background of the case if your Honor wishes.  Otherwise,

7 I can describe the type of discovery that we will be

8 seeking, at least in the outset.

9          THE COURT:  So I just have one question.  You

10 talked about J Cap's short position, and you said they

11 were open about it.  Can you just tell me a little bit

12 about how that information was conveyed?

13          MR. RUBENSTEIN:  So the report was published on

14 J Cap's website, and J Cap -- and it was on or around the

15 headline, made it clear that the company had a short

16 position in NOVAGOLD and then proceeded to release the

17 report.

18          THE COURT:  Okay.  Great.  Then please go ahead

19 in terms of what discovery you're anticipating.

20          MR. RUBENSTEIN:  Sure.  So at least at the

21 outset, your Honor, we would anticipate seeking discovery

22 on a handful of different topics.  We -- NOVAGOLD would

23 like discovery on how NOVAGOLD was identified as a target

24 for the report.  The third parties that either influenced

25 J Cap's decision to target NOVAGOLD, or worked with it to

Proceedings

1   create the report, or put the report in motion.

2           Discovery, of course, about whatever research

3   efforts that J Cap claims that it undertook to compile

4   the report, information concerning the -- J Cap's trading

5   of NOVAGOLD's securities, or any other related securities

6   in the industry that could have been put in motion

7   through this scheme.

8           Let's see.  The public -- let's see, the

9   publication of the actual report and the Tweets, your

10  Honor mentioned the Tweets, the online publication of the

11  defamatory statements, those were really more of the ilk

12  of republication of many of the statements that existed

13  in the report.  We would like some, you know, discovery

14  about who controls that method of publication of those

15  statements, which is to say Twitter, and their Twitter

16  account.

17          Those general categories come to mind, at least

18  at the outset of the discovery that we would like to seek

19  from J Cap.

20          THE COURT:  Okay.  So it sounds like part of

21  what you're trying to prove in your case is that it was a

22  scheme, and that it was deliberately published to drive

23  down the stock prices to the benefit of the defendant,

24  and that is one of the -- I forget which one of the

25  libels it is where it says if you are -- I guess the

Proceedings

1  definition by libel, if it's actual malice, then that

2  would be an element of --

3          MR. RUBENSTEIN:  Yes, but --

4          THE COURT:  -- that (indiscernible) --

5          MR. RUBENSTEIN:  Yes, that's exactly right.

6  And while we might -- and we do dispute whether actual

7  malice is appropriate in this case, and whether NOVAGOLD

8  is a public figure, the defendant certainly has made that

9  assertion, that the defendant is a public figure, and

10  that actual malice is required.

11          THE COURT:  Uh-hum.

12          MR. RUBENSTEIN:  And yes, and so I do agree

13  with your Honor's characterization with a slight tweak to

14  it, which is that it is NOVAGOLD's position that this

15  report was created with the intent to harm NOVAGOLD, to

16  harm NOVAGOLD's reputation in the industry, and the

17  natural byproduct of that for J Cap would be lowering the

18  price of stock which it would then use to cover its

19  position in product.

20          THE COURT:  Oh, okay.  I would've thought it --

21  your theory would be the other way around, that they're

22  trying to make money and in the process, they're hurting

23  your client's reputation, but you're saying the intent

24  was to harm the reputation, and the byproduct was to make

25  money.

1          MR. RUBENSTEIN:  Yes.  I assume we might be

2    talking about things that happen almost instantaneously

3    in time.

4          THE COURT:  Okay.

5          MR. RUBENSTEIN:  The first has to happen before

6    the second can happen.

7          THE COURT:  Okay.  And I wasn't sure if legally

8    it made a difference, which the intent was.  So I just

9    wanted to be clear about it.

10          MR. RUBENSTEIN:  Sure.

11          THE COURT:  All right.  So I think that's all I

12    have.  Mr. Korzenik, or Mr. Keegan, go ahead.

13          MR. KORZENIK:  Yes.  I'm going to try to speak

14    on my speaker phone, if that's not as clear, then please

15    tell me, and I'm going to go directly to the handset.

16          THE COURT:  So far so good.

17          MR. KORZENIK:  So far so good.  So there are

18    three points that I want to address, and one is the first

19    one is why cases that implicate First Amendment issues,

20    and in particular, the opinion defense which is a matter

21    of law, a matter of U.S. Constitution, but more

22    importantly, a matter of New York State Constitution, and

23    why that warrants a stay.

24          The second thing I wanted to do is I wanted to

25    look at some of the statements that they've put in their

1  letter, that they say are actionable, and your Honor is

2  going to see why they are matters of pure opinion.

3          And the third thing I wanted to discuss, and

4  I'm going to move it up front because it occupied most of

5  what my adverse colleague offered as his main pitch, this

6  idea of some kind of short conspiracy, I do -- most of my

7  work is media defense, and I've represented many news

8  organizations who claim that the -- and websites that do

9  financial reporting.

10          And in virtually every single one of them,

11  every single one of them in which a company claims that

12  they've been defamed by a news article, or by an analyst,

13  and seeking out an analyst website that we've acted for,

14  in everyone of them, they all insist that this is a

15  conspiracy of short sellers, and that claim is usually --

16  is almost -- not just usually, every time I've seen it,

17  is a canard.  It's total -- it's totally made up.  It's -

18  - and it's particularly --

19          When you look, for example, in the famous Enron

20  case, the main pitch that Enron made against Fortune

21  Magazine's writer, Bethany McLean, was that her main

22  source was Chanos, who was a short seller.  That's the

23  same thing with WorldCom, it's the same thing with that

24  famous case about the Big Short, Michael Lewis' book,

25  which I had some involvement with, where Mr. Chau, who

Proceedings

1    sold these CDOs sued them for -- sued the book publisher

2    in Michael Lewis, and the short seller, Eisman, and the

3    Court decided it was a matter of opinion.  But the big --

4    the claim that Chau was making was oh, they're short

5    sellers, they're short sellers.

6            In Seeking Alpha, where it just comes up all

7    the time, the claimants say exactly what Mr. Rubenstein

8    offered, and Judge Oetken, for example, in one argument

9    came up with this response by the Bank of the Internet

10   suing -- Seeking Alpha to try to find out what an

11   anonymous poster had said.  The anonymous poster

12   disclosed that he was short on BofI stock, and Oetken

13   said, well, if there really were a shorting conspiracy to

14   this stock, it would be somewhat odd to the posters

15   reveal that they're short the stock, and if it truly was

16   a conspiracy, you would think that they would hide that

17   information.  And in any event, he said I find it's too

18   attenuated, and he threw that out on a threshold motion

19   that involved a subpoena.

20           But what's interested, BOFI wanted to get the

21   name of the anonymous analyst in order to sue him or her,

22   and the Court not only didn't just stay it, it said they

23   can't get this discovery at all through Seeking Alpha, so

24   they couldn't sue.

25           So when First Amendment issues are implicated,

Proceedings

1   as they really here, when everything is so plainly matter

2   of opinion, and when it is a classic analyst report,

3   typical analyst report and evaluation of a company's

4   future projects, a bet or a prediction about its future,

5   which is based on publically-available materials, all

6   cited to in the complaint, and all cited to in the

7   report, that's opinion in its purest sense.

8           Now the thing that's also significant here is

9   in Biro, for example, versus Conde Nast, that was decided

10  in the Southern District by Judge Oetken, and D'Avolio

11  case decided in the Eastern District by Judge Feuerstein,

12  citing Biro, Biro says Rule 12(b)(6) not only protects

13  against the costs of meritless litigation but it provides

14  assurance to those exercising their First Amendment

15  rights, that doing so will not needlessly become

16  prohibitively expensive.

17          And court generally recognize that when a case

18  involves libel, when a case involves the First Amendment,

19  when it involves an opinion defense, which is a

20  constitutional matter, especially in New York under Amino

21  AG and Brian v. Richardson, those two cases actually make

22  it clear that New York's opinion defense, and its

23  definition of opinion is broader than that of the U.S.

24  Constitution, so that things that were considered in

25  Malkovich, which the plaintiff cites that were considered

Proceedings

1  to be factual, are deemed to be opinion under Judith

2  Kaye's decision of this New York Court of Appeals in the

3  Amino AG, and also in the Brian v. Richardson case.  They

4  look more broadly at the context of these things.

5            Analyst reports are predictions, and one of the

6  things Amino AG says is that writers' presumptions and

7  predictions as to what appeared to be, or what might well

8  be, or what could well happen, or should be, would not

9  have been viewed by the average reader of the journal.

10 That was a science journal as conveying actual facts

11 about the plaintiff.  And that rule applies are in the

12 commons case in which was cited, the analyst reports.

13           It applies to analyst reports as in the

14 Biospherics case, which basically is our case.  In that

15 case, the analyst group, Sugaree, which is the company,

16 is not up to the company's claims, but in that case, the

17 Court said the prediction of an analyst's opinion is not

18 actionable, however harmful it may be.

19           And Judge Daniels in the Chau case in the Big

20 Short case, he said yeah, of course opinions can be

21 harmful, but that doesn't make them actionable, and

22 that's what this plaintiff is trying to say.

23           THE COURT:  Can you focus on the discovery --

24           MR. KORZENIK:  So what --

25           THE COURT:  -- issue because these are --

Proceedings

1    MR. KORZENIK:  Yes.

2    THE COURT:  -- ultimate issues of whether the -

3  -

4    MR. KORZENIK:  Well, that is --

5    THE COURT:  -- dismissal of the case at all --

6    MR. KORZENIK:  -- the reason --

7    THE COURT:  So --

8    MR. KORZENIK:  Yeah.

9    THE COURT:  -- okay, so tell me what the

10  discovery issue is.

11    MR. KORZENIK:  Well, that is -- so the

12  discovery issue is this, and let's look at the topics

13  that they want discovery on.  The whole short business,

14  and trying to figure out who are people are, is an

15  invented story.

16    And note, here's the heading of our website,

17  "Be warned.  We are short-sellers.  We are biased.  We do

18  our best to find and present facts based on extensive

19  primary research, and using public resources, but we will

20  profit if these stocks decline in value.  We do not offer

21  advice.  We present our views."  So that falls right

22  into what Judge Oetken observed about the Seeking Alpha,

23  one of the --

24    THE COURT:  Can you give me the website,

25  because I can look it up right now, and follow along.

Proceedings

1        MR. KORZENIK:  For BOFI, it is actually --

2   there are several BOFI cases, but the one --

3        THE COURT:  No, no, not the case.  I'm looking

4   -- you were reading from your client's website.

5        MR. KORZENIK:  Oh, the website.  I'm sorry.

6   Yes.  If you go -- if your Honor goes to

7   www.jcapitalresearch.com and Terence, I think it's at the

8   home page.

9        MR. KEEGAN:  That's right, your Honor.

10  JcapitalReserach.com, when you access that website --

11       THE COURT:  I see it.

12       MR. KEEGAN:  You see a banner, and then --

13       THE COURT:  It says we are biased.  We go deep,

14  so that investors don't have to.

15       MR. KORZENIK:  Yes.

16       MR. KEEGAN:  Yes.

17       THE COURT:  Okay.

18       MR. KORZENIK:  So they're making clear that

19  their statements are - that they are shorts.

20       THE COURT:  Uh-hum.

21       MR. KORZENIK:  And so they're very open about

22  it.  So let's look at the statements that Mr. Rubenstein

23  highlighted, both in his letter, and his complaint.  He

24  said, "Oh, well we misled investors."  By the way, this

25  is just like the Sugaree case, Biosphere.

1          But look at the rest of the sentence, and then

2    look at the report.  It's about pipe dreams.  It's about

3    predictions.  It's about the future.  It's about a bet

4    that it won't succeed.

5          So here's the rest of the sentence, and this is

6    really instructive, "For the past 15 years, NOVAGOLD's

7    management team has systemically misled investors with,"

8    now listen, "subjective presentation of information about

9    a deposit so remote, and technically challenging that the

10   mine will never be built."  So that's a prediction, and

11   the rest of the report is basically is based on the

12   opinions of the writers about the "publicly-available

13   information" that they examined.  So what that is is pure

14   opinion.

15         Here's another one.  "The Donalin Gold

16   Project" --

17         THE COURT:  Well --

18         MR. KORZENIK:  -- is not feasible --

19         THE COURT:  So I'm sorry to cut you off because

20   I don't have --

21         MR. KORZENIK:  Yes.

22         THE COURT:  -- I didn't set aside a full hour

23   for this discussion, so I --

24         MR. KORZENIK:  Okay.

25         THE COURT:  And it's not for me to decide the

1  ultimate issue of whether this is, in fact opinion.  I

2  really need to focus on the discovery.

3          MR. KORZENIK:  Right.

4          THE COURT:  So can you please talk to the

5  discovery that Mr. Rubenstein has proposed, and tell me

6  why that shouldn't be allowed at this stage.

7          MR. KORZENIK:  Well, I think I did in the sense

8  that the whole idea that he wants to investigate who our

9  -- who might have been cited as to write this report, or

10  who might be involved in the report, or why we wrote it,

11  is utterly beside the point when it comes to opinion.

12  This case will be dismissed on that ground.

13          THE COURT:  Uh-hum.

14          MR. KORZENIK:  And the whole idea of a stock --

15  being short is not an impropriety.  And being a short

16  seller is not an impropriety, it is one of the important

17  functions of the market.  So his effort, which he focuses

18  on here to explore the short -- the motivation for the

19  article, is utterly beside the point and it's a waste of

20  time, and we don't have that kind of -- those types of

21  resources to spend on that kind of really fishing

22  expedition.

23          So what's going to happen though for us is if

24  the actionable statements are deemed to be a legitimate

25  basis for discovery, and they are not, they're opinion,

Proceedings

1  we're going to be spending huge amounts of time having

2  experts talk about whether it's "feasible to put into

3  production at any gold price because it's so remote and

4  technically challenging a mine to build", is that

5  something a jury should decide?  Should the jury be

6  asked, or should we have to get discovery on whether that

7  prognosis is right or wrong?

8          THE COURT:  Well, I didn't hear --

9          MR. KORZENIK:  They say (audio interference) --

10          THE COURT:  I'm sorry.  Again, I'm just trying

11  to --

12          MR. KORZENIK:  Yes.

13          THE COURT:  -- bring you back to the points

14  here.  Mr. Rubenstein is not asking -- that was not on

15  his list of discoverable items at this stage.

16          MR. KORZENIK:  Well, look --

17          THE COURT:  The items listed do not include the

18  expertise, it was information, and I can go through it

19  again if you want to know what to focus on, he said

20  information on NOVAGOLD identified this particular

21  plaintiff as a target --

22          MR. KORZENIK:  That's not (audio interference).

23          THE COURT:  -- and the third parties to work

24  together.  So can you just focus on those things, and --

25          MR. KORZENIK:  Yes.

Proceedings

1      THE COURT:  -- why it shouldn't be the subject

2  of discovery now.

3      MR. KORZENIK:  The subject of discovery that I

4  was raising was stuff that he had put into his initial --

5  you know, his statement about -- to us earlier in our

6  meeting about what discovery he wanted.

7      THE COURT:  Uh-hum.

8      MR. KORZENIK:  So I guess he's not interested

9  in those things, but --

10      THE COURT:  At this stge.  I asked him to tell

11  me what discovery --

12      MR. KORZENIK:  Oh.

13      THE COURT:  -- he wants now.

14      MR. KORZENIK:  So what I'm saying is that this

15  -- what he just raised has nothing to do, the reason that

16  we wrote the article has nothing to do with whether a

17  reasonable reader would view it as opinion or not under

18  New York's Constitutional definition of opinion because

19  if it is opinion, which can be decided on a reading of

20  the words by a judge, it's a root matter of law to be

21  decided by the Court, that discovery is not needed.

22      And that applies generally to this short

23  conspiracy.  We've disclosed, and he admits that we've

24  disclosed that we are short sellers, and there's nothing

25  wrong with that.

Proceedings

1          THE COURT:  Uh-hum.

2          MR. KORZENIK:  So the real question is why do

3  we have to spend time, and money, providing disclosure of

4  something that is irrelevant to the motion that we've

5  made, and really ultimately is not even a -- isn't going

6  to survive a Rule 12(b)(6) motion.  So those --

7          THE COURT:  So you're saying that the motion on

8  whether this is the issue, which you're going to pose in

9  the motion to dismiss of whether this is opinion, should

10  be decided just on the four corners of the alleged

11  statement and the complaint.  There should --

12          MR. KORZENIK:  That's correct.

13          THE COURT:  -- be no (audio interference)

14  information necessary to make that determination.

15          MR. KORZENIK:  That's correct.  He does not

16  need any of that, or nor do we, in order to ascertain

17  whether --

18          THE COURT:  Nor does Judge DeArcy Hall.

19          MR. KORZENIK:  -- (audio interference)

20  statement -- exactly.  And that's exactly what the Ammino

21  case, that's exactly what the Chau case, is what every

22  case on opinion says, is that you don't need any of this

23  stuff.  You do it on the basis of the four corners of the

24  complaint, and Judge Feuerstein in D'avolio says you look

25  at all of the documents in the complaint, and that a

1  reference that's incorporated by reference therein, and

2  that is the basis for terminating the action.

3              THE COURT:  Okay.

4              MR. KORZENIK:  And so I am pointing to the

5  general constitutional policy that when First Amendment

6  issues are implicated, and opinion is going to be the

7  dispositive case -- and by the way, even if he contends

8  that something might survive, why should we have

9  discovery about whether you need that horizontal drilling

10 across screens or not?

11             THE COURT:  He didn't say that --

12             MR. KORZENIK:  Why are we even having --

13             THE COURT:  -- as part of what he is requesting

14 in the discovery at this point.

15             MR. KORZENIK:  He did in his papers to us, but

16 if he's --

17             THE COURT:  Again, this is --

18             MR. KORZENIK:  -- just asking --

19             THE COURT:  I asked specifically what discovery

20 he wants now, and that was not on the list.  So --

21             MR. KORZENIK:  Right, but keep in mind that if

22 we needed to protect -- defend ourselves in this case,

23 and prove that our opinions are good ones, then we would

24 have to do a lot of Alaskan depositions in order to

25 confirm some of those things.

Proceedings

1          THE COURT:  Sure.

2          MR. KORZENIK:  So that's just not fair.  But

3   the other -- so it relates to the fact that our discovery

4   burdens would be incredibly onerous, and their requests

5   for discovery into why we wrote this report is just

6   utterly a sideshow.  It's a sideshow of the claim, and

7   it's a total diversion from the actual legal issue that

8   we are raising in our 12(b)(6) to Judge Hall.

9          And so for that reason, I'm requesting that

10  this discovery, and all discovery, burdens be deferred

11  until this motion can be determined.

12         THE COURT:  Okay.  So Mr. Rubenstein --

13         MR. KORZENIK:  It may be that the whole thing -

14  -

15         THE COURT:  Yes.

16         MR. KORZENIK:  -- the conspiracy thing is also

17  going to fall by the way in the motion for --

18         THE COURT:  I hear you.  All right.

19         Mr. Rubenstein, why do you need to do the

20  discovery now rather than perhaps in a few weeks, or a

21  few months?

22         MR. RUBENSTEIN:  So our position, your Honor,

23  is that the -- I mean, as we put in our letter, we as the

24  plaintiff, you have a general right to a speedy

25  resolution of the claims, and the longer that this false

Proceedings

1  report that belies my client left and right is out there,

2  the longer that my client has to spend time and money

3  with investors, and the market, in beating back the

4  falsities time and time again, and delays to justice that

5  it is due.

6          And what I'm hearing from opposing counsel is

7  an argument is similar to sort of what we hearing the

8  context as if personal jurisdiction were at issue in, you

9  know, limiting it to something that is needed to resolve

10  the motion to dismiss.

11          And what we are talking about more is the

12  general principle that the filing of the motion to

13  dismiss doesn't get you a stay of merits discovery, and

14  we believe that merits discovery ought to proceed for one

15  of the reasons -- one of the reasons is what I just

16  mentioned.  Another one is this -- as we mentioned in the

17  letter, we believe that discoverable information is

18  contained by third parties who are not under any

19  obligation to preserve documents at the moment, and may

20  not even have been identified, and so we want --

21          MR. KORZENIK:  Could you tell us how that

22  relates to the motion?

23          THE COURT:  Can you please not interrupt?

24          MR. KORZENIK:  Okay.

25          THE COURT:  Go ahead.

Proceedings

1          MR. RUBENSTEIN:  And so --

2          MR. KORZENIK:  All right.

3          MR. RUBENSTEIN:  -- and so we believe that the

4    potential pendency of a motion to dismiss in this case,

5    and I know your Honor doesn't hear me of the merits of

6    the motion to dismiss, so I am not going to go into that,

7    but suffice it to say is that we think that this is not

8    the motion of the ilk that opposing counsel just

9    described.

10          So our view is that the potential pendency of

11   this motion to dismiss is not something that should put

12   the brakes on merits discovery, and stand in the way of

13   the speedy resolution of our claims, which we wish to

14   begin pursuing discovery on immediately.

15          THE COURT:  All right.

16          MR. KORZENIK:  Your Honor?

17          THE COURT:  So Mr. Korzenik, you wanted to say

18   something?  Yes, you can now.

19          MR. KORZENIK:  Yes.  So the reason that I say

20   that this short conspiracy, which we deal with all the

21   time, is irrelevant, is that if the statements are

22   opinion, then the short conspiracy falls apart, and for

23   that reason -- the other thing is that Jonathan is -- you

24   know, as with many commercial litigators, they view this

25   just as a commercial case, but when the case implicates

Proceedings

1    the First Amendment, then 12(b)(6) is supposed to protect

2    defendants from exercising -- who exercise their First

3    Amendment rights, and assuring them that doing so will

4    not needlessly become prohibitively expensive.

5            So there's a policy in many -- most libel

6    rulings that there should be an early disposition on

7    motions to dismiss, and that they should be permitted,

8    and that's what the Judge Oetken did in Biro, and that's

9    what most courts, in fact Judge Sack as well, favors

10   early disposition of these cases.  And if this stuff is

11   opinion, then the conspiracy canard falls away, and

12   that's why I'm asking for a stay pending resolution of

13   the motion.

14           THE COURT:  All right.  So --

15           MR. KORZENIK:  But I'll just close with one

16   thing, the Sandals case which they cite, your Honor

17   should look at that too, because it goes to the New York

18   constitutional definition of opinion, and it cutoff

19   discovery all together of Sandals Resort Company, that

20   wanted to get to the bottom, just as these plaintiffs do,

21   of the negative statements that were made about their

22   company, and that hurt their stock price.  The Court

23   found it to be pure opinion based on the documents

24   reviewed, and presenting the defendants' point of view.

25   Discovery wasn't just stayed, it was outright denied.

Proceedings

1          THE COURT:  All right.  So I think that the

2  limited discovery that's been proposed can go forward,

3  and so I will deny the motion to stay discovery, but

4  given that you have your conference before Judge DeArcy

5  Hall in about two weeks, if you want to raise the issue

6  with her again, it is your prerogative, because she has

7  the right to overrule any of my decisions, but I think

8  that based on what I am hearing, there isn't a strong

9  enough basis to stop all discovery, especially given the

10  limited discovery that Mr. Rubenstein has put forward as

11  a proposed set of early discovery, and especially given

12  concerns about preservation of materials in this area.

13          So let me just take a quick look --

14          MR. KORZENIK:  We of course are preserving --

15  we're preserving materials.  The one question I have,

16  your Honor, is do we need to do sort of formal objections

17  before the 13th, or can we imply know that the discovery

18  is stayed until we present the same issue before Judge

19  Hall?

20          THE COURT:  Well, I will put down her that the

21  -- that I'm denying the request to stay, and if you want

22  then to post something saying that you intend to object

23  to that, and would seek leave to bring it up at the

24  conference on October 13th, then that will let Judge

25  DeArcy Hall know that that's what you intend to do, all

1 right?

2     MR. KORZENIK:  And would you also make note of

3 the fact that it was some limited discovery, that it

4 wasn't plenary?

5     THE COURT:  I'm sorry, to make note of what?

6     MR. KORZENIK:  That -- note that it was

7 limited, some limited discovery --

8     THE COURT:  Yes, that is limited to --

9     MR. KORZENIK:  -- (audio interference).

10     THE COURT:  -- the items that Mr. Rubenstein

11 mentioned to start, and then, you know, as we move

12 forward, if there's a need -- we would be doing it in

13 steps, because I don't know how long this -- number one,

14 whether the motion to dismiss will go forward, and number

15 two, if it does, how long it will take.

16     So if it turns out, for example, that it takes

17 several months, and there's a point at which the

18 plaintiffs then say okay, we've done this first phase,

19 we're still waiting for a decision but we would like to

20 proceed with the next phase, of course they could raise

21 that.  That is how I intend to manage the discovery in

22 this case.  All right?

23     So the motion to stay discovery was a motion to

24 stay all discovery, I'm denying it.  I'm permitting the

25 limited discovery to go forward on the items that Mr.

Proceedings

1 Rubenstein outlined, and so unless Judge DeArcy Hall

2 overrules me, you should move forward on that.  It

3 doesn't stop the parties from coming back to say we would

4 like to do more discovery, and for me to then look at

5 where you are at that point, and what that next discovery

6 is.  Okay?

7          MR. KORZENIK:  Okay.

8          THE COURT:  So I think it's worth doing things

9 in this phased way.  Mr. Korzenik?

10          MR. KORZENIK:  Yes, thank you, your Honor.

11          THE COURT:  All right.  So I --

12          MR. RUBENSTEIN:  Thank you, your Honor.  I

13 appreciate your time.

14          THE COURT:  And so what I will do is the

15 discovery plan that you've given me sets forth some dates

16 including a settlement conference date, so let's spend a

17 few moments.  Now this was, I know, submitted

18 unilaterally by the plaintiffs.

19          Mr. Korzenik, do you want to have a settlement

20 conference with the Court at some point too?

21          MR. KORZENIK:  We have discussed it with the

22 other side, but I -- at this stage, I think it's going to

23 be difficult.  I think that I'm always open to discussing

24 it with them.  We don't have hostile relations by any

25 means.  I'm not sure how it would be done, but I think we

Proceedings

1  would consider that maybe at some later stage.

2          THE COURT:  All right.  So what I'll do is I

3  will not enter a scheduling order today.  I will let the

4  parties go back to the table, have some discussions, and

5  then perhaps after October 13th, set forth a plan,

6  whether discovery is moving forward -- if discovery is

7  not stayed, let's say, that you should put forward a plan

8  for how discovery will move forward, and at that point,

9  you can also put down dates for settlement, and all those

10  other dates, if you can predict at that point.

11          If you don't know, then you can simply say, you

12  know, TBD, to be determined, but at some point soon, we

13  need to have a scheduling order that either has dates, or

14  states that things are being put off for a while, all

15  right?

16          MR. KORZENIK:  Okay.

17          MR. RUBENSTEIN:  Okay.

18          THE COURT:  Is there any questions, Mr.

19  Rubenstein?

20          MR. RUBENSTEIN:  Not from me, your Honor.

21  Thank you for your time today.

22          THE COURT:  And Mr. Korzenik?

23          MR. KORZENIK:  Nothing further, your Honor.

24  Thank you.

25          THE COURT:  All right.  Thank you, everybody.

Proceedings

1    Appreciate it.

2              MR. KORZENIK:  Thank you.

3              MR. RUBENSTEIN:  Thank you.

4                     (Matter Concluded)

5                         -o0o-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C  E  R  T  I  F  I  C  A  T  E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **6th** day of **October** 2020.

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.