UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
NOVAGOLD RESOURCES INC.,          : 20-cv-02875-LDH-PK
            Plaintiff,            :
                                  :
    - versus -                    : U.S. Courthouse
                                  : Brooklyn, New York
                                  :
                                  :
J. CAPITAL RESEARCH USA, LLC.     : April 26, 2021
            Defendants            : 10:02 AM
------------------------------X

    TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONE CONFERENCE
          BEFORE THE HONORABLE PEGGY M. KUO
          UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**

**For the Plaintiff:**          **Jonathan Rubenstein, Esq.**
                                **Jordan Kazlow, Esq.**
                                Baker Botts L.L.P.
                                2001 Ross Avenue
                                Ste 900
                                Dallas, TX 75201

**For the Defendant:**          **David Korzenik, Esq.**
                                **Terence Keegan, Esq.**
                                Miller Korzenik
                                Sommers Rayman LLP
                                488 Madison Avenue
                                Suite 1120
                                New York, NY 10022



**Transcription Service:**      **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, New York 11795
                                laferrara44@gmail.com

Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

Proceedings

1          THE CLERK:  This is a Motion Hearing in the

2  matter of NOVAGOLD Resources Inc. v. J Capital Research

3  USA, LLC.  Magistrate Judge Peggy Kuo presiding.  Docket

4  number 20-cv-2875.

5          Will the parties please state their

6  appearances, starting with plaintiffs?

7          MR. RUBENSTEIN:  Good morning, your Honor.

8          Jonathan Rubenstein from Baker Botts here on

9  behalf of plaintiff, NOVAGOLD Resources Inc., and with me

10  is my colleague, Jordan Kazlow and Ms. Kazlow will be

11  arguing for us today.

12          THE COURT:  Good morning.

13          MR. KORZENIK:  And good morning, your Honor.

14          This is David Korzenik appearing with Miller

15  Korzenik Sommers Rayman, appearing on behalf of defendant

16  J. Capital Research and with me my partner, Terence

17  Keegan.

18          THE COURT:  All right.  Good morning, everyone.

19          So my understanding is that there is a dispute

20  as to whether further discovery should be stayed and then

21  there is an issue of an assertion of a reporters'

22  privilege by a defendant.

23          So why don't we start with the issue of the

24  stay?  Why don't we start with the plaintiff because I

25  would like to hear what further discovery you'll be

Proceedings

1  seeking that will inform my decision.  Go ahead.  Ms.

2  Kazlow?

3  　　　　MS. KAZLOW:  Your Honor, the issue of the stay,

4  J Cap has framed it as an issue of further discovery but

5  it's really an issue of the discovery that we have

6  currently asked for pursuant to your Honor's order in

7  September that discovery proceeds on certain topics that

8  we discussed at the initial conference in September and

9  NOVAGOLD issued discovery requests to J Cap pursuant to

10  your Honor's order and J Cap has really refused to

11  participate in the discovery process on a couple of

12  different grounds and one of them is this assertion that

13  the anti-SLAPP statute enacted after this case started

14  has some bear -- the stay in that statute has some

15  bearing on this dispute.

16  　　　　And now J Cap made one production of four

17  documents on Friday which is one business day before this

18  dispute and other than that, has not stated that they are

19  currently collecting documents, searching for documents,

20  reviewing documents or have any intention of providing

21  further documents.  Indeed, before last Friday, in

22  discovery meet and confers, they had suggested that they

23  would not be producing any documents before the Court's

24  ruling on their motion to dismiss.

25  　　　　And we really think this is inappropriate for a

Proceedings

1  couple of reasons.  The first is an issue of

2  retroactivity and as I mentioned, this statute that

3  they're relying on is an anti-SLAPP statute that was

4  enacted by the New York Legislature in November of 2020.

5  We filed our dispute in June of 2020, several months

6  before the enactment of this statute and there is a

7  strong presumption against retroactivity in New York and

8  there's been no showing here that this statute should

9  retroactively apply.

10         There's first, a statute to retroactively

11  apply, there needs to be some implication express or

12  otherwise that the statute is to apply retroactively and

13  that's not the case here.  There's some legislative

14  history that the defendants have referred to in other

15  motions and immediately enactment but in the Court of

16  Appeals of Majewski v. -- a New York Court of Appeals

17  case of Majewski v. Broadalbin-Perth Central School

18  District, the Court made clear that that's just simply

19  not sufficient to overcome the presumption against

20  retroactivity and there's, you know -- I think it's

21  really hard to argue in this case that the statute was

22  intended to have some sort of immediate remedial effect

23  where the previous version of the anti-SLAPP statute had

24  been on the books for nearly 30 years and had been

25  applied narrowly by the Courts for that entire time

Proceedings

1 without the legislature acting to correct it.

2        And then second, to this particular dispute,

3 there's even further reason why the anti-SLAPP statute

4 shouldn't apply because this is a discovery dispute and

5 the provision that they're seeking to enact here is a --

6 that they're seeking to apply here is a stay of discovery

7 and the Second Circuit made clear just this last summer

8 that state anti-SLAPP provisions and complexes of the

9 Federal Rules of Civil Procedure and procedural

10 provisions of the state anti-SLAPP statutes do not apply

11 to federal courts that are sitting in diversity.

12        And so for those reasons, it's really -- it's

13 inappropriate to apply it to further discovery and it's

14 inappropriate that they're applying it to refuse to

15 answer any discovery pending the motion to dismiss here,

16 specifically where we already had a hearing on whether or

17 not discovery should be stayed pending a ruling on the

18 motion to dismiss and your Honor denied that motion.

19        THE COURT:  All right.  Is that all, Ms.

20 Kazlow?

21        MS. KAZLOW:  That's all, your Honor --

22        THE COURT:  Okay.

23        MS. KAZLOW:  -- on the anti-SLAPP issue.

24        THE COURT:  Yes.  All right.  Can you delineate

25 a little bit more what discovery you have not received?

1        MS. KAZLOW:  Yes, your Honor.  So we have not

2  received discovery in response to any of our requests for

3  production until this last Friday when J Cap produced

4  four documents that were publicly available news

5  articles, I believe and technical reports related to the

6  project.

7             Their specific requests -- so it is our entire

8  request for production that they are resisting on the

9  basis of this and the reporters' privilege.  There are

10  specific requests that I can go into that relate to both

11  the anti-SLAPP and the reporters' privilege but the

12  requests in general cover a wide range of topics, the

13  sources that NOVAGOLD considered in or that J Cap

14  considered in its decision to target NOVAGOLD, the

15  funding that J Cap received, the research that J Cap may

16  or may not have performed in deciding to write this

17  report, information relating to J Cap's investment in

18  NOVAGOLD securities and information relating to J Cap's

19  investment in other securities in the mining industry,

20  information related to J Cap's editorial process and who

21  had editorial control and who had editorial control and

22  their independence.

23             Like I said, it's every one of our RFPs that

24  they have refused to respond to and the interrogatories,

25  they've given some responses to but there's information

Proceedings

1  they're withholding both on the basis of anti-SLAPP and

2  the reporters' privilege.

3          THE COURT:  All right.  Thank you.

4          So Mr. Korzenik or Mr. Keegan, can you address

5  the anti-SLAPP issue first and then we can talk about the

6  reporters' privilege?

7          MR. KORZENIK:  Yes, let me first say so that

8  this conference can be productive, is that the

9  description of our discovery responses is utterly

10  misleading and the description or the characterization of

11  our position legally is also an utter mischaracterization

12  of what we're doing.

13          Your Honor did order some initial discovery and

14  we responded very openly and forthrightly in the

15  interrogatories and in the document responses to those

16  questions and we are producing documents in the same

17  manner that the other side is.  The other side has

18  produced only their public -- largely their public press

19  releases to us and they've produced very little else.

20  They say that they're doing rolling discovery and so are

21  we.

22          We have not declined to provide answers to the

23  interrogatories.  The answers to the interrogatories were

24  very forthright and direct and they were intended to

25  clear away a lot of the mystery that the plaintiffs,

1    either imagine or feel or see around the issues here.

2            We explained and identified the people how we

3    chose to write about NOVAGOLD and we explained what our

4    source materials were and we identified them.  We asked

5    plaintiff's counsel, do you really want -- all of the

6    documents that we used, all of the supporting materials

7    that we used in creating this report were the publicly

8    available filings and documents that NOVAGOLD put out.

9    The report does not pretend to rely on anything outside

10   of that and we asked in our meet and confer, do you

11   really want us to print out all of those materials and

12   they said oh, no, you can just provide a list.

13           In the interrogatories, we identify them and

14   then we decided, you know, these guys are going to say

15   that we didn't produce anything if we give them a list,

16   so we decided we'd start to produce those documents that

17   we relied on and we're going to do that.

18           The key thing about this report is that it's

19   based on a set of documents that are identified J Capital

20   Research report about NOVAGOLD which is called "Pipe

21   Dreams".  So when I referenced Pipe Dreams, that's the

22   name of the report.

23           So we are providing every single one of the

24   documents on which the report was predicated and on which

25   it was based.  So for them to say that we're not doing

Proceedings

1  that is disingenuous at best.

2          The other thing is they say well, who -- what

3  were our positions on what did J Cap ask specifically,

4  did we have any -- you know, what was our short positions

5  on this NOVAGOLD stock and the two people who actually

6  primarily wrote the report, we identified the other

7  people who had some potential input and we -- those two

8  people are Anne Stevenson-Yang and Tim Murray and both of

9  them were previously journalists and they run this

10  operation as journalists and they keep editorial control

11  over it.  That's their profession and that's their

12  approach.  Anne Stevenson-Yang was a Gannett reporter for

13  a newspaper for many years before she chose to publish

14  more financial-based articles but we disclosed who those

15  people were and we also disclosed and explained in detail

16  why it is that she chose NOVAGOLD as the subject of the

17  report and how she brought her view about it, her

18  suggestion to Tim Murray, who had experience in mining --

19  in writing about mining and knew about it and that's how

20  they chose to do it and there's more detail about it in

21  the report.

22          And then they asked, well did people -- what

23  was J Capital Research's investment position in NOVAGOLD,

24  either short, long or whatever and the answers is that

25  there was none.  They didn't have any through their

Proceedings

1  family, they didn't have any personally, they didn't have

2  any through their company, they didn't have any through

3  any company that they owned or controlled.

4          There are subscribers and others who received

5  the report but as to the question about their investment,

6  we answered that.  So for them to say that we didn't

7  provide information or documents that don't exist is a

8  complete misrepresentation of what it is that's going on

9  here.

10          So the answer is that if -- and we'll be glad

11  to provide our interrogatory answers.  I would say that

12  we tried to make them -- I would say they're more open

13  and forthcoming than most interrogatory answers by most

14  lawyers and the purpose was to answer the questions that

15  your Honor put forth and the purpose was to remove the

16  mystery so that we wouldn't be spending time searching

17  for documents that don't exist and so we tried to

18  identify what exists and what doesn't exist in the

19  answers to the interrogatories.

20          What really does remain are issues about

21  privilege.  They say they they're going to be providing

22  answers to our document requests and interrogatories and

23  that that's going to be rolling.  The only thing they've

24  given us largely are their press releases and maybe a few

25  other things.  We trust that they're going to honor that.

Proceedings

1  That they're asserting privilege, attorney-client

2  privilege as to the attorney's fees that they think that

3  they've told Judge DeArcy Hall was the life blood of

4  their trade libel claim.  In other words without that,

5  their trade libel claim doesn't exist.

6           So I don't know what I am supposed to do about

7  this but Judge DeArcy Hall told them well look, I'm kind

8  of skeptical about your damages pleadings and I don't

9  think you've pled enough to survive the motion that they

10 planned to make, so I am going to let you amend your

11 pleadings on that issue and they did and they said oh,

12 our special damages are our attorney's fees in bringing

13 this action and then preparing our response or PR

14 response.  We then made our motion and that pending

15 motion, one of the issues relates to that.

16          So they -- and they now when we ask for the

17 documents that relate to it, they say oh, attorney-client

18 privilege, well, if we are blocked by an attorney-client

19 privilege, if they're going to redact their billing

20 statements and their communications with their client,

21 well then how are we going to be able to determine

22 whether those legal activities that we're being charged

23 for relate to acceptable range of damage -- acceptable

24 damages, you know, cause damages, or whether they're not.

25 Well, we can't do that.

Proceedings

1          THE COURT:  Okay.

2          MR. KORZENIK:  So the motion sub judice --

3          THE COURT:  Mr. Korzenik --

4          MR. KORZENIK:  -- right now -- okay, so that's

5     my --

6          THE COURT:  Mr. Korzenik, you've gone --

7          MR. KORZENIK:  -- thoughts on this

8     (indiscernible) --

9          THE COURT:  -- really far afield from the issue

10    that I wanted you to talk about.  So the first question

11    was --

12         MR. KORZENIK:  Okay, so retroactivity.

13         THE COURT:  -- about the stay -- well, it's

14    about -- you've said that your position was

15    mischaracterized.

16         MR. KORZENIK:  Yes.

17         THE COURT:  My understanding of the way

18    plaintiff has framed the issue is that he defendant is

19    invoking the anti-SLAPP law to say that there should be

20    no discovery.  Is that, in fact, what you're doing?

21         MR. KORZENIK:  We do think the stay is

22    important but not for that purpose because we've already

23    responded to discovery requests that were responsive or

24    that arose from your Honor's ruling.

25              So for them to say that we are using the stay

Proceedings

1  in order to block discovery or to -- you know, that's

2  simply false.

3          THE COURT:  Okay.

4          MR. KORZENIK:  We --

5          THE COURT:  That's what I wanted to -- that's

6  what I thought I heard you say and I wanted to get that

7  clarified.

8          MR. KORZENIK:  Okay.

9          THE COURT:  So in fact, you're not arguing that

10  the anti-SLAPP law is dispositive here in closing the

11  door on discovery at this moment.

12          MR. KORZENIK:  No, but what it does do is we

13  believe that it should bar and be a factor that your

14  Honor should consider as to any further discovery that we

15  might be required to make.  And I'll just address the

16  retroactivity issue to this extent.

17          The anti-SLAPP has import really more for Judge

18  DeArcy Hall's motion to dismiss because it imposes an

19  actual malice standard on their pleading that they

20  thought they didn't have.  They claimed they were private

21  figures but the anti-SLAPP now imposes that standard on

22  both public and private figures but that's not this issue

23  for your Honor.

24          THE COURT:  Right.  And then --

25          MR. KORZENIK:  There's also (indiscernible) --

Proceedings

1          THE COURT:  Are you saying --

2          MR. KORZENIK:  Well, there's also --

3          THE COURT:  There's also what?

4          MR. KORZENIK:  Yes.  Oh, no.  So on the anti-

5   SLAPP, so we're saying that as a matter of policy, it

6   should have bearing on whether your Honor directs any

7   further discovery from us.

8          THE COURT:  Right.

9          MR. KORZENIK:  And it also should affect the

10  way in which your Honor views discovery sought that may

11  also be privileged and that we think is privileged.

12         THE COURT:  All right.  So but the issue

13  because I understand that the provision of the anti-SLAPP

14  law that you're evoking is a procedural one and it's a

15  state law and there's a general proposition that state

16  procedure shouldn't apply in federal court in diversity

17  cases and so unless the Second Circuit has said for sure

18  that this provision applies here, it's not that clear

19  that there's an actual bar and so what I have heard you

20  say is a little bit to the side of that issue that as a

21  matter of policy, we should not go forward with

22  discovery, not that there's an actual bar that's

23  controlling where the parties cannot go forward with

24  discovery, it's more that they should not.  Is that

25  right?

1    MR. KORZENIK:  I think that's generally correct

2 but I would like to just refine that in two ways.  So the

3 first one the anti-SLAPP substantive provisions do apply

4 in federal court and they do reply retroactively.  So all

5 of the --

6    THE COURT:  Right.  So we're not talking about

7 that when we talk about discovery.

8    MR. KORZENIK:  Correct.  Correct.

9    THE COURT:  All right.  So I am just --

10    MR. KORZENIK:  But what --

11    THE COURT:  -- focused on discovery.

12    MR. KORZENIK:  -- my adversary was arguing that

13 the retroactivity makes it a moot point and that's simply

14 not true because he anti-SLAPP applies retroactively

15 according to the four rulings so far.

16    THE COURT:  The substantive (indiscernible).

17    MR. KORZENIK:  But the substantive part.  But

18 the policy part is important in two respects; one, the

19 Second Circuit has in any event in libel cases, follow

20 that same policy even before the anti-SLAPP was enacted,

21 so that in the Bireau (ph.) case for example, and

22 elsewhere, the Second Circuit made clear that it was

23 concerned about the impact of discovery costs on speech

24 and the chilling effect that that kind of cost that a

25 plaintiff can impose on a defendant speaker and

Proceedings

1  therefore, they both expressed the desire to allow these

2  actions to be subject to early dispositive motions and

3  two, to confine discovery in a way that protects these

4  figures from undo cost.

5           So the thing that concerns us most here is that

6  a lot of the discovery or any further discovery than what

7  we've provided is going to cost tremendous amounts and

8  what we're also concerned is they've challenged some 20-

9  plus -- they say 100 but the ones that they've identified

10  are in the range of 20, false statements.  We've said

11  those are opinions.  Judge DeArcy Hall is going to decide

12  that either all of them --

13           THE COURT:  Yes.

14           MR. KORZENIK:  -- or some of them are matters

15  of opinion --

16           THE COURT:  Okay.

17           MR. KORZENIK:  And why should we be paying for

18  discovery --

19           THE COURT:  Mr. Korzenik --

20           MR. KORZENIK:  -- on items that are not

21  actionable --

22           THE COURT:  All right, Mr. Korzenik --

23           MR. KORZENIK:  -- and that's why I --

24           THE COURT:  Look --

25           MR. KORZENIK:  -- think (indiscernible) --

  1          THE COURT:  -- I'm sorry to cut you off but we

  2  --

  3          MR. KORZENIK:  Yeah, so that's why we -- that's

  4  okay.

  5          THE COURT:  Yeah, we don't have unlimited time

  6  this morning, so I really just want to focus on the

  7  decisions that I have to make.

  8          MR. KORZENIK:  Fair enough.

  9          THE COURT:  All right.  So let me go back to

 10  Ms. Kazlow because I just want to clarify, there seems to

 11  be two different things.  One is the limited discovery

 12  that I authorized in September and the other is moving

 13  forward with further discovery.

 14          Ms. Kazlow, are you saying that the limited

 15  discovery has not really taken place fully, that there

 16  are issues there?  I think I hear you say that.  Are you

 17  also saying that you want to expand the limited discovery

 18  I authorized to include further discovery moving forward?

 19          MS. KAZLOW:  Your Honor, the issue here is

 20  really with the limited discovery that you already

 21  authorized and the responses --

 22          THE COURT:  Okay.

 23          MS. KAZLOW:  -- that (indiscernible) to this

 24  time.

 25          THE COURT:  Okay.

Proceedings

1          MS. KAZLOW:  And if --

2          THE COURT:  So let me pause there.  So you're

3     not, in fact, saying you want to expand the discovery.

4     So this whole issue about the anti-SLAPP law and the

5     policy not allowing full discovery in the early stages,

6     it doesn't sound like that's really relevant here because

7     you're not arguing to expand discovery at this point; is

8     that right?

9          MS. KAZLOW:  Right and I'm concerned about --

10    I'm not sure that I understand what Mr. Korzenik means

11    when he's objecting to further discovery and whether he

12    is objecting to NOVAGOLD bringing further requests which

13    it has not yet brought and we can take up this issue at

14    that time, although we still believe that the anti-SLAPP

15    stay wouldn't apply in this federal case or whether he

16    means further discovery in that he's discussing J Cap's

17    obligation to further respond more fully to the discovery

18    NOVAGOLD has already requested.

19         THE COURT:  Exactly.  And that's why I am

20    asking the question.  So what I hear you say Ms. Kazlow

21    is that the plaintiff is not seeking to expand the

22    discovery beyond what was authorized in September but you

23    do have issues with defendant's compliance with what has

24    been propounded, right --

25         MS. KAZLOW:  That's right, Judge.

Proceedings

1        THE COURT:  -- I just want to get that issue

2    clear.  Okay, good.  So then this whole issue about

3    expansion of the discovery and the anti-SLAPP law I think

4    is really not relevant at this point because we're still

5    talking about my order from September and I'm not

6    inclined to revisit that or to narrow it any further

7    based on any issues of the anti-SLAPP law because my

8    reading of our discovery in September is that I limit it

9    -- I authorized only very limited discovery in the first

10   place and so let's focus on that discovery and whether it

11   has happened.

12        So what I hear Ms. Kazlow you say is that there

13   have been issues in terms of the defendant complying.

14   You said that they only made a production on Friday of

15   four documents and I hear Mr. Korzenik say that is in

16   fact all we have or all that we are obligated to produce,

17   Mr. Korzenik.

18        MR. KORZENIK:  No, no, I didn't say that.

19        THE COURT:  No.

20        MR. KORZENIK:  So we still think that there are

21   more things --

22        THE COURT:  I'm asking the question -- Mr.

23   Korzenik, I'm not saying what -- I'm asking you the

24   question.  So --

25        MR. KORZENIK:  Okay, go ahead.

Proceedings

1          THE COURT:  So which one is it.  Okay?

2          MR. KORZENIK:  The answer is we do not consider

3    that production to be the end of what we intend to

4    produce --

5          THE COURT:  Okay.

6          MR. KORZENIK:  -- in response to the limited

7    discovery that your Honor ordered.

8          THE COURT:  Great.  So when will you get the

9    remaining discovery to the plaintiff?

10         MR. KORZENIK:  Well, the issue is this.  As to

11   disclosing all of the documents on which we base the

12   report which is really, you know -- that we had asked the

13   plaintiffs, I said do you really want us to actually

14   produce that physically?  I said are you really --

15   because those documents that we base the report on are

16   your client's own documents and they said oh, no, you

17   don't have to do that just list them.

18         Well, we say well, we'd like to list them but

19   you -- obviously we need to Bates stamp them so that we

20   can use them in other proceedings but they said that

21   would suffice but then when they came forward and said

22   that we hadn't produced anything, I just was kind of

23   surprised by that, so that we decided --

24         THE COURT:  Okay.

25         MR. KORZENIK:  -- all right, we'll start to

Proceedings

1  produce these documents that they told us we didn't have

2  to produce but I am going to do it anyway --

3          THE COURT:  All right.

4          MR. KORZENIK:  -- because --

5          THE COURT:  Let me pause here.

6          MR. KORZENIK:  -- I've got to Bates stamp them.

7  Yeah.

8          THE COURT:  Mr. Korzenik, let me pause here.

9  It seems like there's a communication gap based on what

10  you're saying, all right?  So when you get a request for

11  production the responses are either here they are or we

12  think we should have to produce them and then you state

13  the grounds for it or we don't have them, right?

14          MR. KORZENIK:  Right.

15          THE COURT:  So I am a little bit unsure based

16  on how you describe it, what exactly happened because you

17  said your response was we have them but do you really

18  want us to produce them and they said no, we just want a

19  list and that you produced the list and then they came

20  back and said where are the documents.  Is that accurate?

21          MR. KORZENIK:  No, they didn't --

22          MR. KEEGAN:  Your Honor?

23          MR. KORZENIK:  -- do that in their --

24          THE COURT:  Well, let me finish with Mr.

25  Korzenik.

Proceedings

1          Go ahead.  Just be clear because I am confused.

2    I wasn't there and I don't -- I didn't go into any great

3    detail in your responses --

4          MR. KORZENIK:  No, we -- at first no, in their

5    letter, they made it seem as if we weren't producing

6    those materials --

7          THE COURT:  Okay.

8          MR. KORZENIK:  -- and we weren't because we

9    were going to give them a list and the list --

10         THE COURT:  Right.

11         MR. KORZENIK:  -- is already manifestly present

12   in the report because the report --

13         THE COURT:  Right.

14         MR. KORZENIK:  -- lists all of the documents on

15   which it was based.

16         THE COURT:  Okay.

17         MR. KORZENIK:  But we decided when they wrote

18   in their letter that we hadn't produced any documents, we

19   said all right, they told us we could give them a list

20   but we're not going to do that because they're making us

21   look bad in front of your Honor and so we are going to

22   roll out those things.  We're going to give them the full

23   set.  We've got to Bates stamp them anyway, so we're

24   going to do that and we're going to --

25         MR. KEEGAN:  But your Honor --

Proceedings

1          THE COURT:  Well, actually -- so hold on.  Wait

2   a second.  It sounds like when I gave you the option,

3   there was a fourth option which I neglected which is we

4   haven't given it to you yet and so that sounds like what

5   you're saying.

6          MR. KORZENIK:  Correct.

7          THE COURT:  Is that right, Mr. Korzenik?

8          MR. KORZENIK:  Correct.

9          THE COURT:  Okay.  So Mr. Rubenstein, I heard

10  you say -- tried to interrupt in the background.  What

11  are you trying to say?

12         MR. KEEGAN:  No, your Honor, that was Terrence

13  Keegan.

14         THE COURT:  Okay.  Mr. Keegan, you were

15  interrupting your cocounsel?

16         MR. KORZENIK:  He can.

17         MR. KEEGAN:  No, no, not at all, your Honor.

18  And I didn't mean to cut anybody off.  I just wanted to

19  clarify what we had produced and the nature of our

20  production.  Just like NOVAGOLD, we are identifying

21  documents.  We had identified -- we have categories of

22  documents that we would produce in our responses to their

23  requests for production and as we evaluate those

24  documents, then we are producing them.  We did produce

25  documents on Friday.

Proceedings

1          Ms. Kazlow did say that there are four

2    documents.  It's over 900 pages of material that we

3    produced on Friday.  So that does take time to evaluate,

4    just as we acknowledge it takes times for NOVAGOLD to

5    evaluate documents as well.

6          I believe we had produced from a quantitative

7    stand point more documents than we had received from

8    NOVAGOLD already.  And so yes, we're continuing to

9    evaluate the materials that J Capital used to -- in its

10   report.  That takes time.  We'll continue to evaluate

11   them and produce them as we're ready to do so.

12          MS. KAZLOW:  Your Honor?

13          MR. KEEGAN:  That's just what I wanted to

14   clarify.

15          THE COURT:  Okay.  So Mr. Keegan, since you

16   jumped in, why has it taken so long to respond?

17          MR. KEEGAN:  It's again, the correspondence

18   that we had in the meet and confers that we had.  As Mr.

19   Korzenik said, we did suggest, we could provide a list of

20   the documents that we used to -- in the report.

21   Initially, that was the way that we thought we were going

22   to go.

23          Instead, given the joint letter before your

24   Honor and with this conference pending, we've decided

25   it's better to produce the documents themselves and

1  (indiscernible).

2       THE COURT:  When was the list produced?

3       MR. KEEGAN:  No, instead of producing the list,

4  we are producing the actual documents.

5       THE COURT:  So you never produced the list?

6       MR. KEEGAN:  We did not produce the list.

7       MR. KORZENIK:  Well, they had the list.

8       MR. KEEGAN:  We suggested production of the

9  list in our meet and confers and --

10       THE COURT:  And you were told that that list

11  was okay or not okay?

12       MR. KEEGAN:  We were told the list was going to

13  be okay but then the joint letter goes in and it appears

14  after the joint letter that, you know, the list is not

15  going to suffice and so that's why we even said

16  (indiscernible) --

17       THE COURT:  When was the agreement --

18       MR. KEEGAN:  -- produce this document.

19       THE COURT:  When did you think you had an

20  agreement that the list was okay?

21       MR. KORZENIK:  I think in our first meet and

22  confer.  There were two.  I don't remember the date.

23  Jordan, do you remember?

24       MS. KAZLOW:  It was March 9th.  And your Honor,

25  if I may, there's been some mischaracterization here of

Proceedings

1  the issue and there's kind of really a twofold problem

2  with the way that J Cap's characterizing the issue here.

3  The first is that they really zeroed in on as though our

4  request for the documents that they relied on is the only

5  one of our requests.  We've made 15 requests for

6  production and this is just one of them and they haven't

7  responded to any of the others.

8          And then with that, what they're representing

9  here today is that they've told us all they've relied on

10  is the publicly available documents and that they'll give

11  us them and it's true that they say -- you know, they

12  said do we really need to give you the publicly available

13  documents and in an effort to compromise, we said if you

14  can give us a list of them, we don't need you to print

15  them out for us, we can print them out in an effort to

16  compromise.

17          But the issue is that that's not -- they have

18  not made a statement until this call today that that is

19  the total of the list.  They've got catchalls all over

20  their responses that say that, you know, to the extent

21  there's any of -- they list the document and it's not a

22  catchall that to the extent there are any other

23  documents, we're objecting on the basis of paragraphs 1,

24  2, 3, 4, 5, 6, 7 of their objections.

25          And then the other issue is that this today is

1  really the first that we've heard of a rolling

2  production.  We asked Mr. Korzenik on our March 18th, I

3  believe, call, I asked, you know, are you've raised all

4  these other objections and I understand that you have

5  these reporters' privilege objections to our discovery

6  requests but barring those objections, would you be

7  willing to produce documents now or are you standing on

8  your anti-SLAPP objection?  And he just kept repeating

9  that there's a timing issue and that he was going to be

10 standing on his anti-SLAPP objection.

11        I think if we had come to an agreement on a

12 rolling production prior to this discovery conference

13 today, we could have saved your Honor 45 minutes perhaps

14 but this is really just --

15        THE COURT:  Or longer.

16        MS. KAZLOW:  -- this is the first we're hearing

17 of it.  So you know, we were concerned --

18        MR. KORZENIK:  That's false.

19        MS. KAZLOW:  -- that we were going to come to

20 your Honor --

21        MR. KORZENIK:  That's not true but

22 (indiscernible).

23        MS. KAZLOW:  And we were concerned that we were

24 going to come to your Honor and we're going to bring

25 these reporters' privilege issues and we're going to work

Proceedings

1  through these reporters' privilege issues with your Honor

2  and then we turn around and two days later they say okay,

3  reporters privilege is resolved but we're not going to

4  give you this stuff because of anti-SLAPP and so we

5  needed to bring them together, so that when we got the

6  relief on one, we received the documents from them and

7  they had made clear in discovery meet and confer, they

8  would not commit to producing documents.

9          THE COURT:  All right.  So --

10          MR. KORZENIK:  I cannot say that that's true.

11          THE COURT:  Well, no, hold on.  Please don't.

12  This is -- we are going beyond where we need to be.  I

13  know that you disagree with things that have been said.

14  What I am going to remark is the documents that were

15  given to me were the filing at ECF 51 includes an Exhibit

16  C that is plaintiff's first request for production of

17  debt collector and I see that it is dated October 9th,

18  2020.

19          So normally, when there is a request for

20  production of documents, the other side has 30 days to

21  respond, all right?  I am hearing that there wasn't a

22  response in 30 days.  I didn't see any deficiency letters

23  or discovery disputes raised until this recent letter and

24  I heard somebody say that your first meet and confer was

25  March 9th.  That is of great concern to me.  All right?

1  So --

2       MS. KAZLOW:  Your Honor, we sent -- your Honor,

3  NOVAGOLD first sent a letter to J Cap in January raising

4  concerns about discovery and the process was dragged out

5  from there.  We wanted to --

6       THE COURT:  Yes.  This (indiscernible).

7       MS. KAZLOW:  -- (indiscernible) confer with

8  each other.

9       THE COURT:  Yes.  So this is my concern is that

10 it is being dragged out, all right?  And so I don't want

11 to get into the issues now because there's a lot of back

12 and forth between counsel as to whose fault it is and I

13 don't think at this point that that is particularly

14 useful because what I am seeing is that for a request for

15 production of documents that went out on October 9th and

16 for it not to be -- well, for there still to be a dispute

17 as to whether it has been fully complied with is of great

18 concern to me.  So number one --

19      MR. KORZENIK:  Can I address that?  Can I

20 address that timing, your Honor?

21      THE COURT:  Wait.  Hold on.  I will give you

22 five seconds to address it.  Who is speaking?

23      MR. KORZENIK:  David Korzenik.  We responded to

24 those --

25      THE COURT:  All right.  Five seconds, Mr.

1  Korzenik.

2        MR. KORZENIK:  We responded on November 24th

3  and then w were in the midst of motion practice on our

4  motion to dismiss and both parties were briefing that for

5  the several months that followed in December through

6  December and into early January, I believe.  So we were

7  occupied --

8        THE COURT:  All right.

9        MR. KORZENIK:  -- with the motions to dismiss.

10 Then when those were done and raised, we turned to

11 speaking with other -- each other again about the

12 discovery but we responded on November 24th with our

13 answers to the interrogatories.

14       THE COURT:  All right.

15       MR. KORZENIK:  And we responded on November

16 24th with our answers to the --

17       THE COURT:  I see -- I see the responses to the

18 interrogatories, nobody attached any responses to the

19 production of documents.  All right, so --

20       MR. KORZENIK:  We can provide those --

21       MR. KEEGAN:  We did do that.  We did provide

22 that, your Honor.

23       THE COURT:  All right.

24       MR. KEEGAN:  That was also on the same day.  We

25 had a response to the request for production.

Proceedings

1    THE COURT:  Okay.  I'm just looking at what was
2    filed with me and it was a joint filing, so if you wanted
3    me to see that, then somebody should've filed it but in
4    any event, this is what I am seeing and now I've heard
5    what you've said about the response.

6         So whatever those responses were and the
7    problems there are issues that you still need to talk
8    about and what you've said to me about whether the
9    documents themselves need to be produced or whether a
10   list is sufficient, are things that you need to continue
11   to meet and confer, so that you can be clear on what you
12   need and what you don't need.

13        The point is not to inflict the same amount of
14   work on each side.  I heard someone say well, we produced
15   more than they did.  That's not really the relevant
16   issue.  The issue is that both sides get what they're
17   entitled to and what they need to move this litigation
18   forward, all right?  But you should be clear and work
19   with each other in an efficient way to produce what you
20   need and only what you need.  So if the 900 pages of
21   documents are publicly available and you can get it
22   yourself, you should have a discussion about whether
23   that's sufficient, all right?  And not jump to
24   conclusions about how bad it makes you look in front of
25   me.  I don't care, right?

1     I want the parties to get what you need and if

2 you get it, however you do, if you agree on it, that's

3 great.  That is the thing that impresses me the most is

4 that you can come to an agreement that is efficient and

5 effective pursuant to Rule 1 of the Federal Rules of

6 Civil Procedure which is that there should be speedy,

7 just and inexpensive resolution of these issues.

8     So if you can come to an agreement, that's the

9 best thing.  If you can't, then you need to put forward

10 to me in a very clear way what the problem is.  Now the

11 letter that was filed was not entirely clear to me

12 because there was a lot of discussion about the scope of

13 discovery.  I read it and perhaps I misread it to mean

14 that the plaintiffs were seeking an expansion of the

15 discovery that I authorized in September.  I'm hearing

16 today, in fact, it's not.  You're just having ongoing

17 discovery disputes about the discovery that has already

18 been authorized.

19     So in order to -- and the two issues were --

20 well, I am not sure that anti-SLAPP plays into this at

21 all.  Maybe one of the issues was that there was an

22 attempt to constrict even the limited discovery that I

23 authorized in light of anti-SLAPP and I will say to that

24 point, that I am not doing that.  It should go forward

25 the way it was authorized in September.

1            And then the second issue was that there seemed

2   to be two issues, one is has defendant complied and

3   produced fully or are there outstanding issues and one

4   piece of that is this reporters' privilege issue.

5            So we haven't even gotten to the reporters'

6   privilege and we've run out of time because I heard some

7   other people call in for my next conference.  So I will

8   say that my reading of the -- on the issue of reporters'

9   privilege is that there needs to be a lot -- the

10  requesting party has a burden to state more clearly what

11  they're seeking and how they can't get it somewhere else,

12  right?  So they have the burden.

13           And so Ms. Kazlow, if you're seeking to

14  overcome the reporters' privilege, then you need to

15  present more than has currently been presented to me, if

16  that continues to be an issue.  So for purposes of

17  today's --

18           MS. KAZLOW:  Your Honor, I do believe that

19  that's going to continue to be an issue --

20           THE COURT:  Okay.

21           MS. KAZLOW:  -- and I don't know if it's

22  possible for you to provide some guidance today on the

23  scope of that privilege.  J Cap is using it to assert a

24  privilege and refuse production on basically anything

25  that is not within the four corners of the report and we

1  think that that's really an extremely over broad

2  assertion of the privilege and so even setting aside the

3  burden on a requesting party to show that nonconfidential

4  information is necessary, there's a wide swathe of

5  categories to which they've refused production that we

6  don't believe the reporters' privilege would even apply.

7  For example, who is funding their report or their

8  financial motive in the report and these are categories

9  that you expressly authorized discovery in in the limited

10  granted discovery in September.  And so, I'm just afraid

11  that -- I know we're running out of time.  I'm just

12  afraid that our conversations as to this won't be

13  productive without some advice perhaps on the scope of

14  this privilege.

15          THE COURT:  Well so my understanding of the

16  framework of this privilege is that the plaintiff in this

17  case, the parties seeking the confidential or

18  nonconfidential news has to make a clear and specific

19  showing that the news is highly material and relevant,

20  critical or necessary to a party's claim, defense or

21  proof of a material issue and not obtainable from any

22  other source.

23          And here it says clearly that it's not the

24  nonconfidential news.  So to the extent that that informs

25  the scope of what you're talking about, that seems to be

1  the clear reading of the scope of that material.  I don't

2  have before me, unless you can point it out to me, Ms.

3  Kazlow, what beyond the news it is that you're seeking

4  that is -- for which this privilege is being asserted.

5          MS. KAZLOW:  Yes, so the list is kind of long

6  and I'm sorry because I know we're running out of time

7  but there's a request for production number three for

8  internal policies and procedures related to J Cap

9  selection and subject and reporting guidelines.  There's

10 request number six for documents and communications

11 between J Cap and NOVAGOLD.  There's a request number

12 seven for documents and communications between J Cap and

13 third persons regarding NOVAGOLD and this would expand

14 beyond just news being communicated about to, you know

15 the reasons why --

16          THE COURT:  Okay.

17          MS. KAZLOW:  -- (indiscernible) report.

18 There's document --

19          THE COURT:  I --

20          MS. KAZLOW:  Yes, your Honor?

21          THE COURT:  I see.  I see.  And so to the

22 extent, for example, just production number three, it

23 says all internal policies and procedures related to a

24 selection of subjects for the report.  I on the face of

25 it, don't see how it is news because it's outside of the

Proceedings

1 news itself but if Mr. Korzenik or Mr. Keegan, you want

2 to put in a future filing, more information as to how

3 that is in fact covered by the privilege, you're welcomed

4 to do that and the parties can then brief that in greater

5 detail.

6          MR. KORZENIK:  Okay.

7          THE COURT:  All right?

8          MR. KORZENIK:  We'll do that.

9          THE COURT:  But my reading of the privilege is

10 that it covers news and the requests that Ms. Kazlow have

11 pointed out don't seem to be news on its face.  There are

12 policies surrounding the handling of the reports and et

13 cetera, the production of the news, let's say, not the

14 news itself.  So if the privilege applies, that -- I'm

15 open to see more briefing on the issue but on the face of

16 it, I don't see how it does.  All right?

17          So that has not yet been fully briefed and I

18 will grant the parties leave to brief that issue if it

19 becomes an ongoing issue.  So I want the parties to

20 confer and see if you can reach an agreement and if you

21 can't, then I will authorize there to be motions to

22 compel or for protective orders based on that provision.

23 All right?

24          MS. KAZLOW:  Thank you, your Honor.

25          THE COURT:  And so I think --

Proceedings

1        MR. KORZENIK:  Okay.

2        THE COURT:  -- that's -- and then I saw at the

3   very end that J Cap has asked for leave to file a letter

4   about deficiencies that it has identified by defense --

5   by plaintiff and I think that if you can't -- I don't

6   know what those deficiencies are.  There was an allusion

7   to the attorney-client privilege being asserted.  So if

8   you can't work that out, then I will also permit you to

9   brief that issue and file a motion for a protective order

10  or to compel based on that limited issue or those limited

11  issues -- I mean, I don't -- again, I don't know the

12  scope of the deficiencies you're talking about, so I

13  guess what I will do is I'll permit -- I'll grant

14  defendant leave to file letters setting forth those

15  deficiencies and then we can have another phone

16  conversation about what those deficiencies are and if we

17  identify any that require further briefing, then I may

18  authorize it at that point but I think maybe the first

19  interim step will be that the defendant can file a letter

20  setting forth the deficiencies only after you have tried

21  to resolve them with the plaintiff.

22        MS. KAZLOW:  Your Honor, may I ask just one

23  clarifying question.

24        THE COURT:  All right.  Ms. Kazlow?  Yes.

25        MS. KAZLOW:  So for the attorney-client

Proceedings

1  privilege issue, if we're not able to sort it out, you've

2  requested a letter.  Am I understanding correctly that if

3  we're not able -- we'll first try to sort out of the

4  reporters' privilege issue between ourselves but if we're

5  not able to sort those out, your Honor is permitting full

6  briefing on that issue in the form of a motion to compel

7  --

8              THE COURT:  Right.

9              MS. KAZLOW:  -- or protection.  Okay.

10  Understood.  Thank you, your Honor.

11             THE COURT:  Yes, because that issue has been

12  identified and I think it's a discrete enough issue that

13  the further legal arguments will be helpful to the Court.

14  All right.

15             MS. KAZLOW:  Yes.

16             THE COURT:  And then on the third point about

17  the deficiencies with regard to the plaintiff's

18  production, I am not authorizing full briefing on that

19  issue yet because I don't know the scope of the

20  defendant's complaint about what the deficiencies are.

21  So the defendant needs to file a letter with the Court

22  first setting forth the -- let me backtrack.  That

23  process needs to go through my normal procedure of the

24  parties filing a joint letter on those deficiencies that

25  you can't resolve with regard to plaintiff's production

Proceedings

1  and only after discussion by phone about that letter may
2  I possibly authorize a full briefing on issues such a
3  attorney-client privilege.  And these relate to the
4  plaintiff's deficiencies, not the defendant's.  All
5  right?  So I think that gives us a plan for moving
6  forward.
7          MR. KORZENIK:  Okay.
8          THE COURT:  But I think I'll just go back to
9  what I said at the very beginning which is that the scope
10 of the discovery I authorized in September has not
11 changed.  So keep that in mind.
12         MR. KORZENIK:  Okay.  Thank you very much, your
13 Honor.
14         THE COURT:  All right.
15         MS. KAZLOW:  Thank you.
16         THE COURT:  I'm not going to put a deadline on
17 these matters because I would like the parties have time
18 to meet and confer and to discuss things but as far as
19 briefing of any motion on the reporters' privilege,
20 please work out a briefing schedule between the parties,
21 so that it's clear on who is filing what when.  All
22 right?
23         MS. KAZLOW:  Will do so.  Thank you, your
24 Honor.
25         THE COURT:  Great.  Thank you, everybody.

Proceedings

1          MR. KORZENIK:  Thank you, your Honor.

2          MR. KEEGAN:  Good.  Thank you, your Honor.

3          MR. RUBENSTEIN:  Thank you.

4          THE COURT:  Okay.

5                    (Matter Concluded)

6                        -o0o-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **27th** day of **April** 2021.

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.