UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

NOVAGOLD RESOURCES, INC.,

                                    Plaintiff,

                    v.

J CAPITAL RESEARCH USA LLC,

                                    Defendant.

---

**MEMORANDUM AND ORDER**

20-CV-2875 (LDH) (PK)

LASHANN DEARCY HALL, United States District Judge:

NOVAGOLD Resources, Inc. ("Plaintiff") brings this action against J Capital Research USA LLC ("Defendant") alleging defamation by libel per se and trade libel. Defendant moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint in its entirety.

## BACKGROUND[1]

Plaintiff is a publicly traded Canadian precious metals company with its shares trading on the Toronto Stock Exchange and New York Stock Exchange. (Am. Compl. ¶¶ 5, 10, ECF No. 34.) Plaintiff's focus is the development of the Donlin Gold project (the "Donlin Project") in Alaska, of which it owns 50%. (*Id*. ¶ 10.) The Donlin Project "is regarded to be one of the largest, highest-grade, and most prospective known open-pittable gold deposits in the world." (*Id*.) The Donlin Project's feasibility is supported by environmental, technical, and social studies, specifically: the "Donlin Creek Gold Project Alaska, USA, NI 43-101 Technical Report on Second Updated Feasibility Study" (the "Feasibility Study"); the "Natural Gas Pipeline Plan

---

[1] The following facts taken from the amended complaint are assumed to be true for the purpose of this memorandum and order.

of Development Donlin Gold, Revision 1" (the "Plan of Development"); and the "Letter Re: Supplemental Information for the Donlin Gold Natural Gas Pipeline" (the "Supplemental Pipeline Information").  (*Id*.)  The Feasibility Study and Plan of Development are publicly available, whereas the Supplemental Pipeline Information was submitted to the Alaskan State Pipeline Coordinator's Office.  (*Id*.)

Defendant is a New York research organization that publishes short-seller reports on publicly traded companies.  (*Id*. ¶¶ 6, 12, 17.)  Plaintiff alleges that Defendant has a "track record of attempting to manipulate the market" and is "deliberately indifferent to the truth."  (*Id*. ¶¶ 2, 12.)  According to Plaintiff, Defendant's "modus operandi" is to "sucker-punch companies by publishing lengthy reports without warning in the middle of a trading day when [Defendant] knows the company will not have adequate time to digest and respond before uncertainty in the market causes the share price to drop."  (*Id*. ¶ 14.)  In the past, Defendant's reports focused on Chinese companies in the technology and consumer cyclical industries.  (*Id*. ¶ 18.)

Sometime around September 2019, Tim Murray, an analyst working for Defendant, communicated to Plaintiff that he was transitioning from covering iron and steel investments to gold investments.  (*Id*. ¶ 11.)  On or about May 28, 2020, Defendant published a 22-page report titled "*Pipe Dream: The deposit that will never be mined*" (the "Report"), authored by Mr. Murray, criticizing the feasibility and Plaintiff's management of the Donlin Project.[2]  (*Id*. ¶ 16.) Plaintiff alleges that the Report focuses on three demonstrably false "themes".

---

[2] The Report is referenced throughout but not attached to the amended complaint.  (*See, e.g.*, Am. Compl. ¶¶ 20–35.) A copy of the Report, attached to a declaration submitted by Defendant in support of its motion to dismiss, is incorporated by reference.  (*See* Decl. David S. Korzenik dated Jan. 15, 2021 ("Korzenik Decl."), Ex. A, ECF No. 39-1.)

*First*, Plaintiff alleges that the Report falsely asserts that Plaintiff misled its investors. Specifically, the report states: "[f]or the last 15 years, [Plaintiff's] management team has systematically misled investors with subjective presentation of information about a deposit so remote and technically challenging that the mine will never be built"; "management's biggest misrepresentation is around the cost to build the pipeline" and "[m]anagement deliberately misleads investors with custom metrics designed to deceive, directing investors to presentations which claim the deposit will require $6.7 bln in capital, however, the feasibility study clearly shows this number is $8 bln (already, we believe, far too low)"; "[t]he most recent feasibility study, done in 2012, estimated that the initial capex alone, is $ 8 bln, not $ 6.7 bln." (*Id*. ¶ 21.) Further, Plaintiff alleges that the Report states that "[m]anagement has drilled only 16 holes since 2011 and not even released the modeling results of the last, meager drill assays in 2017." (*Id*. ¶ 23.)  And finally, Plaintiff alleges that the Report claims that Plaintiff misled its investors with respect to a separate mining project partially owned by Plaintiff.  (*Id*. ¶ 24.)  According to Plaintiff, these statements were false, misleading, and/or "designed to create panic."  (*Id*. ¶¶ 22–24.)

*Second*, Plaintiff alleges that the Report makes false claims regarding the feasibility of the Donlin Project.  For instance, the Report states: "the Donlin deposit . . . is not feasible to put into production at any gold price" and is a "stock promote, not a mining plan"; "[t]he proposed natural gas pipeline central to powering the project is dead on arrival," and "[t]he terrain around the Donlin deposit is among the most inhospitable on the planet."  (*Id*. ¶¶ 25–26.)  The Report goes on to state: "[e]ach of the 300 stream crossings will require a temporary bridge, and dam, and two pits, one on either side of the stream, for the drilling equipment to bore a hole under the stream"; "[e]ven if [Plaintiff] reduced the mine capacity by half, it could not barge enough diesel

to operate the power plant"; "[t]he total diesel that can be barged up the river is at best 253 ML"; that "[u]nder the most optimistic scenario, cutting production to half of what is now planned, the diesel barged in would be sufficient for at most seven months of operations per year, essentially reducing output to a quarter of what is now planned"; and that the Donlin Project's planned power plant "would be the largest power plant in Alaska and increase the electricity produced in that state by about 40%." (*Id.* ¶¶ 28–30.) According to Plaintiff, these statements are all demonstrably false. (*Id.*)

*Third*, Plaintiff alleges the Report attacks its management by falsely stating that "management has been treating this 12-person concept company like an ATM" and has "awarded themselves base salaries that rival those of the CEO's at Newmont and Barrick." (*Id.* ¶ 33.) Additionally, the Report states that: "[s]enior office holders and directors have taken $35 mln in net cash from share sales in the last five years"; "[s]ome 70% of [Plaintiff] insider share sales were over the last 12 months, as the share price increased by 300%"; "[t]he CFO's stock in the company has halved, from around 2.2 mln shares to 1 mln"; "[t]he CEO has reduced his net position by 26%"; and that "[a]fter the 2017 assay, the CEO sold down $2.5 mln in stock." (*Id.* ¶ 34.) Last, Plaintiff notes that a table included in the Report contains demonstrably false insider share sales figures and management positions. (*Id.* ¶ 35.)

Following the Report's publication, Defendant took to Twitter to promote the Report and re-publish its statements. (*Id.* ¶ 36.) On May 28, 2020, Defendant tweeted the following:

> **J Capital** @JCap_Research • May 28
> Knowing that the pipeline isn't feasible, [Plaintiff] is claiming it can barge diesel up the river during the 5 months it's not frozen.  It can't.

> **J Capital** @JCap_Research • May 28
> The [Plaintiff] share sales make a few million in cash comp look like pocket change.

> **J Capital** @JCap_Research • May 28
>
> You might call [Plaintiff] the purest form of capital-market fraud, 24-carat.

> **J Capital** @JCap_Research • May 28
>
> The pipeline to the [Plaintiff's] deposit site would need 300 tunnels to cross the river.  If you could build it, which you can't at any reasonable cost.

(*Id*. ¶¶ 36–38, 40.)

Plaintiff immediately began preparing a formal response to the Report and advised its investors that a "fulsome response" addressing the "numerous inaccuracies and falsehoods" in the Report was forthcoming.  (*Id*. ¶ 41.)  On June 8, 2020, Plaintiff published a 40-page response to the Report, specifically refuting each statement made by Defendant.  (*Id*. ¶ 43.)  Moreover, Plaintiff's chairman published a statement alleging that the Report was filled with lies used for Defendant's "nefarious goal to manipulate [Plaintiff's] stock price and derive a quick profit on the backs of unsuspecting shareholders."  (*Id*.)  According to Plaintiff, the Report was published as part of Defendant's "short and distort" scheme to drive Plaintiff's stock price down in order to benefit short-sellers of the stock.  (*Id*. ¶¶ 17, 41.)  Specifically, Plaintiff alleges that the Report was designed to create panic and cast doubt on the feasibility of the Donlin Project, despite publicly available information to the contrary.  (*See id*. ¶¶ 22, 31.)

In addition to substantial reputational damage, Plaintiff alleges that its shares fell nearly 9% between the close of trading on May 27, 2020, and close of trading on May 28, 2020, when the Report was released.  (*Id*. ¶ 46.)  Moreover, Plaintiff alleges that it incurred significant costs in its effort to counteract the effects of the Report.  (*Id*. ¶ 49.)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

*v. Iqbal*, 556 U.S. 662, 677–78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of defendant's liability for the alleged misconduct. *Id*. at 678. While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999) (citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).

## DISCUSSION

### I.   Defamation by Libel Per Se

To state a claim for defamation in New York, a plaintiff must allege: "(1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability." *Palin v. New York Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019). Defendant argues that Plaintiff's defamation claim is susceptible to dismissal for a number of reasons. In particular, Defendant argues that Plaintiff fails to plead actual malice, that its statements are non-actionable opinion, and that the statements contained in the Report were not false in any event. (*See generally*, Def.'s Mem. L. Supp. Mot. Dismiss ("Def.'s Mem.") at 1–19, ECF No. 40.) The Court disagrees.

A. **Defamatory Statement**

       *1.*    *Fact vs. Opinion*

It is well established that "only factual statements are actionable as defamation or libel." *Chau v. Lewis*, 771 F.3d 118, 128 (2d Cir. 2014). Put another way, "[a]n expression of pure opinion is not actionable." *Steinhilber v. Alphonse*, 501 N.E.2d 550, 552 (N.Y. 1986). A statement of "pure opinion" is "a statement . . . accompanied by a recitation of the facts upon which it is based" or one that "does not imply that it is based upon undisclosed facts." *Id*. By contrast, a "mixed opinion . . . is an opinion that *does* imply a basis in undisclosed facts, or fact known only to the author, and is actionable." *Chau*, 771 F.3d at 129 (citing *Steinhilber*, 501 N.E.2d at 552). Accordingly, only statements of fact or mixed opinion are actionable under New York law.

       To determine whether a defendant's allegedly defamatory statement constitutes fact or non-actionable opinion, New York courts generally consider three factors:

> (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Flamm v. Am. Ass'n of Univ. Women*, 201 F.3d 144, 153 (2d Cir. 2000) (quoting *Gross v. New York Times Co.*, 623 N.E.2d 1163, 1167 (N.Y. 1993)). Although no factor is dispositive in determining whether a defendant's statements are actionable, courts consistently focus on the third factor— "the overall context in which the complained-of assertions were made." *Id.* (collecting cases). Thus, "the 'essential task is to decide whether the words complained of, considered in the context of the entire communication and of the circumstances in which they were . . . written, may be reasonably understood as implying the assertion of undisclosed facts

justifying the opinion.'" *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 178 (2d Cir. 2000) (quoting *Steinhilber*, 501 N.E.2d at 553).

In determining whether the broader context in which statements were made renders those statements opinion, courts look for "signals to readers that something is opinion, not fact." *Chau*, 771 F.3d at 129 (citing *Steinhilber*, 501 N.E.2d at 554)).  For instance, courts look for "rhetorical 'indicators' that the writer or speaker is expressing an opinion." *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*, 151 F. Supp. 3d 287, 293 (E.D.N.Y. 2015); *see also Levin v. McPhee*, 119 F.3d 189, 197 (2d Cir. 1997) ("When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact.")  Likewise, phrases such as "'appeared to be,' 'might well be,' 'could well happen,' and 'should be' . . . signal presumptions and predictions rather than facts." *Flamm*, 201 F.3d at 154 (citing *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991))).

Defendant argues that the statements contained in the Report are non-actionable opinion given the context in which they were made.  (*See generally*, Def.'s Mem. at 1–13.)  Notably, Defendant only highlights one of the many allegedly defamatory statements from the Report. Specifically, Defendant contends that the statement, "[Plaintiff] . . . has systematically misled investors with subjective presentations of information about a deposit so remote and technically challenging that the mine will never be built[,]" is a nonactionable prediction of the future success of the Donlin Project.  (*Id*. at 5–6, 12 (emphasis omitted).)

With respect to this statement, Defendant first argues that the term "subjective" somehow indicates to the reader that the statement is an opinion because "opinions are subjective." (Def. Mem. at 6.)  That argument is pure nonsense.  A review of the statement makes plain that the

word "subjective" refers to Plaintiff's presentations which Defendant stated served to mislead investors.  In other words, "subjective" does not signal that Defendant's the statement is Defendant's subjective opinion.

Next, Defendant argues that the disclosure on its website and terms of service in the Report signal that the Report is, in its entirety, opinion.  (Def. Mem. at 8–9.)  According to Defendant, the disclosure on its website states: "Be warned.  We are activists, usually on the short-side.  We are biased. . . . we will profit if these stocks decline or, when we are long, rise in value."  (Def.'s Mem. at 8.)  Defendant's terms of service, which appear on the first page of the Report, state in part that the reader "should assume that . . . [Defendant] may benefit from short positions a client has in all stocks . . . covered herein, and therefore stands to realize significant gains in the event that the price of either declines."  (Korzenik Decl., Ex. A at 1.)  The terms of service go on to state that "[Defendant's] research and reports express our opinions . . . ."  (*Id.*)  However, these broad disclaimers on their own are insufficient to cloak the entire Report in the protections afforded opinions.

Defendant invites the Court to look for guidance to several cases that found short-seller reports to be opinion rather than actionable statements of fact.  (Def.'s Mem. at 4–7.)  A review of those cases does not change the outcome here as they are inapposite.  In *Silvercorp Metals Incorporated v. Anthion Management LLC*, the allegedly defamatory letter raising concerns of accounting irregularities "included phrases like the author 'believed' [plaintiff] committed 'potential' fraud, and that the stated 'opinions' could change."  959 N.Y.S.2d 92 (Sup. Ct. Aug. 16, 2012).  In *Yangtze River Port and Logistics Limited v. Research*, the defendant's short-seller report included, "Disclosure: We are short [plaintiff's stock]," and the statements contained in the report were prefaced with phrases like "[w]e can therefore infer" and "we believe."  No.

150721/2019, 2020 WL 905770, at *1–*3 (N.Y. Sup. Ct. Feb. 25, 2020) (finding statements in

report "explicitly expressed in the form of opinions."). In *Eros International PLC v. Mangrove*

*Partners*, the court found that "language of conjecture pervade[d]" the defendant's short-seller

publications where phrases like "[w]e believe" and "[i]n our opinion" were interwoven

throughout the articles and reports. 2019 WL 1129196 at *8. In *Nanoviricides, Inc. v. Seeking*

*Alpha, Inc.*, the court found that the defendant's disclaimer signaled to readers that the article

was opinion where the article also contained the phrases "'we believe,' 'it seems to us' or the

relevant equivalent over fifteen times." No. 151908/2014, 2014 WL 2930753, at *5 (N.Y. Sup.

Ct. June 26, 2014). The same is true in *Bellavia Blatt & Crossett, P.C. v. Kel & Partners LLC*,

where the defendant's statement was "full of qualifiers—such as 'reputation,' 'word of the street'

and 'whispered'—which ma[d]e clear that [defendant's] statement [was] one of opinion." 151 F.

Supp. 3d 287, 294 (E.D.N.Y. 2015), *aff'd*, 670 F. App'x 731 (2d Cir. 2016). The documents in

these cases, on the whole, were pregnant with signals to the reader that the statements made

therein were opinion.[3] Here, in contrast, Defendant points to its general website disclaimer and

terms of service, but nothing else.[4]

      Finally, Defendant urges that the statements in the Report are pure opinion because they

are based on publicly available documents expressly referenced in the Report. (Def. Mem. at 9.)

That is true, to an extent. Although the Report cites some publicly available documents, such as

---

[3] Defendant's argument that its Report is protected opinion because it is about "the *potential future outcome and consequences of [Plaintiff's] proposed plans*[ ]" is unpersuasive. (Def.'s Mem. at 13). Unlike the letter in *Immuno AG*, the Report does not signal to readers that it is a prediction. *See Immuno AG.*, 567 N.E.2d 1270, 1281 (N.Y. 1991) (finding the defendant's "presumptions and predictions as to what 'appeared to be' or 'might well be' or 'could well happen' or 'should be' would not have been viewed by the average reader . . . as conveying actual facts about plaintiff.").

[4] To be sure, Defendant is not absolved from defamation liability simply by virtue of being a short-seller or by the inclusion of a blanket disclosure that its Report is an opinion. *See Eros*, 2019 WL 1129196, at *11, n.7 ("The foregoing should not be read to suggest that a 'short and distort' scheme can *never* give rise to a viable claim of defamation simply because the alleged distortion is cloaked in the form of an opinion.").

the Feasibility Study, portions of the Report rely on the findings of an anonymous engineer.  (*See* Am. Compl. ¶ 19.)  Additionally, the Report concludes rather emphatically and without citation that "the mine will never be built."  (*Id.*)  At a minimum, a reasonable reader could infer that this statement and statements purportedly supported by an anonymous engineer imply that Defendant is aware of undisclosed facts.  *See, e.g.*, *Pisani v. Staten Island Univ. Hosp.*, 440 F. Supp. 2d 168, 176 (E.D.N.Y. 2006) (denying motion to dismiss where a reasonable jury could imply from the defendant's statement that defendant was aware of undisclosed facts that confirm plaintiff's misconduct); *see also Gross*, 623 N.E.2d at 1168 ("[A]lthough the articles contain many assertions that would be understood by the reasonable reader as mere hypotheses premised on stated facts, there are also actionable charges made in the articles—such as the charges that plaintiff engaged in cover-ups, directed the creation of 'misleading' autopsy reports and was guilty of 'possibly illegal' conduct—that, although couched in the language of hypothesis or conclusion, actually would be understood by the reasonable reader as assertions of fact.").[5]

**B.    Fault**

*1.    Public Figure*

"The showing of fault necessary to recover for libel varies depending on a plaintiff's position in society, requiring a higher degree of fault for public officials and public figures." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000).  A plaintiff that is a public figure must plausibly allege that "the statements were made with 'actual malice'—that is, with

---

[5] Defendant's reliance on *Nanoviricides* is misplaced.  There, the court found the article at issue was pure opinion in part because the statements made therein were either "followed by a recitation of 'facts' uncovered from public filings . . . linked to in the article itself, or no implication [was] given that they [were] based on undisclosed facts." *Nanoviricides*, 2014 WL 2930753, at *5.  In the instant case, a review of the Report reveals that it is entirely unclear which purported facts rely on the cited public documents.  Further, as mentioned, Defendant's Report relies on an anonymous engineer to conclude that the Donlin Project "is so remote and technically challenging that the mine will never be built."  (Am. Compl. ¶ 19.)

knowledge that the statements were false or with reckless disregard as to their falsity." *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (citations omitted). "Where the question whether a plaintiff is a public figure can be determined based upon the pleadings alone, the Court may deem a plaintiff a public figure at the motion to dismiss stage." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 270 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015), *and aff'd*, 622 F. App'x 67 (2d Cir. 2015). As the Supreme Court has recognized, a public figure is one who either: (1) achieves "such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts[,]" or (2) "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). The former is known as a general-purpose public figure, while the latter is a limited-purpose public figure.

Here, Defendant concedes that Plaintiff's status as a publicly traded company, on its own, does not render it a public figure for all general purposes. (Def.'s Reply Mem. Supp. Mot. Dismiss ("Def.'s Reply") at 5, ECF No. 43.) True. *See, e.g., Comput. Aid, Inc. v. Hewlett-Packard Co.*, 56 F. Supp. 2d 526, 535 (E.D. Pa. 1999) (applying New York law and finding that Hewlett-Packard, even if one of the "largest and most influential corporations in the world with one of the most actively traded stocks on the New York Stock Exchange" was not a public figure because it had not achieved "such pervasive fame or notoriety to be deemed a general purpose public figure."); *see also Enigma Software Grp. USA, LLC v. Bleeping Comput. LLC*, 194 F. Supp. 3d 263, 289 (S.D.N.Y. 2016) ("New York Courts have held that 'the mere fact that a business enterprise is successful is an insufficient reason to deem it a public figure.'" (quoting *Behr v. Weber*, No. 16047/89, 1990 WL 270993, at *2 (N.Y. Sup. Ct. Jan. 5, 1990), *aff'd*, 568

N.Y.S.2d 948 (App. Div. 1991))).  Instead, Defendant argues that Plaintiff is "at very least . . . a limited purpose public figure."  (Def.'s Mem. at 16.).

To prove that a plaintiff is a limited-purpose public figure, a defendant must show that a plaintiff has:

> (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.

*Biro*, 963 F. Supp. 2d at 270 (quoting *Lerman v. Flynt Distrib. Co., Inc.*, 745 F.2d 123, 136–37 (2d Cir. 1984)).  The facts in *Biro v. Conde Nast* are illustrative.  There, plaintiff alleged that he was a "leading authority" in his field, "lectured" on his field of study, "published . . . in various scientific journals", and had been interviewed for several documentaries on the subject.  *Id.* at 271.  The court found that "[t]he very purpose of writing articles in scientific journals, lecturing at universities, and opining in news shows and documentaries is to influence public discourse." *Id.*; *see also Lerman*, 745 F.2d at 137 (finding that an internationally renowned author of nine novels "[n]o doubt . . . invited public attention to her views" and "voluntarily devot[ed] herself to the public's interest in sexual mores, through extensive writing on this topic, reaping profits and wide notoriety for herself in the process").  As such, the court found the plaintiff was a limited-purpose public figure.  *Biro*, 963 F. Supp. 2d at 276.

In an effort to persuade the Court that Plaintiff is a limited-purpose public figure, Defendant directs the Court to news articles and a press release issued by Plaintiff to demonstrate that Plaintiff promotes the Donlin Project in the press and "polices criticism" of its plans.  (Def.'s Mem. at 16.; *see* Korzenik Decl., Ex. C (Plaintiff's news release regarding Defendant's Report), ECF No. 39-3; *id.*, Ex. D (June 17, 2020 news article regarding Defendant's Report), ECF No. 39-4; *id.*, Ex. E (Aug. 23, 2020 Business Insider article), ECF No. 39-5.)  Defendant also cites

three news articles on the environmental impact and regulatory framework surrounding the

"Pebble Mine project" to support a limited-purpose public figure finding.[6]  (Def.'s Reply at 6;

Reply Decl. David S. Korzenik dated Feb. 10, 2021, Exs. A–C, ECF Nos. 42-1–42-3.)

Perhaps these sources support such a finding.  However, Defendant's reliance on these

press releases and articles is misplaced at this stage.  When ruling on a motion to dismiss for

failure to state a claim, the Court "confine[s] its consideration 'to facts stated on the face of the

complaint, in documents appended to the complaint or incorporated in the complaint by

reference, and to matters of which judicial notice may be taken.'"  *Leonard F. v. Israel Disc.*

*Bank of New York*, 199 F.3d 99, 107 (2d Cir. 1999) (quoting *Allen v. WestPoint–Pepperell, Inc.*,

945 F.2d 40, 44 (2d Cir.1991)).  The Court may also consider material that is "integral" to the

complaint "when the complaint 'relies heavily upon its terms and effect."  *See Palin v. New York*

*Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019) (quotation marks omitted) ("Typically, an integral

matter is a contract, agreement, or other document essential to the litigation.").  None of the

sources cited by Defendant are incorporated in or integral to the amended complaint.  Further,

the Court declines to take judicial notice of Plaintiff's statements made to analysts, the media,

and the public.[7]  Short of converting Defendant's motion to dismiss into a motion for summary

judgment, which the Court declines to do, there is no basis to consider Defendant's outside

sources at this stage.  Indeed, the Second Circuit has made clear that to do so is improper.  *See id*.

(reversing where trial court "both relied on matters outside the pleadings to decide the motion to

dismiss and did not convert the motion into one for summary judgment.").

---

[6]  The relevance of the seemingly unrelated "Pebble Mine project" is lost on the Court.  It is neither referenced in the amended complaint nor in Plaintiff's briefs.

[7]  Defendant asserts that it is "hardly 'inappropriate'" to take judicial notice of these articles because they are not subject to "reasonable dispute."  (Def.'s Reply at 6, n. 3.)  That point itself is disputable.  Nevertheless, as noted above, the Court declines to take judicial notice.

In any event, Defendant maintains that Plaintiff has thrust itself into public controversy by planning, and seeking the public permits necessary to carry out, the Donlin Project. (Def.'s Mem. at 16.)  According to Defendant, Plaintiff's plans and permits are "environment-related" and the Donlin Project "will operate on Indigenous lands under contract with 'Native Corporation partners' that engage a regulatory framework of more than usual public concern." (Def.'s Reply at 6.)  Moreover, Defendant argues that Plaintiff "seeks out and secures much press to promote its gold mining plans as the [amended complaint] boasts."  (Def.'s Mem. at 16.) These arguments are unavailing.

The Second Circuit has defined "public controversy" as "any topic upon which sizeable segments of society have different, strongly held views."  *Lerman*, 745 F.2d at 138.  "[T]he issue into which the plaintiff has injected himself must be 'controversial' at the time the plaintiff forayed into the matter."  *Biro*, 963 F. Supp. 2d at 272.  Here, there is no support in the pleadings for the contention that the Donlin Project constitutes a public controversy or that Plaintiff "plunge[d] into the arena and enter[ed] the fray[]" of controversy.  *Lerman*, 745 F.2d at 138. There are no allegations that a "public controversy" even existed over the Donlin Project prior to the publication of the Report.  Instead, the only allegation touching on the public relates to the publicly available documents that support the "feasibility of the Donlin Gold project."  (Am. Compl. ¶ 10.)  That does not a public controversy make.  Although Plaintiff alleges that it publicly refuted the statements in Defendant's Report (*id.* ¶ 43), public denials of alleged defamations "do not constitute [a plaintiff] 'injecting' themselves into a public controversy." *Calvin Klein Trademark Tr. v. Wachner*, 129 F. Supp. 2d 248, 252 (S.D.N.Y. 2001).

2.      New York's anti-SLAPP" Law

Defendant maintains that even if the Court finds that Plaintiff is not a limited-purpose public figure, Plaintiff must plead actual malice under New York's recently amended anti-SLAPP law.  (Def. Mem. at 14–15.)  New York's anti-SLAPP law has long required a plaintiff plead actual malice "[i]n an action involving public petition and participation."  N.Y. Civ. Rights Law § 76-a(2) (McKinney 2020).  The prior version of the statute encompassed "persons whose proposed actions required government permission."  *Chandok v. Klessig*, 632 F.3d 803, 819 (2d Cir. 2011) (collecting cases).  On November 10, 2020, New York amended its anti-SLAPP statute and broadened the scope of actions subject to the actual malice requirement.  Now, an "action involving public petition and participation" includes:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civil Rights Law § 76-a(1)(a).  Additionally, the law instructs that "'[p]ublic interest' shall be construed broadly, and shall mean any subject other than a purely private matter."  *Id*. at §76(1)(d).  Plaintiff does not dispute that the complained of conduct falls under the anti-SLAPP statute.  However, Plaintiff argues that the law's amendment does not apply retroactively, and thus Plaintiff is not required to plead actual malice.  (*See* Pl.'s Mem. L. Opp. Mot. Dismiss ("Pl.'s Opp.) at 7–9, ECF No. 41.)  The Court disagrees.

Under New York law, statutory amendments are "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated."  *In re Gleason (Michael Vee, Ltd.)*, 749 N.E.2d 724, 726 (N.Y. 2001).  That said, "remedial legislation should be given retroactive effect . . . ."  *Id*.  "Remedial statutes are those

16

designed to correct imperfections in prior law, by generally giving relief to the aggrieved party."
*Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 263 (Sup. Ct. 2011) (citation and internal quotation marks omitted).  Under that framework, it is clear that New York's anti-SLAPP statute is such a remedial statute.

Moreover, the retroactive application of the statute's amendment is supported by the plain language of the statute as well as the legislature's intent.  In determining whether to apply a statute retroactively, Courts consider "whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency" and "whether the enactment itself reaffirms a legislative judgment about what the law in question should be."  *In re Gleason (Michael Vee, Ltd.)*, 749 N.E.2d at 726.  According to the statute's Sponsor Memorandum, the amendment "shall take effect immediately."  S52A Sponsor Mem. (July 22, 2020), https://www.nysenate.gov/legislation/bills/2019/s52.  Further, the legislature specifically noted that "this amendment to Section 76-a will better advance the purposes that the Legislature originally identified in enacting New York's anti-SLAPP law. . . . by broadly widening the ambit of the law . . . ."  *Id*.  Thus, as other courts in this circuit have found, the remedial intent and expressed urgency of the amendment compel retroactive application of the New York anti-SLAPP law as amended.  *See, e.g.*, *Coleman v. Grand*, No. 18-CV-5663, 2021 WL 768167, at *8 (E.D.N.Y. Feb. 26, 2021) (applying New York's anti-SLAPP amendment retroactively); *Palin v. New York Times Co.*, 510 F. Supp. 3d 21, 26–29 (S.D.N.Y. 2020) (same).

### 3.    *Actual Malice*

Having found that Plaintiff is subject to New York's amended anti-SLAPP law, to sustain its claim, Plaintiff must plead actual malice.  Actual malice is the "knowledge that the statements were false or [made] with reckless disregard as to their falsity."  *Biro v. Conde Nast*, 807 F.3d

17

541, 544 (2d Cir. 2015).  As the Supreme Court has explained, while "the concept of 'reckless disregard' cannot be fully encompassed in one infallible definition, we have made clear that the defendant must have made the false publication with a high degree of awareness of probable falsity, or must have entertained serious doubts as to the truth of his publication."  *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989) (internal quotation marks, citations, and alterations omitted).

Here, Plaintiff's allegations give rise to a plausible inference that Defendant published the Report with reckless disregard for the truth.  According to the amended complaint, Defendant created and published the Report with "an incendiary tapestry of inaccuracies, misstatements, and falsehoods . . . all for the purpose of manipulating the price of [Plaintiff's] stock downward and causing panic."  (Am. Compl. ¶ 1.)  In doing so, Defendant's Report is "deliberately indifferent to the truth, time and time again."  (*Id*. ¶ 12.)  Specifically, the allegations explain that Defendant contacted Plaintiff to inquire as to the Donlin Project but neglected to follow-up with specific questions before publishing the Report despite Defendant's "lack of experience covering mining companies."  (*Id*. ¶¶ 11, 19.)  Plaintiff further alleges that the claims made in the Report are readily contradicted by public documents, including the Feasibility Study, which is cited in the Report.  For example, the Report asserts that "[m]anagement deliberately misleads investors with custom metrics designed to deceive, directing investors to presentations which claim the deposit will require $6.7 bln in capital, however the feasibility study clearly shows this number is $8 bln . . . ."  (*Id*. ¶ 21.)  According to Plaintiff, the Feasibility Study cited by Defendant makes clear that the $8 bln figure referenced in the Report includes operating costs, as opposed to the $6.7 bln figure that represents initial capital costs.  (*Id*. ¶ 22.)  Additionally, Plaintiff identifies statements in the Report regarding the commercial and environmental feasibility of the Donlin

Project as being directly contradicted by the Plan of Development and Supplemental Pipeline Information. (*See id*. ¶ 28.) In sum, Plaintiff's allegations that Defendant had access to relevant truthful facts contradicting the statements in the Report which it chose to ignore or blatantly misrepresent paint a plausible picture of Defendant's willful disregard for the truth. *See Palin*, 940 F.3d at 815 (allegation that Defendant included a hyperlink to contradictory information in its publication supported a finding of actual malice).

### C. Falsity

#### 1. Substantial Truth

In a final effort to convince the Court to dismiss Plaintiff's defamation claim, Defendant argues that Plaintiff fails to allege the falsity of its statements. (*See* Def.'s Mem. at 18–19.) The Court disagrees. As the Second Circuit has made clear, to prevail on a motion to dismiss a plaintiff "must plead facts that, if proven, would establish that the defendant's statements were not substantially true." *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 247 (2d Cir. 2017). "[A] statement is substantially true if the statement would not have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Id*. at 242 (quotation marks and citation omitted).

The crux of Defendant's argument is that Plaintiff's allegations of falsity are merely different interpretations of the same public documents. (Def.'s Mem. at 19.) Defendant's argument, even if it had merit, only highlights three specific statements from the Report. Defendant does not address the number of other allegedly false statements. For example, the Report states that "the Donlin deposit . . . is not feasible to put into production at any gold price . . . ." (Am. Compl. ¶ 25.) Plaintiff alleges that the Feasibility Study "goes into exacting detail to demonstrate the economic viability of the deposit at numerous gold prices—including at $1,200

per ounce, which is substantially lower than today's current gold price of approximately $1,700 per ounce . . . ." (*Id.*) Additionally, the Report claims that "[t]he proposed natural gas pipeline central to power the project is dead on arrival," and that "[t]he terrain around the Donlin deposit is among the most inhospitable on the planet." (*Id.* ¶ 26.) Plaintiff alleges that this statement is false in part because "more than half of the planned route is comprised of lowlands or rolling terrain." (*Id.* ¶ 27.) Moreover, Plaintiff alleges that the Report incorrectly states that "[e]ach of the 300 stream crossings will require a temporary bridge, and dam, and two pits, one on either side of the stream, for the drilling equipment to bore a hole under the stream." (*Id.* ¶ 28.) Plaintiff alleges, however, that the Plan of Development and Supplemental Pipeline Information show that "approximately 7—not 300—stream crossings are proposed for horizontal directional drilling" and "[n]o equipment is required to 'bore a hole under the stream' for these other 293 crossings." (*Id.* ¶ 28.) Plaintiff has more than adequately alleged specific facts demonstrating that Defendant's statements would "have a different effect on the mind of the reader from that which the pleaded truth would have produced." *Tannerite Sports, LLC*, 864 F.3d at 242; *see also Goldman v. Reddington*, 417 F. Supp. 3d 163, 173 (E.D.N.Y. 2019) (finding plaintiff adequately pleaded falsity where plaintiff "unambiguously disavow[ed]" the defamatory statement and "present[ed] specific facts . . . to plausibly allege" the statements were not true); *cf. Primiani v. Vintage 185 Inc.*, No. 18-CV-2237, 2019 WL 486087, at *3 (E.D.N.Y. Feb. 6, 2019) (dismissing defamation claim where "vague assertions" were "unclear what, if any, parts of" the challenged statements were false). Accordingly, Defendant's motion is denied with respect to Plaintiff's defamation per se claim.

## II.     Trade Libel

Under New York law, a claim for trade libel, sometimes referred to as product disparagement or injurious falsehood, is distinct from a defamation claim.  *See Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 522 (N.Y. 1981) ("[A]lthough defamation and disparagement in the commercial context are allied in that the gravamen of both are falsehoods published to third parties, there is a distinction.").  To establish a claim for trade libel, "plaintiff[] must show defendant['s] publication of a defamatory statement directed at the quality of their goods, which statement caused 'special damages.'"  *Bilinski v. Keith Haring Found., Inc.*, 632 F. App'x 637, 641 (2d Cir. 2015) (citing *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 59 (2d Cir. 2002)).

Defendant argues that the Donlin Project is not capable of disparagement and, therefore, the statements made in the Report cannot support a trade libel claim.  (Def.'s Mem. at 20.)  Trade libel encompasses statements that "negatively reflect upon the condition, value or quality of a product or property."  *Eminah Properties LLC v. Energizer Holdings, Inc.*, No. 20CV148, 2021 WL 1209562, at *10 (E.D.N.Y. Mar. 31, 2021) (citing *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016)).  Here, it is unclear whether the Donlin Project—a prospective "open-pittable gold deposit[]"—is capable of disparagement as a matter of law.[8]  (Am. Compl. ¶ 10.)  However, whether the Donlin Project is capable of disparagement is of no moment because Plaintiff has failed to allege special damages.

---

[8] Defendant argues, in part, that the Donlin Project is not capable of disparagement because Plaintiff does not own the land that would be the site of the future mine.  (Def.'s Reply at 9.)  At least one case has found that allegedly defamatory statements about a proposed office and shopping center development could support trade libel.  *See*, *Cambridge Assocs. v. Inland Vale Farm Co.*, 497 N.Y.S.2d 751, 753 (App. Div. 1986).

"Language which merely disparages a product is not actionable unless special damages are pleaded and it appears that such damage is a natural and immediate consequence of the disparaging statements." *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (citations omitted). "Special damages are limited to losses having pecuniary or economic value, and must be fully and accurately stated, with sufficient particularity to identify actual losses." *Enigma Software*, 194 F. Supp. 3d at 292 (internal quotation marks and citation omitted). For example, a plaintiff must "identify actual losses or name . . . individuals who have ceased to be [its] customers due to the defendant['s]" disparaging statement. *Idema v. Wager*, 120 F. Supp. 2d 361, 368–67 (S.D.N.Y. 2000), *aff'd*, 29 F. App'x 676 (2d Cir. 2002) (citation omitted). Further, actual damages must be specifically pleaded—"relying . . . on round figures" is not enough. *Id.* at 369 (citation omitted). "[F]ailure to plead special damages is a fatal defect" to a claim for trade libel. *Id.* at 368. Plaintiff argues that it has pleaded special damages in the form of divestment in its company and a drop in its stock-value following publication of the Report, in addition to costs associated with counteracting the impact of the Report. (*See* Pl.'s Mem. at 21–25.) The Court disagrees.

First, Plaintiff argues that its stock price "plunge[d]" following the publication of the report, "which convinced investors to divest from [Plaintiff]." (*Id.* at 23.) According to the amended complaint, Plaintiff's stock price dropped nearly 9% over the course of the day that the Report was published and continued to fall in the weeks that followed. (Am. Compl. ¶ 46.) In support of this theory of special damages, Plaintiff primarily relies on the District of New Jersey's decision in *Intervet, Incorporated v. Mileutis, Limited*. (*See* Pl.'s Mem. at 22.) In *Intervet*, the court found that loss of investment income could constitute special damages to support a trade libel claim. *Intervet, Inc. v. Mileutis, Ltd.*, No. CV 15-1371, 2017 WL 1528719,

at *5 (D.N.J. Apr. 27, 2017).  The court's determination, however, was rooted in New Jersey

state law precedent holding that a plaintiff need only "identify particular 'business interests who

have refrained from dealing with [it]'" to plead special damages.  *Id*. (quoting *Patel v. Soriano*,

848 A.2d 803, 835 (N.J. Super. Ct. App. Div. 2004)).  Here, as the parties rightly note, New

York courts have not entirely adopted this theory of special damages, which is akin to a "loss of

market" theory.  *See Bilinski*, 632 F. App'x at 642 ("[T]he New York Court of Appeals has yet to

adopt this theory of special damages.")  In any event, Plaintiff's single paragraph allegation

regarding its stock decline fails to specifically identify lost investors or attempt to explain why

identification is impossible.  *See id*. (rejecting loss of market theory where plaintiff failed to

identify individuals whose conduct caused the loss).  Indeed, Plaintiff does not actually allege

any divestment or loss of investors occurred as the result of the Report, only that its stock price

declined.  In that respect, Plaintiff has not eliminated "the possibility that other factors [] caused"

the decline in its stock price.  *Charles Atlas, Ltd. v. Time-Life Books, Inc.*, 570 F. Supp. 150, 156

(S.D.N.Y. 1983) (quoting W. Prosser, Handbook of the Law of Torts § 128, at 923–24 (4th ed.

1971)).  In sum, Plaintiff's allegations that its stock price declined do not constitute special

damages.

     Second, Plaintiff argues that it suffered special damages in the form of legal fees and

employee time incurred "to remedy [Defendant's] false and disparaging statements prior to

initiating this legal action."  (Def.'s Mem. at 24.)  According to the amended complaint, Plaintiff

incurred $212,000 in legal fees from its pre-suit efforts to counteract the effect of Defendant's

Report and "at least $201,000 in employee time to date."  (*Id*. ¶ 49.)  With respect to legal fees,

Defendant's reliance on *Angio-Medical Corporation v. Eli Lilly & Company* for the proposition

that legal fees do not constitute special damages is not persuasive.  (*See* Def.'s Mem. at 22.)

*Angio-Medical Corporation* simply states the rule that legal fees incurred "for the commencement of [an] action" are not recoverable as special damages. *Angio-Med. Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (quoting *Wallace v. Weiss*, 372 N.Y.S.2d 416, 421 (Sup. Ct. 1975)). Further, the court in *Angio-Medical Corporation* acknowledged that the rule applies where legal fees and executive time are the only special damages alleged. *Id.* ("[W]e determine that legal fees and executive time, standing alone do not comprise special damages . . . ."). That is not altogether the case here, where the legal fees at issue are not limited to initiating this action and include fees incurred by rebutting the effects of Defendant's Report. (Am. Compl. ¶ 49.) Nevertheless, Plaintiff summarily alleges that the expenses for "analyzing the Report . . . refuting the misstatements in the Report . . . analyzing market activity, and in clearing [Plaintiff's] name[]" amounted to "at least $212,000" in legal fees. (*Id.*) Further, Plaintiff alleges that employees and management "spen[t] significant time rebutting the numerous falsehoods and inaccuracies raised in [the] Report" to the estimated tune of $201,000 in lost employee time. (*Id.*) These estimated losses, as pleaded, fail to sufficiently allege particularized actual losses.[9] *See Idema*, 120 F. Supp. 2d at 368–69 (dismissing allegations of special damages where the plaintiff "fail[ed] to specify the amount of actual damage he [] suffered, relying instead on round figures, which is not appropriate.") Accordingly, Plaintiff has failed to plead special damages.

---

[9] Plaintiff's deficiency in this respect is particularly egregious given that the Court granted leave for Plaintiff to amend its original allegations of special damages.

**CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is DENIED in PART and

GRANTED in PART.  Defendant's motion to dismiss Plaintiff's defamation by libel per se claim

is DENIED.  Defendant's motion to dismiss Plaintiff's trade libel claim is GRANTED.

                                        SO ORDERED.

Dated: Brooklyn, New York                /s/ LDH
       March 28, 2022                    LaSHANN DeARCY HALL
                                         United States District Judge

25