UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

NOVAGOLD RESOURCES, INC.

                Plaintiff,

       - against -

J CAPITAL RESEARCH USA, LLC,

               Defendant.

-------------------------------------------------------------X

Index No. 1:20-cv-02875-LDH-PK

**ANSWER AND ANTI-SLAPP COUNTERCLAIM OF DEFENDANT J CAPITAL RESEARCH USA, LLC**

Defendant *J Capital Research USA, LLC* ("JCap"), by its attorneys*, Miller Korzenik Sommers Rayman LL*P, answers the First Amended Complaint ("Complaint" or "FAC") of Plaintiff Novagold Resources, Inc. ("NG") and asserts its Counterclaim as follows:

### NG's Action Is a Typical SLAPP Suit

a. The present action brought by NG against JCap is a classic SLAPP action under N.Y. Civ. Rights Law §§ 70-a and 76-a. Precisely as § 76-a defines it. Precisely the kind of suit that the Anti-SLAPP law was enacted to interdict. NG's libel action was "*commenced and continued without a substantial basis in fact and law*" for the purpose of suppressing JCap's critical speech by using litigation to "harass[ ], intimidate[ ], punish[ ] or otherwise maliciously inhibit[ ] the free exercise of speech."

b. ***NG's Lawsuit is Itself a "Stock Promote"***: To say that NG is a "stock promote" is a legitimate and fair expression of non-actionable opinion. To say that this libel action by Plaintiff NG is itself an abusive extension of NG's stock promote, captures its core purpose. The FAC is an argumentative PR piece, which NG transposed into the form of a lawsuit designed to punish JCap with burdensome costs of defense and to intimidate anyone who might consider criticizing

NG's 2012 Feasibility Study or shorting its stock. That is what this case is about and why it was brought.

    **c**. JCap's "Pipe Dream" Report was a critique of its 2012 Feasibility Study. ("FS or "2012 FS") There is little more to NG than the promise of the 2012 FS and its mining permits. ***There is no mine, no powerplant, no 315+ mile pipeline, no gold being mined, no revenue.*** That is why the Report calls the 2012 FS a "Pipe Dream."

    **d**. Rarely do companies that have revenues sue for libel - no matter what is said of them. But for those who are *not* earning revenues and whose *yet unrealized* prospects are based on hype and promises (or those who claim to have earnings, but which are suspect), libel actions are the first tools deployed to stifle criticism. As here with NG's SLAPP, such libel suits buy time and deniability for plaintiffs i) while they continue to benefit and ii) while they impose needless and abusive costs and burdens on less well-funded defendant speakers such as JCap.

    **e**. NG's FAC lacks substantial basis in law or fact: Among other defects, it fails to plausibly plead *or anywhere assert* actual malice: Most telling is NG's allegations a) that its 2012 FS (https://www.novagold.com/_resources/projects/technical_report_donlin_gold.pdf ) *itself* demonstrates the "falsehood" of the Report (see e.g., FAC ¶10, 22, 27 among others); and b) that JCap *should have known* that it was false because the Report *hyperlinks to and quotes from the FS*. (DKT 41 at p. 14-15 [1] ) These are not just allegations; they are admissions; and they have two consequences: 1) They defeat an allegation of actual malice and 2) they stand as an

---

[1] The FAC asserts *no facts* regarding actual malice. It addresses actual malice in only one paragraph, ¶51. But ¶51 offers no more than "actual malice" legal buzzwords - nothing more. (See CC125-CC128 below) Ordinarily, this patent defect would lead to prompt dismissal. NG in its opposition to the Motion to Dismiss gamely sought to fill that obvious gap with its specious *hyperlink* argument. That hyperlink argument does not remedy the defect; it compounds it. (The allegations that JCap was a "short seller" or "biased" does nothing for actual malice. All companies who sue short reports for libel say that; but that does not get close to actual malice.)

admission that the so-called contested "facts" are nothing other than disputed non-actionable opinions about the 2012 FS.

**f.** NG's basis for pleading "actual malice" is built on an unjustified misreading and unwarranted expansion of *Palin v. NY Times,* 940 F..3d 804 (2d Cir. 2020) and substantially departs from accepted law. Hyperlinks *to the work criticized* cannot form any plausible basis for alleging actual malice.  Rather, they *negate* actual malice. There is no legal authority to the contrary[2]. NG can cite none.

**g.**  When a publication such as JCap's Report hyperlinks to and quotes from the very words it is criticizing, that is the benchmark of its *fairness and good faith* (the very opposite of actual malice). Similarly, if a publication such as the JCap Report hyperlinks to and quotes from the very words it is criticizing, that is the benchmark and essence of *non-actionable opinion*.

**h**. Many of the challenged statements are *not about* NG; many are *not defamatory* of anyone; most *are predictions* which are therefore straight opinion; and many are on their face pure words of *opinion standing alone*. No good faith libel suit can be based on them.

**i.** NG's SLAPP suit is all the more lacking in any substantial basis because NG asserts in its Feasibility Study that the statements in it are "*forward looking*" and therefore not to be relied on by potential investors as fact. JCap's criticism of the FS can likewise be nothing other than forward looking criticism of a forward looking Study – outright non-actionable opinion. Hypocritically, NG asserts that its FS is forward looking, but that JCap's Report on the FS is not.

---

[2] In none of their submissions to the Court does NG site any. And the consistent line of authority applying the *Immuno v Moor-Jankowski* opinion standard to short reports (the *Silvercorp 7* line of cases, DKT 40 at p. 2-5) all run to the contrary.

### *N.B.: Interlaced Anti-SLAPP Counterclaim Pleadings*

The Anti-SLAPP law, NYCRL §70-a, provides a libel defendant with a counterclaim against a plaintiff where the libel suit has been "commenced and continued without a substantial basis *in fact and law*." (emphasis added)

The pleading of an Anti-SLAPP Counterclaim, therefore, uniquely addresses the *lack of substantial basis* in the underlying action and its allegations. While some core elements of the Anti-SLAPP Counterclaim are plead below *after* the Answer to the FAC, here *key specific allegations* in support of the Counterclaim follow *each* of NG's numbered allegations in its FAC.

Accordingly, Plaintiff in answering this Anti-SLAPP Counterclaim must specifically admit or deny each of the Defendant's allegations that follow and that challenge each impugned paragraph of the FAC. These interlaced Counterclaim allegations, to be answered by NG, are set out in **Blue**. They are numbered and identified as, **CC1, CC2**, etc.

The Interlaced pleading format is appropriate to the special Anti-SLAPP cause of action. It is also more convenient for the parties and for the Court so that the reader need not constantly look back at earlier numbered paragraphs to understand what defects are being alleged.

In some cases, mostly with the FAC's pleading of allegedly false statements (i.e., FAC ¶20-40), those allegations from the FAC are reprinted in full in this Answer and then addressed by specific Counterclaim allegations (CC1, CC2 on) which NG must answer – because they go to the lack of "substantial basis" for those FAC allegations. They are part of the Counterclaim pleading.

## ANSWER

1.       Denies every factual allegation contained in paragraph 1 of the Complaint.

**CC1**: NG diverts the focus of its libel claim by making it seem that what is at issue is a "short and distort scheme" and by alleging that short selling backed by short reports is itself improper and "illegal" when in fact it is not.

**CC2**: This is a libel action; not a securities action.

**CC3**: Short selling, short reports and financial research groups provide a legitimate, valuable and recognized market function.[3]

**CC4**: The SEC recognizes that short selling has a legitimate market function and has said so multiple times. NG knows that its FAC lacks substantial basis by pleading otherwise.

**CC5**: When a short report publisher writes critically of a company by attacking or criticizing its hype, there is nothing illegal or improper about it.

a.   And if they profit from such publications via short selling, there is nothing illegal or improper about that either.

**CC6**: NG's pleading that short selling or short reports are "illegal" is false and the claim has no substantial basis.

**CC7**: There is no law or regulation that bars or makes short reports per se illegal or improper.

---

[3] "Nevertheless, short selling provides a financial incentive for individuals to uncover negative information (such as fraud) and can also act to dampen the boom/bust cycle, since shorts can reduce irrational exuberance when stocks are going up, and covering shorts acts as upward pressure on declining stocks." See, e.g., Vivian W. Fang, Allen H. Huang, and Jonathan M. Karpoff. "Short selling and earnings management: A controlled experiment." The Journal of Finance 71.3 (2016): 1251-1294, Robert F. Stambaugh, Yu Jianfeng, and Yu Yuan. "The short of it: Investor sentiment and anomalies." Journal of Financial Economics 104.2 (2012): 288-302.

**CC8**: There is no substantial basis for claiming otherwise. In fact, any effort by the SEC to regulate short reports or short selling based on them would run afoul of the First Amendment[4].

2.      Denies every factual allegation contained in **paragraph 2**, except admits JCap has analyzed both Chinese technology companies and mining companies as well.

**CC9**: NG alleges that "JCap has a track record of attempting to manipulate the market" when NG knows that is untrue and that JCap has a track record of truthfully exposing abusive companies. JCap was one of the short research organizations that exposed *Luckin Coffee* and *Wirecard* – both cited by Prof. Coffee[5] as examples of the valued and worthy contributions that such short reports can and do provide.

**CC10**: JCap has experience covering mining. And has covered mining companies before. (Northern Dynasty's Pebble Mine, also in Alaska, among them.)

**CC11**: JCap did not publish the "*Pipe Dream*" Report anonymously.

a.   JCap would have been entirely within its rights had it done so.

3.      Denies every factual allegation contained in **paragraphs 3 and 4** of the Complaint.

**CC12**: NG's FAC persists with its "market manipulation"/ "short and distort" canard as if it had some other grievance against JCap other than a libel claim. None of those allegations

---

[4]  Prof. John Coffee, of Columbia Law School has stated that any effort to regulate short reports or short sellers would run afoul of the First Amendment: *"But, in the US, our First Amendment protects anonymous speech and any contrary SEC rule would be clearly unconstitutional."* The CLS Blue Sky Blog ("Columbia Law School's Blog on Corporations and Capital Markets") https://clsbluesky.law.columbia.edu/2020/07/07/activist-short-selling-today-the-two-sides-of-the-coin/

[5]  Prof. Coffee has written of short report publishers and short sellers: "On the positive side, they uncovered the frauds at *Luckin Coffee* and *Wirecard*, and in the recent past they shined the spotlight of disclosure on Valeant Pharmaceuticals. James Chanos deservedly became the patron saint of short sellers for his long and risky efforts to organize the campaign that ultimately brought down Enron." Id at F

can get NG around the First Amendment or Anti-SLAPP constraints that they in fact face. But that is exactly what NG's SLAPP effort, with its "short and distort" canard, is intended to do.

**CC13**: NG has neither plead nor come forward, even when given opportunities to do so, with any evidence of any harm caused to them by the JCap Report. In all events, the Trade Libel claim that these general allegations of putative harm largely pertain to was dismissed for failing even to plausibly allege the basis or requisite harm for such a cause of action.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in **paragraph 5** of the Complaint.

5.      As to the allegations contained in **paragraphs 6 through 9** of the Complaint, which largely consist of legal conclusions and references to statutes, Defendant respectfully refers the Court to those statutes and laws for their interpretation.  But JCap does not challenge personal jurisdiction in New York.

6.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in **paragraph 10** of the Complaint, except denies that the feasibility of the Donlin Project is supported by the documents or that "key findings" are well-documented by any of the publicly available documents referred to in paragraph 10.

**CC14**: The documents referred to by NG in ¶10 are disputed in the JCap Report. They are hyperlinked, cited and repeatedly quoted in the JCap Report so that readers can assess for themselves ***JCap's reading of them*** *versus* ***NG's reading of the very same documents***. It is clear to any reader that the Report is based on a review of these publicly available documents, nothing more and nothing less. There is nothing else to write about *but* the documents – since NG's mine, pipeline, power station, etc. do not exist.

**CC15:** NG's ¶10 allegations are themselves an admission – one of many - that the JCap Report is pure opinion based on fully disclosed underlying fact.

      a.   The 2012 FS hyperlinked to the Report is an authentic copy of NG's 2012 FS.

      b.   NG has never claimed otherwise.

7.      Denies every factual allegation contained in **paragraph 11** of the Complaint, except admits that Tim Murray contacted Plaintiff at least as early as September 2019.

8.      Denies every factual allegation contained in **paragraph 12** of the Complaint, except that JCap admits that it publishes "highly diligenced research," as described, on over-valued companies throughout the world.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in **paragraphs 13 through 15** of the Complaint. Denies that Wedge Partners' issues with FINRA, if any, have any bearing on JCap or on JCap's Report. Denies the description of JCap's "modus operandi" and notes that NG mischaracterizes the statement quoted in paragraph 15.

10.     Denies every factual allegation contained in **paragraph 16** of the Complaint, except admits that JCap published its 22-page report on Thursday, May 28, 2020 and agrees that, as alleged, NG did publish its rebuttal to JCap's Report as well as follow-up rebuttals.

11.     Denies every factual allegation contained in **paragraph 17** of the Complaint and notes that none of it proves or demonstrates any falsehood in the JCap Report.

12.     Denies every factual allegation contained in **paragraph 18** of the Complaint, except admits and concurs that JCap does have experience covering Chinese companies, tech and consumer companies, but also mining companies as well.

**CC16:** Among the mining projects JCap has covered is Northern Dynasty's Pebble Mine and its Alaskan open-pit mining plans, quite similar in many ways to NG's. *Northern Dynasty*, is another Canadian company. Its permits were rescinded; and its Pebble Mine will never be built.

**CC17:** NG and its counsel knew, when it filed this lawsuit and its FAC that JCap had experience covering mines; and that it had covered Northern Dynasty's Pebble Mine, etc.

13.     Denies every factual allegation contained in **paragraph 19** of the Complaint, except admits that the two limited quotations from the Report are fair and well-founded.

**CC18**: NG's ¶19 allegations demonstrate the specious character of NG's SLAPP suit. At its core NG's FAC is *quarreling over **predictions** -* predictions and forward-looking statements about a mine that does not exist.  ¶19 is itself an admission that 1) the allegations are matters of non-actionable opinion; and 2) the lawsuit is a SLAPP, an effort to use litigation to promote and tout NG's 2012 predictions about its Donlin plans, and to use litigation to argue over the future of its 2012 Feasibility Study and, most importantly, to chill any criticism of it.

### *Statements in JCap's Report Challenged in NG's FAC*

**N.B.: All Bracketed San Serif paragraphs below are directly quoted paragraphs from the FAC. They are reprinted here for the convenience of the Court, the reader and NG when it responds to these Counterclaim allegations**.

[**FAC ¶20**. The numerous distortions and flat-out falsities contained in the Report revolve around three central themes: that NOVAGOLD misled investors, that the Donlin Gold project is so remote it will never be built, and that NOVAGOLD's management is dumping its equity in the company. All are demonstrably false.]

14. Denies every factual allegation contained in **paragraph 20** of the FAC as well as its mischaracterizations of the Report. And objects to the misleading use of generalized "themes" that are not based on the actual words at issue quoted in context. The generalized "themes" cannot be read standing alone.

**CC19**: *As to the first generalized "theme*:" To "mislead" as to a fact may sometimes, depending on context, be a fact; but to "mislead" as to an opinion is an opinion. Similarly, to "mislead" as to a *prediction* or "*forward looking statement*" is likewise non-actionable opinion. The FAC stands on the unsupportable suggestion that any claim that someone "misleads" – whether referring to an opinion or not - are all "factual." They are not.

**CC20**: *As to the second generalized "theme*:" The statement that a "*project is so remote it will never be built*" is a) a prediction/opinion ("*will* never") and b) and an opinion ("so remote"). The statement is on its face non-actionable and to contend otherwise is frivolous. The statement admits to no precise meaning that can be proven true or false (A fact finder should not be put to certifying the feasibility of NG's plan or the merits of investing in its stock.)

**CC21**:  *As to the third generalized "theme*:" NG *admits* that management did exercise options, which public documents also show. To characterize that admitted action as "dumping" is straight opinion.  Management may not have *added* to their holdings of NG, but they did exercise their options to earn money from the sale.

**CC22**: Disingenuously and frivolously, NG asserts that management still holds the same number of shares before the exercise as they did after they exercised and sold their options.


**[FAC ¶21**. JCAP's distortions start from the first sentence of the Report. JCAP falsely states that "[f]or the last 15 years, NOVAGOLD's management team has systematically misled investors with subjective presentation of information about a deposit so remote and technically challenging that the mine will never be built." Most prominently, JCAP asserts that "management's biggest misrepresentation is around the cost to build the pipeline" and then intentionally misrepresents that "[m]anagement continually and deliberately misleads investors on capital costs for Donlin." According to JCAP, "[m]anagement deliberately misleads investors with custom metrics designed to deceive, directing investors to presentations which claim the deposit will require $6.7 bln in capital, however, the feasibility study clearly shows this number is $8 bln (already, we believe, far too low)." Elsewhere in the Report, JCAP represents that "[t]he most recent feasibility study, done in 2012, estimated that the initial capex alone, is $8 bln, not $6.7 bln."]

15. Denies every factual allegation contained in **paragraph 21** of the FAC as well as its mischaracterizations of the Report.

**CC23:** NG's use of the word "distortions" is an effort to create libel by implication claims that are not properly or plausibly pleaded and lack substantial basis in fact or law.

**CC24:** *The FAC Treats Compound Opinions as "Libel:"* The allegation that NG, "misled investors with subjective presentation of information about a deposit so remote and technically challenging that the mine will never be built" *is compound opinion*. It is a claim that the NG FS "misleads" as to three compounded points of opinion: 1) with "*subjective presentation*" (not objective); 2) about "a deposit *so remote and technically challenging*" (total opinion); and 3) "that the mine *will never* be built" (plain opinion about a prediction). To say that NG misleads about an opinion ("subjective") about an opinion ("so remote . . and challenging") about an opinion ("will never be built") is compound opinion.

a. There is no legitimate or substantial basis for making such a claim. And it is all the more lacking in substantial basis because the underlying 2012 Feasibility Study and related public documents are all set forth and cited in the Report for readers to decide for themselves.

**CC25:** *NG's Libel Claim about "Misleading Investors regarding Capital Costs:"* The FAC's key and "*most prominent*" example of how "management systematically and deliberately misleads investors" is the statement that "management continually and deliberately misleads investors on the capital costs for Donlin." This putative "misrepresentation" as NG identifies it specifically relates to the dispute over how the FS characterizes the "***8 bln versus 6.7 bln cost***."

a.      The FS offers the *same numbers* and explains them as it wishes, the Report cites the FS for those *same numbers* and disputes their characterization. Are these costs, capital costs or are they operating costs?

b.      The hyperlinked FS permits readers to decide for themselves how best to classify those ***very same numbers***. That makes this libel claim pure and transparent opinion.

**CC26**: There is no non-frivolous or substantial basis for alleging such opinion to be a "false" fact.

[**FAC22**. These statements are false, misleading, and defamatory, and they are designed to create panic. NOVAGOLD has clearly and consistently communicated to investors that the estimated initial capital required for the project is $6.7 billion. This remains true. The $8 billion figure referenced by JCAP in its Report includes *operating costs* as required under U.S. Generally Accepted Accounting Principles ("US GAAP"), rendering it an apples-and-oranges comparison to the $6.7 billion figure for *initial capital costs* against which JCAP compares it. The Feasibility Study plainly explains the difference.]

16. Denies every factual allegation contained in **paragraph 22** of the FAC as well as its mischaracterizations of the Report.

**CC27**: NG admits here at ¶22 of the FAC that "The Feasibility Study plainly explains the difference." But the NG's Feasibility Study with that "plain explanation" is hyperlinked and quoted by the JCap Report. So, it can be nothing other than pure and transparent opinion. Readers can decide for themselves if the difference (the cost of removing the deposit's "overburden") is a "capital cost" or an "operating cost."

a. The Report says that the presentation of Capital Costs in the FS is "misleading." The Report points readers to that presentation in the 2012 FS. They can agree or disagree. The basis of the Report's classification of this cost is all fully disclosed in the Report. It is straight opinion - based on fully disclosed information.

**CC28**: JCap here restates points **CC23** and **CC24** above. Moreover, the disputed reading is not defamatory or false. It is opinion about how to read the *same numbers that both parties acknowledge and discuss* – in the 2012 FS and in the Report. For NG to make this into a libel claim is to do so without substantial basis and it is frivolous as well.

[**FAC ¶23.** The Report later asserts that "[m]anagement has drilled only 16 holes since 2011 and not even released the modeling results of the last, meager drill assays in 2017." This too is false and misleading. Donlin Gold conducted a limited, focused drilling campaign in 2017. The drill assays were not "meager"; they were proportional to Donlin Gold's goal: namely, to gather additional geochemical and structural data from targeted portions of the defined ACMA and Lewis deposit areas to support ongoing optimization work. Upon receipt of the assays, and contrary to JCAP's statement, NOVAGOLD disclosed the 2017 drilling results to the public in a press release dated February 20, 2018.]

17. Denies every factual allegation contained in **paragraph 23** of the FAC as well as its mischaracterizations of the Report.

**CC29**: NG admits at ¶23 that there were 16 assays since 2011. JCap's Report says the same thing.

**CC30**: NG admits at ¶23 that the alleged "falsehood" in the Report consists in a dispute over whether that number (16) of drill assays were "*meager*" or "*proportional*." The Report says that the 16 were "*meager*." NG says at ¶23 that the 16 were "*not meager*" but "proportional."

    a.   NG admits that the assays were "limited."

    b.   It is therefore admittedly opinion.

**CC31**: There was no obligation on NG's part to release such information and it is not defamatory of anyone to say that the assays were or were not released. The FAC mischaracterizes what the Report said about the gold reserves at Donlin. The Report says that the quality and quantity of the Donlin gold reserves are *good*: "Specifically, the Report says… Donlin already has a large enough reserve for 27 years of mine life."

a.  Standing alone or in context, words like "meager" vs. "proportional" are words of rank opinion. They admit to no precise meaning (*Immuno*[6] Factor 1) and could not be proven true or false (*Immuno* Factor 2).

**CC32**: The Report correctly quotes NG's CEO as saying that NG was trying to find "opportunities for additional drilling and expansion of resources." The drilling assays were beyond the "main mining area."

a.  The Report does not question or challenge the quality or quantity of the Donlin mine's gold resources. To the contrary, it says NG has enough for at least 27 years of mine life.

**CC33**: The FAC's claims at ¶23 not only lack substantial basis, but as with most of the claims, they are frivolous.

[**FAC¶24**. JCAP also falsely asserts that NOVAGOLD misled investors as to the value of the Galore Creek asset—an unrelated mining project owned 50/50 by NOVAGOLD and Teck Resources Limited. NOVAGOLD sold its interest in Galore Creek in 2018 to focus its efforts and resources on the Donlin Gold project. In support of its misstatement regarding the value of Galore Creek, JCAP falsely states that one of the current owners of the asset "quietly shut the project down on April 28, 2020." What the Galore Creek Mining Corporation actually announced to the public on April 28, 2020 was that "due to the COVID-19 pandemic and the resulting economic uncertainties faced by the mining industry, expenditures on the Galore Creek project have been reduced in 2020, deferring the start of the planned Prefeasibility Study."]

18. Denies every factual allegation contained in **paragraph 24** of the FAC as well as its mischaracterizations of the Report.

**CC34**: *The Galore Creek Project:* In order to manufacture a "libel" claim over Galore Creek, the FAC incorrectly describes and mischaracterizes the Report in its coverage of the Galore Creek Project.

---

[6] *Immuno AG v. Moor-Jankowski,* 77 N.Y. 2d 235 (1991) (The NY State Court of Appeals stated explicitly that the NY State Constitution protects a wider range of statements as non-actionable opinion and gives broader protection to opinion than does the U.S. Constitution.)

**CC35:** The FAC admits that the Report correctly states that the Galore Creek project was sold; and that NG sold its interest in Galore Creek to Galore Creek Mining Corp.

**CC36:** The FAC admits that the Galore Creek Mining Corporation [*not NG*] announced that expenditure on the project were being "reduced" so as to "defer[ ] the start of the planned Prefeasibility Study."

**CC37**: The account in the Report is therefore substantially true. It is fair to say that Galore "quietly shut the project down."

**CC38**: Significantly, the Report also *hyperlinks* to the Galore Creek Mining Corp's own statement.  (Report fn. 11). The reader can therefore decide what to make of Galore Creek's own statement; and that renders the FAC's alleged "falsehood," non-actionable opinion.

**CC39**: The FAC quibbles with the way in which the admitted discontinuation of Galore by the purchaser is characterized: The FAC prefers the euphemism that because of covid and uncertainties of the mining industry, they are just "deferring the start" of a Prefeasibility Study.

**CC40**: The FAC admits that Galore Mining Co. does not even have a feasibility study and *is not even starting a **Pre**-Feasibility Study.*

**CC41**: This is all rank opinion. It is not defamatory. It is *not even about NG*, but about new owner – a different owner. This is not proper libel pleading. There is no substantial or non-frivolous basis for calling this a libel claim.

  a.  NG sold Galore Creek to the purchaser at a loss.

  b.  While NG owned Galore Creek, NG's estimates of "capital costs" for the Galore Creek project increased by at least 500% from NG's 2004 estimates to NG's 2022 estimates.

*[FAC Heading: The Report falsely asserts that the deposit is so remote and technically challenging that the mine will never be built.]*

19.  Denies any facts alleged in all of the Headings of the FAC including this one which on its face is opinion.

**CC42:** This heading and statement is non-actionable opinion - as are all the so called "themes" and headings. They are opinion on at least ***five independent grounds***: 1) the particular words used are *words of opinion* ("so remote and technically challenging"); 2) the underlying Feasibility Study and public documents are all hyperlinked, cited and quoted in the JCap Report; 3) it is *prediction* about the prospects of a long unrealized plan and therefore opinion; 4) the *social context and adversarial nature of the Report* signals opinion; and 5) In the context of the *repeated and multiple opinion words used throughout the Report*, a reader could only conclude that the Report will and does deliver opinion.

[**FAC ¶25**. The Report's second theme is likewise a fiction designed to mislead and defame. Disregarding the thousands of pages of publicly-available studies supporting the Donlin Gold project, which was granted federal permits by the U.S. Army Corps of Engineers and the Bureau of Land Management, JCAP misrepresents that "***the Donlin deposit . . . is not feasible to put into production at any gold price" and that the project is a "stock promote, not a mining plan***." Yet the publicly-available Feasibility Study conducted by credentialed industry-leading professionals goes into exacting detail to demonstrate the economic viability of the deposit at numerous gold prices—including at $1,200 per ounce, which is substantially lower than today's current gold price of approximately $1,700 per ounce—and attractive leverage to a rising gold price. With 39 million ounces of contained gold in measured and indicated resources,[2] Donlin Gold is currently among the largest gold development projects in the world.]

20. Denies every factual allegation contained in **paragraph 25** of the FAC as well as its mischaracterizations of the Report.

**CC43**: The FAC alleges that the statements: a) "the Donlin deposit . . . is not feasible to put into production at any gold price" and that b) the project is a "stock promote, not a mining plan" are false and defamatory.

**CC44**: The FAC admits: "Yet the publicly available Feasibility Study . . . demonstrates the economic viability of the deposit at numerous gold prices. . ."

**CC45**: The FS is itself ***hyperlinked***, quoted and referenced by the Report.

**CC46**: Hence, the statements a) and b) are both pure opinion which readers of the Report can judge for themselves.

**CC47:** Quite apart from the hyperlink to the FS and the references and links to the other "publicly available documents," the two statements *standing alone* are rank opinion.

**CC48:** First, whether a plan is "feasible" or not is a matter of judgment and opinion about a future outcome.

**CC49:** Second, to say that it is "not feasible *at any price*" is also hyperbole (classic opinion):

a.  If the price of gold went up to $4000/oz and stayed there steadily for as long as it takes to build and extract gold from the mine, then maybe that would be "feasible." But that is all speculation. The statement is insult - not libel.

**CC50**: The statement b) that "the project" is just a "*stock promote and not a mining plan*" is pure opinion and insult.

**CC51**: As NG alleges throughout the FAC, the FS is hyperlinked and made part of the Report; So, the Reader can, as FAC ¶25 admits once again, read it and agree or disagree with these insults.

**CC52**: The FAC alleges throughout that one who reads the Feasibility Study and supporting public documents and the Report will be able see that their FS is "true" and the Report "false."

[**FAC¶26**. Unable to refute the demonstrated value of Donlin Gold's resources, JCAP turns to condemning Donlin Gold's planned infrastructure by falsely representing that "[t]he proposed natural gas pipeline central to powering the project is dead on arrival," and that "[t]he terrain around the Donlin

deposit is among the most inhospitable on the planet." But these statements too are demonstrably false.]

21. Denies every factual allegation contained in **paragraph 26** of the FAC as well as its

mischaracterizations of the Report.

CC53: First, to say that something is "dead on arrival" is pure opinion and non-actionable insult – on its face.

CC54: It does not admit to precise meaning; and cannot be proven true or false.

CC55: The statement is a prediction.

CC56: Second, to say of the Alaskan terrain around Donlin that it is "among the most inhospitable on the planet" is also hyperbole and obvious opinion on its face.[7]

CC57: Moreover, as with other statement that the FAC tries to call "libel" the FS and public documents are all hyperlinked, cited and quoted in the Report so that a reader, again, can decide what they think about the plan or any of the criticisms of it.

CC58: These are frivolous libel claims as are all those that are opinion standing alone and/or pure opinion in the context of the hyperlinked and quoted FS and publicly available documents. NG has no substantial basis for these allegations.

[**FAC¶27**. The feasibility of the Donlin Gold infrastructure project is well-documented in the public Feasibility Study, which details the extensive technical, environmental, and social studies that were conducted by reputable firms to ensure the longevity and viable development of such an important deposit. The pipeline design and analysis are similarly detailed in the publicly- available Plan of Development and Supplemental Pipeline Information. The Plan of Development contains a mile-by-mile accounting of the planned pipeline route: approximately 75 miles of the planned 315-mile route includes rugged mountainous terrain. More than half of the planned route is comprised of lowlands or rolling terrain. NOVAGOLD, Barrick, and their experts have determined that construction of the pipeline over the entirety of the 315-mile route is commercially, technically, and environmentally feasible.]

---

[7] It is no different that NG's assertion in ¶25 of the FAC that: "Donlin Gold is currently among the largest gold development projects in the world." Complete puffery.

22. Denies every factual allegation contained in **paragraph 27** of the FAC as well as its mischaracterizations of the Report.

**CC59**: FAC¶27 asserts that NG does set forth, detail, describe and well-document its Donlin plan in its 2012 FS, such that anyone who reads it would see that the plan "commercially, technically, and environmentally feasible" by all these different respects.

**CC60:** That admission by NG here (and elsewhere in the FAC) together with the admitted fact that the Report includes and *hyperlinks* to the FS renders the FAC and its libel allegations about the Donlin mine and its feasibility pure non-actionable opinion. Critics may and are entitled to disagree. NG's confidence in the worthiness of its plans and in the success of its future is ***not*** the only or final word on the project.

**CC61:** The admitted hyperlink to the FS in the Report also establishes the *fairness* of the Report and failure of the FAC to plausibly plead or demonstrate or point to actual malice of any kind.

**CC62**: The Feasibility Study was issued in 2012 – a decade ago. Even with the permits it has, NG does not operate a Donlin mine. There is no mine. There is no pipeline. There is no powerplant. No gold has been mined or sold.

**CC63:** No construction of the mine, the powerplant or the pipeline is under way.

**CC64:** No construction contracts are in place for the mine, the powerplant or the pipeline.

a.  A "Feasibility" Study is inherently a matter of estimation, projection, judgment calls – a matter of opinion.

b. The 2012 FS is a decade old. NG will need to do another Feasibility Study before it even contemplates or decides to move forward with building any pipeline, power plant or mine.

c. NG plans and expects to undertake a *new Feasibility Study* in the second half of 2022. NG has not yet commenced its "updated Feasibility Study" which it estimates will require one and a half years or more to complete.

d. The estimates and projections of the old 2012 FS are no longer operative – as they will be subject to changes that a new and superseding Feasibility Study will entail.

e. If the 2012 FS conveys "facts," it will be relevant to see what the *new and alternate facts* about NG's Donlin plans and costs in its new FS will be. The new FS with projected costs and contingencies will take into account new "environmental, commercial and technical" contingencies that NG says are to be evaluated in any FS.

[**FAC¶28**. Taking a new tack on its false representations regarding the proposed pipeline plan, the Report incorrectly states that "[e]ach of the 300 stream crossings will require a temporary bridge, and dam, and two pits, one on either side of the stream, for the drilling equipment to bore a hole under the stream." Yet again, JCAP willfully disregards the facts contained in published engineering reports in favor of its false and unverified statements. As described in the Plan of Development and Supplemental Pipeline Information, approximately 7— not 300—stream crossings are proposed for horizontal directional drilling. The balance of the stream crossings generally only require open cut methods. No drilling equipment is required to "bore a hole under the stream" for these other 293 crossings.]

23. Denies every factual allegation contained in **paragraph 28** of the FAC as well as its mischaracterizations of the Report.

**CC65**: The statement at issue about how the admitted 300 stream crossings (at least 300 if not more) will have to be accomplished is a matter of estimate, opinion and judgment. It is also pure opinion inasmuch the FS and publicly available documents are *hyperlinked* and cited in the Report with NG's views of the issue set forth for readers.

**CC66:** It is also a matter of *prediction* as a) the stream conditions change by season, b) the number of streams to be crossed vary depending on the different alternative routes being considered for the pipeline (400 crossing for one pipeline route; 419 for an alternative; 406 for another; 330 for another; and 377 for another, each having different estimated potential HDD (horizontal drilling) requirements; and c) all the streams must in all events be crossed by going *over, under or through* them - *all* of which entail expense and uncertainties of different kinds.

**CC67**: NG claims here that there are only 7 streams that will require HDD boring, but that projected and cherry-picked number itself varies depending on the study and the alternative pipeline path (See Army Corp of Engineers Study) and they are still hypothetical.

    a.   With climate change and thawing permafrost, the 2012 FS is all the more questionable as the costs of cutting across streams by any method have no doubt increased significantly over the past decade. Inflation too weighs upon the pipeline's estimated costs.

**CC68**: As both the Report and NG's FS note, the stream crossing costs may all change if NG moves to its claimed *diesel fuel barging alternative, supplement or backup* (See FAC¶29 below). The fuel barging becomes an important alternative if the pipeline plans don't pan out, require change or turn out to be less feasible than hoped. NG says so in its FS. NG references and admits to the diesel fuel barging alternative in FAC¶29 below.

**CC69**: Further, the statements at issue are not defamatory; they are not "of or pertaining to" NG. And all is based on publicly available documents cited in the FS and Report, rendering them, again, opinion.

**CC70**: NG's claim that there are only 7 HDD's cherry picks the lowest estimated number of HDD's. Other estimates are higher were the number of stream crossings are higher. But they

are all estimates and projections that depend on many different contingencies. Somewhere from 300 to 419 streams have to be crossed or cut through one way or another and each stream crossing will cost time and money.

[**FAC¶29**. Moving on from the pipeline, JCAP pulls another falsehood from its grab-bag of lies: that NOVAGOLD intends to "pivot" to barging diesel. JCAP glibly and incorrectly represents that "[e]ven if NOVAGOLD reduced the mine capacity by half, it could not barge enough diesel to operate the power plant," that "[t]he total diesel that can be barged up the river is at best 253 ML" and that "[u]nder the most optimistic scenario, cutting production to half of what is now planned, the diesel barged in would be sufficient for at most seven months of operations per year, essentially reducing output to a quarter of what is now planned." All demonstrably false. Barging diesel was always part of the mine plan, and it was detailed extensively in the Feasibility Study. JCAP's statements on barging capacity misleadingly assume both that Donlin Gold would use only diesel fuel and that current planned barging capacity could not be increased. The current plan is to use natural gas as fuel for the power plant and to have diesel available as an optional emergency backup. The barging plan described in the Feasibility Study is based on this current plan. ***But, of course, if the plan changed so too would the Feasibility Study.*** If Donlin Gold needs to transport more diesel, the barging capacity could be readily increased.] {*Emphasis added.*}

24. Denies every factual allegation contained in **paragraph 29** of the FAC as well as its mischaracterizations of the Report.

**CC71**: As with all the allegations in the FAC, they are all the subject of the 2012 FS and the referenced publicly available documents. All hyperlinked, cited and quoted in the Report.

**CC72**: At ¶29 the FAC makes the following admission: "Barging diesel was always part of the mine plan, and it was detailed extensively in the Feasibility Study." Again, all available to the reader.

**CC73**: But here is the most telling and disingenuous admission in FAC¶29: The barging plan described in the Feasibility Study is based on this **current plan**. ***But, of course, if the plan changed so too would the Feasibility Study."*** *(emphasis added)* Remarkably, NG asserts that everything could change and then the FS would change. So, the FS is all about ***projection and prediction*** and ***changing contingencies***.

**CC74:** The admission of such the contingencies and shifting feasibilities in NG's *current and potentially changed plans* with admitted and resulting changes in the FS all signal Opinion by any measure.

**CC75**: The "current plan" and the potentially "changing plan" that would require a "change in the Feasibility Study" points again to the lack of any good faith substantial basis for NG's SLAPP. It is all a matter of future contingencies, judgment calls and opinion.

**[FAC¶30**. The JCAP Report goes on to falsely state that the Donlin Gold project's planned power plant "would be the largest power plant in Alaska and increase the electricity produced in that state by about 40%." Official data from the U.S. Department of Energy refutes JCAP's false statement. The U.S. Department of Energy states that annual power generation in Alaska is 6.9TWh, which equates to just under 800 MW average generation. The Donlin Gold power plant would add 153 MW of electricity, increasing the State of Alaska's total output by ***approximately 20%, not 40%.*** JCAP's statement that the Donlin Gold power plant would be the largest in Alaska is also false. The Donlin Gold plant would be smaller than Chugach Electric's Beluga power plant with a total capacity of 332MW.] {*emphasis added*}

25. Denies every factual allegation contained in **paragraph 30** of the FAC as well as its mischaracterizations of the Report.

**CC76:** *The Planned Power Plant "Would be the largest powerplant in Alaska*:" This statement is not defamatory. It is not defamatory of NG.

a.  It is also a *prediction* about some possible future *comparison* which is also matter of opinion. It is a prediction that could change – depending on NG's changed plans (which "changed plans" NG claims are possible).

**CC77:** NG's FAC30 is quibbling over whether its hypothetical power plant, if and when built, would constitute an "approximately 20%" versus "40%" increase "in the State of Alaska's total output" of electricity.

**CC78:** If there is a difference of "approximately" "20% not 40%," the Report's competing estimate would be *substantially true*. The planned power plant would in either case

substantially increase Alaska's estimated total output of electricity – if and when it is built, whenever that turns out to be.

**CC79:** The fact that the Beluga power plant might be bigger, makes no substantial difference.

**CC80**: Because there is no substantial difference in these projections, there is no substantial basis for NG's making these allegations part of its FAC. NG's claim, as with the others, shows this case to be a SLAPP designed to imposed abusive costs on JCap and to suppress and intimidate and punish critics of NG's decade old and still unrealized plans, projections and predictions.

[**FAC¶31**. In moving rapidly from one falsehood to the next, JCAP's strategy is death by a thousand cuts. The Report lobs lie after lie—both big and small—attacking the feasibility of the Donlin Gold project in an effort to chip away, bit by bit, at investors' confidence in the Donlin Gold project. The resulting damage to NOVAGOLD's reputation occasioned by JCAP's false statements was inevitable and is substantial.]

26. Denies every factual allegation contained in **paragraph 31** of the FAC as well as its mischaracterizations of the Report.

**CC81**:  Opinion can sometimes cause harm – which NG has never adequately plead or alleged or come forward with – but the possibility of harm does not make opinion actionable. It never is. And it does not turn opinion into "fact."

**CC82:** Courts recognize this. *Chau v Michael Lewis, WW Norton and Steven Eisman* (a short seller source of Lewis'), 771 F.3d 118 (2d Cir. 2014). There is no authority to the contrary. NG has no substantial basis at law for claiming otherwise.

**CC83:** The "death by a thousand cuts" metaphor is a bad faith effort to make unsupportable claims of harm from 1) statements in the Report that NG has not challenged in its FAC; and 2) statements in the Report that are not actionable – either because they are opinion, or because they are not defamatory or otherwise not actionable. There is no substantial or justifiable

basis for this kind of indiscriminate and blunderbuss pleading with no connection to a specifically alleged "falsehood." This is not just decorative pleading; it is designed to mislead a fact finder and to add cost to the defense.

**[FAC Heading: The Report falsely asserts that management has "voted with their feet" by reducing their share ownership.]**

27. Denies any facts alleged in all of the Headings of the FAC including this one which on its face is opinion and which mischaracterizes the Report's treatment of management's exercise of options.

[**FAC¶32**. To complete its unwarranted attack on NOVAGOLD, JCAP's Report states that "management has been treating this 12-person concept company like an ATM" and that insiders have "voted with their feet" by reducing their share ownership. Not true.]

28. Denies every factual allegation contained in **paragraph 32** of the FAC as well as its mischaracterizations of the Report.

**CC84:** The phrases "treating the company as an ATM" and "voted with their feet" are both on their face, a) figurative and b) rhetorical hyperbole - expressions of obvious opinion and insult.

**CC85:** NG *admits* that management did exercise options, which public documents also show. To characterize that admitted action as "treating the company as an ATM" is straight opinion.

a. Management may *not* have exercised their options to *add* to their holdings of NG, but they did exercise their options to earn money from the sale of NG shares.

**CC86**: To the extent that the Report is asserting that management exercised options of NG shares and sold them, the Report is not only substantially true, but also precisely true.

**CC87**: Disingenuously and frivolously, NG asserts that management still holds the same number of shares before the exercise of NG options as they did after they exercised their options.

This assertion lacks any substantial or justifiable basis in fact or law, and it is one more of many indicia, described above and herein, of a highly abusive SLAPP.

[**FAC¶33**. JCAP states that management has "awarded themselves base salaries that rival those of the CEO's at Newmont and Barrick." This is demonstrably false. First, NOVAGOLD management does not award compensation to itself. Compensation of NOVAGOLD management is established by the Compensation Committee of NOVAGOLD's Board of Directors and is duly approved by the entire Board. It is regularly measured against levels of compensation of a carefully selected peer group of companies. The base salary of NOVAGOLD's President and CEO is 65% and 42% of the base salaries of the President and CEOs of gold companies Newmont and Barrick, respectively, as per the latest publicly-filed information for each company, a fact that JCAP elected not to disclose in its Report.]

29. Denies every factual allegation contained in **paragraph 33** of the FAC as well as its mischaracterizations of the Report.

**CC88**: The salaries are the salaries – they are known and set forth publicly by the Companies themselves. Chart 9 compares *CEO's Total Annual Compensation.* It appears at page 17 of the Report. It is drawn correctly from Company reports for the years 2017-2019.

    a. Chart 10 on p.18 of the Report shows *CEO, GC, and CFO Annual Cash Compensation* for the years 2015-2019 and it is draw correctly from Company reports.

**CC89**: To state that the salaries "rival" those of the publicly known salaries of Newmont and Barrick CEO's is pure *comparative opinion*. The officer compensations are set forth and disclosed in the Charts. NG does not challenge the numbers reported in the charts. Readers can agree, disagree or make nothing of it.

**CC90**: "Rival" is a word that does not admit to precise meaning.

**CC91**: It is not defamatory of NG to say that its management salaries "rival" others.

**CC92**: There is no substantial basis for this claim in law or in fact.

[**FAC¶34**. The second prong of JCAP's attack on NOVAGOLD management is equally false: there is simply no truth to JCAP's repeated misstatements that NOVAGOLD management has engaged in insider sales, including JCAP's statement that "[s]enior office holders and directors have taken $35 mln in net cash

from share sales in the last five years" and that "[s]ome 70% of NG insider share sales were over the last 12 months, as the share price increased by 300%," that "[t]he CFO's stock in the company has halved, from around 2.2 mln shares to 1 mln," that "[t]he CEO has reduced his net position by 26%," and that "[a]fter the 2017 assay, the CEO sold down $2.5 mln in stock." The Report's false and misleading table purporting to document insider share sales is as follows:]

| Insider share sales | Position | Net Cash Sales |
|---|---|---|
| **Lang Gregory A** | CEO | $15,806,949.19 |
| **Ottewell David A** | CFO | $9,629,516.76 |
| **Walsh Anthony P** | Director | $2,271,348.84 |
| **Nauman Clynton R** | Director | $2,175,710.12 |
| **Deisley David** | Director | $1,996,975.59 |
| **Levental Igor** | Director | $1,574,548.27 |
| **Dowdall Sharon** | Director | $1,067,422.44 |
| **Madhavpeddi Kalidas V** | Director | $479,210.79 |
| **Kaplan Thomas Scott** | Chairman | $314,318.38 |
| | | $35,316,000.38 |

[**FAC** ¶35. All of this is readily contradicted by the truth. JCAP's statements concerning insider sales deliberately conflate the *sale of shares by insiders* with the *exercise of options by insiders* – two materially different transactions. The current NOVAGOLD management team has been in place almost eight years and exercised options before they expired (a five-year time limit from the grant date). Likewise, the information included in the Report's table is demonstrably false. David Deisley—identified as a "Director"—retired more than a year ago and never served as a director. None of the other individuals identified in JCAP's table above have sold shares of NOVAGOLD in the most recent 12 months, other than in connection with a stock option exercise, which does not result in a net decrease of shares owned. And according to publicly-available information through Canada's System for Electronic Disclosure by Insiders ("SEDI") database, NOVAGOLD's Vice President and CFO, David Ottewell, has steadily increased his shareholdings in the company from 35,000 common shares to 617,000 shares during his tenure. Similarly, NOVAGOLD's President and CEO, Greg Lang has increased his shareholdings in the company from 116,000 to 1,830,000 shares during his tenure.]

30. Denies every factual allegation contained in **paragraphs 34 and 35** of the FAC as well as its mischaracterizations of the Report.

**CC93**: The sales of share by management are correctly reflected in **Table 4** above which is drawn from "***Washington EZ Insider***" from publicly available records.

CC94: These allegations in ¶'s 34 and 35 relate to individual actions of shareholders. They are therefore not of or pertaining to NG.

CC95: These allegations in ¶'s 34 and 35 rely on a specious distinction between the "sale of shares" and the "exercise of options" that do not have any material or substantial significance or bearing on the truth of the Report as to the sales or dispositions of NG shares by the individuals referred to.

CC96: NG without any legitimate or substantial basis mischaracterizes and re-writes the words at issue to make it seem as if the Report is about whether the individuals' holdings increased or decreased after the transactions referenced in the report. This mischaracterization is one made in bad faith and without substantial basis. It is also a frivolous pleading. And it is NG's core mischaracterization of the Report that underlies the "third theme" that the FAC alleges.

**The Twitter Posts [¶'s 36 – 40]**

31. Admits that the @JCap_Research tweets copied in **paragraphs 36 through 40** *[reprinted below]* of the Complaint were posted from the @JCap_Research account, except denies the other allegations therein to the extent that they are factual.

CC97: As to the allegations in ¶ 36 – 40, and the Twitter posts referred to, several common facts apply:
    a) The posts were all on made on social media.
    b) The posts were all in response to other posts on social media.
    c) The posts were all in response to adversarial posts on social media.
    d) The posts were all in response to adversarial posts made on behalf of NG.
    e) The posts were all invited by NG and its own social media opposition to the Report.
    f) Social media posts, particularly those responding to adverse posts by others, are understood and treated as expressions of opinion.
    g) Substantial NY case law consistently recognizes such posts made in the context of social media platforms such as Twitter to be expressions of opinion. There is no substantial basis in law or fact for NG's contending or pleading otherwise.
    h) The posts *each link to the Report* and therefore must be read together with and in the context of the Report.
    i) Additional Points specific to the particular tweets referenced below follow each of them.

    j)   The alleged Tweets are matters of non-actionable opinion, (i) *Standing alone*, (ii) in the *particular context* in which they appear; and in the (iii) *broader social context* in which they were made.

[¶36. JCAP magnified the damage caused by the publication of the short and distort Report by re-publishing the Report's false and defamatory statements about NOVAGOLD on Twitter. On May 28, 2020 and May 29, 2020, JCAP unleashed a barrage of tweets highlighting some of the most spurious and incendiary statements in the Report, including that the natural gas pipeline is not feasible:]



**CC98:** The tweet is clearly one of adversarial opinion, on its face and in context.

**CC99**: To challenge someone's claim that they "can do" something in the future is obvious and straight opinion.

    a)   To frame that claim or criticism (i.e., that NG "can't) as anything other than opinion is frivolous.

**CC100**: The tweet includes a link to the Report.

[¶37. JCAP repeated its statement that NOVAGOLD insiders have been selling down their ownership in the company, when the truth is just the opposite: ]



**CC101:** The tweet is clearly one of adversarial opinion, on its face and in context.

**CC102**: The statement in the tweet is not the statement that the tweet is alleged to include.

**CC103:** The reference to "…make …cash comp look like pocket change" is figurative and it is also rhetorical hyperbole.

**CC104:** NG's ¶37 is a rewrite of the tweet.

    a.   NG's rewrite is wrong and frivolous.

**CC105**: The tweet includes a hyperlink to the Report.

[¶38. JCAP also falsely stated in a tweet that NOVAGOLD had perpetrated a "fraud" on the investing public:



    **CC106:** The tweet is clearly one of adversarial opinion, on its face and in context.

    **CC107**: The phrase "you might call" signals opinion.

    **CC108**: The phrases "purest form" of capital-market fraud, and "24-carat" both signal opinion.

    **CC109**: The tweet includes a hyperlink to the Report.

    **CC110**: Allegations of "fraud" and "misrepresentation" are typically deemed opinion by Courts, among them in the *Silvercorp 7* line of short report cases, which this Court has deemed correctly decided. (DKT 90 at p. 9-10) To contend otherwise here lacks substantial support in law or fact.

    a.  Such words as "fraud" are common words of derision and insult, pure opinion – especially when used in the setting of Twitter and other social media.

    b.  NY rulings support that consistently.

[¶39. JCAP repeated its false statement that NOVAGOLD concealed the amount of initial capital required for the Donlin Gold project:



    **CC111:** The tweet is clearly one of adversarial opinion, on its face and in context.

**CC112:** The phrase "treasure hunt" is figurative and signals opinion.

   a)   Another tweet follows as is shown in the FAC at paragraph 39.

   b)   The two tweets are displayed together in the FAC as they appear on Twitter – together – one after the other.

   c)   The next tweet following the "treasure hunt" tweet says. "Thought I'd give you a hand. . ."  That signals opinion.

   d)   The phrase "sustaining capital" according to the tweet, clearly appears in the NG Feasibility Study.

   e)   To call NG's phrase "sustaining capital" both "kind of oxymoronic" and "maybe just moronic" is signals that the tweets are matters of classic opinion, insult and rhetorical hyperbole.

**CC113**: The reference to the "actual estimate" is a reference to a statement contained in the NG Feasibility Study.

**CC114**: NG at paragraph 39 re-writes the tweet.

**CC115**: The tweet includes a hyperlink to the Report.



**CC116:** The tweet is clearly one of adversarial opinion, on its face and in context.

**CC117**: The two tweets are read together and in broader context such that **CC111-115** apply equally here.

[**¶40**. Finally, JCAP repeated its statement that the pipeline to the site is unreasonable to build:]



**CC118:** To state that a pipeline ranging in 315 *or more* miles over different possible projected routes "can't [be built] at any reasonable cost" is a statement of *straight opinion* – whatever method is needed to cross the numerous streams and rivers that must be crossed over the several potential alternative routes. Among other things it lacks specific meaning and is not something that fact finder should or can be expected to certify. The post is not defamatory and it is not about NG.

**CC119**: To say that something is "unreasonable to build" as alleged at ¶40 is entirely a matter of opinion. To say that something "can't [be built] at any reasonable cost" is likewise a matter of opinion.

**CC120**: The tweet is clearly one of adversarial opinion, on its face and in context.

**CC121**: The tweet includes a link to the Report.


**[FAC P.16 - "Novagold Fights Back"]**

32. Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in **paragraph 41** of the FAC.

   **CC122**: As described in the FAC, NG had the ability and the capacity to publish widely its opposition to and criticism of the Report.

   a.   NG has and had the capacity to direct its criticism of the Report to investors.

33. Admits that the JCap tweet pasted into **paragraph 42** of the FAC was posted from the @JCap_Research account, except denies the other allegations therein to the extent that they are factual.

**CC123**: The combative character of this tweet – a expression of pure opinion - can only add to any reader's conclusion that the entire set of tweets and related Report were matters of adverse opinion. NG does not allege (and cannot claim) that a tweet of this kind can be false or anything other than opinion.

34.    Admits that NG published its own lengthy statement attacking the Report which statement NG was able to publish widely; but JCap otherwise denies NG's characterizations of the Report or its own publication as alleged in **paragraph 43** of the FAC.

35.    Admits that the JCap tweet pasted into **paragraph 44** of the FAC was posted from the @JCap_Research account, except denies the other allegations therein to the extent that they are factual and denies NG's mischaracterizations of the Report or the tweet.

36.    Denies any factual allegations contained in **paragraph 45** of the FAC to the extent that there are any factual allegations.

37.    Denies every allegation contained in **paragraph 46** of the FAC, except denies knowledge or information sufficient to form a belief as to the truth of the allegations regarding the share price and trading volume of Novagold shares between May 28, 2020 and June 18, 2020.

38.    To the extent that there is any factual content in the allegations contained in **paragraph 47**, JCap disputes and denies them. But the contentious and unfocused allegations contained in this paragraph demonstrate just how much the matters at issue between the parties in the Report and this lawsuit are matters of dispute and opinion.

39.    The allegations contained in **paragraphs 48 and 49** pertain to NG's Trade libel/disparagement claim which has been dismissed by the Court. To the extent that they have

any residual import, which JCap denies, JCap denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in **paragraphs 48 and 49** of the FAC.

40.     JCap repeats and realleges its responses to **paragraphs 1 through 49** above as if fully set forth herein in response to **paragraph 50** of the Complaint.

41.     Denies each and every factual allegation contained **paragraph 51 through 56** of the Complaint.

**CC124:** As to the allegations in **paragraph 52 and 55** of the FAC, statements of opinion and criticism may sometimes cause a subject to be exposed to public ridicule or even harm, but such harm is not actionable. Insults and other species of opinion may be disparaging and even harmful, but they are not actionable; nor are they the proper subjects of legal actions. Typical SLAPP suits such as this suit by NG improperly present opinion as "fact" to force a defendant into costly defense.

**CC125:** NG's allegations in **paragraph 51 of the FAC** are the sole allegations in the FAC that address the requisite plausible pleading of actual malice – a burden of proof that it must carry with clear and convincing evidence.

**CC126:** Beyond the spare and conclusory legal buzzwords "actual malice" and "with reckless disregard as to their veracity," the FAC offers no plausible factual bases for "actual malice" pleading and NG and its counsel can point to none.

**CC127:** To commence or to continue a lawsuit with such facially inadequate pleading of "actual malice" without amendment – even after the initial Complaint was challenged on that very same basis, demonstrates that this case was "commenced or continued" without substantial basis in fact or in law – in a manner that the Anti-SLAPP law was intended to interdict.

**CC128:** In motion practice that followed, NG came forward with no plausible factual allegations of actual malice.

    a.   NG can point to none.

**CC129**: NG's allegations in **paragraph 56** seeks a ***prior restraint*** against JCap's speech and criticism of NG.

    a.   Among other manifest defects, it is also void for vagueness.

    b.   In all events it barred by long and well accepted First Amendment law against prior restraints.

**CC130**: Such pleading for injunctions may be standard fare for commercial litigation and commercial litigators, but it is entirely inappropriate in cases involving First Amendment standards which this FAC has completely ignored.

**CC131:** NG's **Prayer for Relief section b.** illustrates how extreme and unsupportable NG's FAC is: It seeks an injunction not only against "libelous allegations" (something not supportable under the law against prior restraints), but "direct[ing] Defendants to immediately remove the [ ] Report and all references to NOVAGOLD and Donlin Gold from its website and social media accounts." There is no substantial or legitimate basis for any such demand; and it is another blatant mark of a SLAPP.

    42.    As to Count II, the Trade Libel Cause of Action, this claim has been dismissed, but JCap denies the allegations contained in **paragraphs 58 and 59** and as to **paragraph 57** repeats and realleges its responses to the allegations set forth in paragraphs 1 through 59 of the FAC as if fully set forth herein.

    43.    To the extent Plaintiff's Prayer for Relief and its subsections, or headings in the FAC contain factual allegations, denies every such allegation set forth therein.

## DEFENSES

1.      Plaintiff has failed to state a cause of action upon which relief can be granted against JCap.

2.      The alleged defamatory statements are non-actionable opinion under the N.Y. State Constitution's broad protection of opinion speech, *Immuno AG v. Moor-Jankowski,* 77 N.Y. 2d 235 (1991), which defines opinion more broadly and generously than does the U.S. Constitution.

3.      And **CC132**: NG's Feasibility Study which is the subject of JCap's Report is a "forward-looking" document containing "forward-looking" statements (i.e., predictions about future outcomes) and The Report is thus likewise a forward-looking document with correlate predictions about future outcomes. Predictions are non-actionable opinions.

4.      And **CC133:** "Pipe Dream" Report is a forward-looking prediction about a forward-looking FS - which, even after more than a decade, remains nothing other than a FS.

5.      **And CC134**: The Report and the 2012 Feasibility Study are all about a future and as yet unrealized project. A new Feasibility Study is expected which may change its costs and plans.

6.      **CC135**: The Report and its subject NG Feasibility Study are not only both forward-looking non-actionable opinions, but the Report consists of numerous statements challenged by the FAC that are stated *unmistakably in future tense*.

7.      **CC136**: The Report is also non-actionable opinion on the separate and independent ground that the Report is full of words of opinion, figurative words and metaphors as well as words of insult – all of which signal to the reader that the Report delivers opinion.

8.      Plaintiff caused, exacerbated and contributed to any harm it alleges by its own conduct and statements.

9.      **And CC136 a.** To the extent that the Report references official documents and or filings, it is protected under the absolute privilege allowed to fair reports of public proceedings, under NY Civil Rights Law §74.

10.     Plaintiff's own statements and conduct have invited statements alleged to be defamatory.

11.     Plaintiff's purported claims are barred because the conduct of JCap – i.e., the specific statements alleged to be false - was *not the proximate cause* of any alleged damage or harm to Plaintiff.

12.     JCap reserves the right to assert and rely on other defenses that become available or appear in the course of this action.

<u>**COUNTERCLAIM**</u>

J Capital Research USA LLC, ("JCap") for its Counterclaim alleges as follows:

**CC137:**  JCap realleges the allegations set forth in ¶¶ CC1 – CC136 above, and ¶¶ a. – i. (on pages 1-3 above) as if fully set for herein, as they are specific allegations that pertain to, are integral to and support the Counterclaim alleged here.

**CC138**:  JCap also realleges its allegations and responses to the FAC set forth in its responses at ¶¶ 1 – 43 above and ¶¶ 1 – 12 of its Defenses.

**CC139:** This lawsuit brought by Novagold Resources Inc. ("NG") is a classic SLAPP action.  NYCRL §70-a and §76-a.

**CC140**: The Report is a "communication in a place open to the public or a public forum in connection with an issue of public interest." It was posted on the internet on JCap's website.

**CC141**: The Report is a "communication conducted in furtherance of the exercise of a constitutional right of free speech in connection with an issue of public interest."

**CC142**: The Anti-SLAPP statute provides that the term "public interest" is to be "construed broadly" to mean "any subject other than a purely private matter."  §76-a(1)(d).

**CC143:** The Report is not about a purely private matter.

**CC144**: The FAC has been commenced and continued without a substantial basis in fact and law – as set forth below and in ¶¶ CC1 – CC144 above.

**CC145:** The FAC cannot be supported by a substantial argument for the extension, modification or reversal of existing law.

a.  NG has not proffered any such argument for the extension, modification or reversal of existing law in any of its submissions and motions.

**CC146:** The FAC is not merely lacking in substantial basis, but it is unusually frivolous, baseless and vexatious in that it is premised on the Report's hyperlink to and quotation of the 2012 FS and related publicly available documents; and because it does not anywhere plausibly plead or anywhere assert actual malice which, under 76-a(2), it must "establish with clear and convincing evidence."  The FAC itself and NG' subsequent filings show that this

action was commenced and has been continued without a substantial basis in law.

a. The FAC and the earlier complaint (largely the same) are essentially NG's public relations statements converted into the form of a legal complaint.

**CC147**: NG's claim for Trade Libel was dismissed for failure to plead requisite damages, though it had at least two opportunities to do so.

**CC148:** *Notice of Anti-SLAPP Claim*: JCap in its answers and objections to NG's Interrogatories and in its responses to NG's Requests for Documents informed NG of its intention to seek remedies under the NY Anti-SLAPP law (NYCRL §70-a and §76-a). Such notice was given to NG at least as early as November 24, 2020. (NG's preservation obligations were triggered at least as early as that date, if not earlier.)

**CC149:** The purpose of NG in bringing this action is to impose costly litigation on its critics such as JCap so as to intimidate and silence them.

**CC150**: NG's libel action was "*commenced and continued without a substantial basis in fact and law*" for the purpose of suppressing JCap's critical speech by using litigation to "harass[ ], intimidate[ ], punish[ ] or otherwise maliciously inhibit[ ] the free exercise of speech." JCap is therefore also entitled to ***other compensatory damages*** beyond its legal fees and cost.

**CC151**: NG's libel action was "*commenced and continued without a substantial basis in fact and law*" for the sole purpose of suppressing JCap's critical speech by using litigation to "harass[ ], intimidate[ ], punish[ ] or otherwise maliciously inhibit[ ] the free exercise of speech." JCap is therefore also entitled to ***punitive damages*** beyond its legal fees and costs and beyond its compensatory damages.

**CC152**: JCap has been harmed and damaged in its business and has incurred needless costs and expenses as a result of the present litigation.

WHEREFORE, Defendant JCap respectfully prays for judgment dismissing the NG's action in its entirety and granting JCap the remedies to which it is entitled under the New York Anti-SLAAP law including a) costs and attorney fees, b) other compensatory damages, and c) punitive damages, and such other and further relief as the court deems just, equitable and proper.

## Jury Demand

JCap demands a trial by jury on all issues so triable.

Dated: July 12, 2022

Respectfully Submitted,

**Miller Korzenik Sommers Rayman LLP**

//s// David S. Korzenik

David S.  Korzenik
The Paramount Building
1501 Broadway, Suite 1501
New York, New York 10036
212-752-9200
*Attorneys for Defendant,*
*J Capital Research USA LLC*