UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOVAGOLD RESOURCES, INC.,

Plaintiff,

-against-

No. 1:20-cv-02875-LDH-PK

J CAPITAL RESEARCH USA, LLC,

Defendant.

**DEFENDANT J CAPITAL RESEARCH USA LLC'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS**

MILLER KORZENIK RAYMAN LLP

DAVID S. KORZENIK
dkorzenik@mkslex.com
GILLIAN VERNICK
gvernick@mkslex.com
1501 Broadway, Suite 2015
New York, New York 10036
(212) 752-9200

*Attorney for Defendant*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND .................................................................................................................... 3

    I.     No Third Party Chose Novagold as the Subject of the Report or Put JCap Up to Report on Novagold. ....................................................................................................... 3

    II.    No Third Party Could Control the Substance, Content or Publication of the Report. ..... 5

    III.   JCap Has Never Misrepresented its Confidential Sources of Information Regarding the Report. .................................................................................................................... 8

    IV.   JCap's Editorial Independence Was at the Center of the Aug. 11, 2021 Oral Argument on the Motion to Compel. ....................................................................................... 15

    V.    JCap Was Never Ordered to Produce a Log of Reporters Privilege Material. ............ 16

ARGUMENT ....................................................................................................................... 17

    I.     Because JCap and its Counsel Had a Colorable Basis for Its Assertions and Did Not Act in Bad Faith, § 1927/ Inherent Power Sanctions Are Not Appropriate or Proper. 17

        a.    JCap and its Attorney have a Colorable Basis to Argue JCap's Independence, which is a Legal Finding, not a Colloquial Term. ............................................................. 19

        b.    JCap and its Counsel have a More than Colorable Basis to Argue ATP was a Confidential Source of Information and News Under § 79h. ................................... 21

        c.    There is No Clear Evidence That JCap and its Attorney Acted in Bad Faith, for Harassment or Delay. ........................................................................................... 23

    II.    No Sanctions of Any Kind Requested Are Appropriate. ............................................ 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Baker v. Goldman Sachs & Co.,*
669 F.3d 105 (2d Cir. 2012).................................................................................... 22

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991).................................................................................................. 17

*Chevron Corp.v. Berlinger,*
629 F.3d 297 (2d Cir. 2011)..................................................................................... 19

*DLC Mgmt. Corp. v. Town of Hyde Park,*
163 F.3d 124 (2d Cir. 1998)..................................................................................... 24

*Eisemann v. Greene,*
204 F.3d 393 (2d Cir. 2000)..................................................................................... 17

*Enmon v. Prospect Cap. Corp.,*
675 F.3d 138 (2d Cir. 2012)..................................................................................... 24

*Giuffre v. Maxwell,*
221 F. Supp. 3d 472 (S.D.N.Y. 2016)................................................................. 21, 22

*Green v. Cosby,*
No. 16-mc-00099-P1 (S.D.N.Y. Apr. 26, 2016)....................................................... 22

*Grifols S.A. v. Yu et al,*
No. 24-CV-00576, 2026 WL 836657 (S.D.N.Y. Mar. 26, 2026)............................... 25

*Hong v. Mommy's Jamaican Mkt. Corp.,*
No. 20-CV-9612, 2024 WL 3824394 (S.D.N.Y. Aug. 14, 2024)........................... 18, 24

*In re Application to Quash Subpoena to Nat'l Broad. Co., Inc.,*
79 F.3d 346 (2d Cir. 1996)....................................................................................... 22

*In re Fitch, Inc.,*
330 F.3d 104 (2d Cir. 2003)................................................................................. 19, 20

*Laba v. JBO Worldwide Supply Pty Ltd,*
No. 20CV3443AKHKHP, 2023 WL 4985290 (S.D.N.Y. July 19, 2023)...................... 25

*Lee v. Hong,*
No. 24-2435, 2025 WL 3637495 (2d Cir. Dec. 16, 2025).......................................... 18

*Murray Energy Corp. v. Reorg Rsch., Inc.,*
152 A.D.3d 445 (2017) .......................................................................................... 15

*NASCO, Inc. v. Calcasieu Television & Radio, Inc.,*
894 F.2d 696 (5th Cir. 1990) ................................................................................ 17

*Nemeroff v. Abelson,*
620 F.2d 339 (2d Cir.1980) ................................................................................... 21

*People of the State of New York v. Operation Rescue Nat'l,*
80 F.3d 64 (2d Cir.) ............................................................................................... 23

*Schlaifer Nance & Co. v. Est. of Warhol,*
194 F.3d 323 (2d Cir. 1999) ...................................................................... 17, 20, 23

*Shafii v. Brit. Airways, PLC,*
83 F.3d 566 (2d Cir. 1996) .................................................................................... 18

*Trump v. O'Brien,*
958 A.2d 85 (N.J. App. Div. 2008) ....................................................................... 22

*Wolters Kluwer Fin. Servs., Inc. v. Scivantage,*
564 F.3d 110 (2d Cir. 2009) ................................................................................. 17

**Statutes**

28 U.S.C. § 1927 .............................................................................................. 18, 23

N.Y. Civil Rights Law § 79-h ......................................................................... passim

Defendant J Capital Research USA LLC ("JCap") and its counsel respectfully submit this memorandum of law in opposition to Plaintiff Novagold Resources Inc.'s ("Novagold" or "NG") motion for sanctions under 28 U.S.C. § 1927 and the Court's inherent power. ECF 221.

## PRELIMINARY STATEMENT

J Cap has been entirely candid with this Court, and the documents NG obtained in Texas show that. For the duration of this litigation, NG has been framing its discovery requests based on "made up" and imagined nefarious relationships behind the scenes that it speculated were controlling JCap's reporting.[1] Now that it got those documents—through its own misrepresentations to the Texas Court —the grand reveal is that JCap worked hard to ensure that its Report was sound through due diligence and factchecking before publication.

NG reports all of this breathlessly as if it is new and compromising information. Yet the documents show that the communications between JCap and the Anonymous Third Party ("ATP") are consistent with the plain terms of the previously disclosed agreement between JCap and the ATP. The Texas documents align with the representations made to this Court, specifically that JCap is editorially independent – as a matter of law and fact.

Anne Stevenson-Yang in her June 9, 2021 Declaration (ECF 61) set out the terms of the Agreement as well as the basis of JCap's editorial control and independence. The terms of the Agreement were described clearly from the outset: (1) JCap had sole discretion to publish a report on its website or in any public forum; (2) all decisions regarding the Report's contents, methodology and conclusions were solely JCap's; (3) no other party had any right, directly or indirectly, to direct, guide or control the contents, methodology or conclusions of JCap's research; and (4) affiliation between the parties would be kept confidential.

---

[1] *See* Ex. A, full transcript of Aug. 11, 2021 oral argument on Motion to Compel, at 48: 16-22 (Novagold counsel hypothesized various rationales for his discovery demands, which were unfounded and denied).

Moreover, the parties' agreement provides for the type of relationship actually shown in the documents—one that consisted of JCap sharing its research and analysis, and the materials supporting its research, and then benefitting from the opinions, comments and suggestions from the ATP so that the Report would be sound and accurate. The documents show that JCap and the ATP prioritized diligence, care and rigor -- the very opposite of anything like the actual malice that NG imagined and hoped to find. JCap sought to honor its commitment to confidentiality as it was contractually obligated to do. It also asserted the Reporters Privilege as to the ATP as a matter of principle, in line with its conscientious belief in its function as investigative journalist under NY Civil Rights Law 79-h (6) and (8) and its definitions of "news" and "journalist."

NG speculates about what happened on zoom calls; that there might have been some "encouragement" to actualize its nefarious hypothesis. But, with all documents now laid bare, it is plain to see the interaction between the parties is one of caution, due diligence, factchecking, comment and careful inquiry. JCap did not make any misrepresentations to the Court about that. JCap told the Court accurately that the Report was the work of its internal writers (i.e., Anne and Tim); and that JCap had communications with third-parties to whom it had promised confidentiality (i.e., the anonymous pipeline expert and the ATP/Short).

Confidential parties who provide information, opinion and comment for "news" to "professional journalists" are absolutely privileged under the Reporters Privilege. As NG knew at all times, the ATP was itself an activist ███, a ██████████ firm.[2] The ATP also ████████ ▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨▨. If one ██████████ is a reporter publishing news under the Reporters Privilege, as this Court found on accurate representations,

---

[2] How activist short report writers do their work is well known and understood. For example, Steve Eisman of "*The Big Short*" by Michael Lewis; James Chanos who exposed and shorted Enron. JCap was known for exposing WireCard, as well as fraudulent Chinese companies trading on U.S. exchanges.

two ██████████ "affiliating" together to disseminate "news" would bring both under the express protections of 79-h(a)(6). If one party chooses to make that affiliation anonymous, that does not change the character of the work, which is independent, investigative journalism on publicly traded companies. Nothing in the documents change the fact that JCap was the initiator and author of the Report with full and final control over whatever it chose to publish.

For years, NG has refused to accept this Court's finding that JCap was indeed a "journalist," the Report was "news," as those terms are defined under 79-h; and its editorial processes therefore protected. In spite of 79-h's expansive statutory definitions, NG kept insisting that JCap's Report was "not news." It insisted without support that the ATP, an "otherwise professionally affiliated" party under 79-h(a)(6) was not also fully protected under 79-h. NG may have lifted the curtain via Texas, but what they have found is exactly what this Court had protected, *editorial process* and confidential communications with a third-party. If there was any misunderstanding, it was NG's misunderstanding of how 79-h works and what the strongest Reporters Privilege in the country shields from disclosure.

## BACKGROUND

### I. No Third Party Chose Novagold as the Subject of the Report or Put JCap Up to Report on Novagold.

Neither party has disputed that JCap principal Anne Stevenson-Yang independently chose NG as the subject of the Report, and brought that idea to her co-writer at JCap, Tim Murray. ████████████████████████████████ It was confirmed earlier in undisputed discovery responses, declarations, and to the Court:

> **Interrogatory No. 1:** Provide a complete factual explanation of how you identified NOVAGOLD as a subject for the Report.

> **RESPONSE:** Anne Stevenson-Yang is the Research Director of JCAP. In 2018 she traveled to Alaska, in the Fairbanks area and far to the North of it, on a kayak

trip. Through her travels she became familiar with the harsh and difficult terrain, expanse and weather conditions of Alaska's interior. That drew her to consider its impact on that state's main industries – prominent among them, gold mining. ...That is how JCAP identified and selected NovaGold as the subject of their research and their Report about it entitled, *NovaGold: The Pipe Dream*. (*"Pipe Dream* Report" or *"Pipe Dream"*). *See* Ex. C.

This was reiterated in the second Declaration of Anne-Stevenson-Yang, ECF 79:

¶ 6. We were also clear and open in our responses on several additional points to remove the speculative mystery that NG breathlessly sought to build around those confidential persons:

(a) JCap alone chose NG as the subject for its Report. No one else did.

(b) JCap controls the content of its reports. No one else does. Nor can they.

(c) In our response to Interrogatory No. 1, we explained in detail how and why we selected NG as the subject of our Report. *See* Dkt. 61-1. No one outside of JCap proposed or even suggested that we cover NG. It would have been entirely proper if they had done so. But that was not so here[.] Ex. C.

That was reiterated in other responses to document demands, Ex. C:

**Response to RFP5:** The primary documents that influenced the decision to focus on NG as the subject of a report are described in Defendant's answer to Interrogatory #1. ... If there are other documents that are arguably responsive to this request, they are subject to the Reporters' Privilege (see Objection at Paragraph 7 above) and Defendant objects to producing them on that ground.

And J Cap counsel reiterated that to the Court,

**Court:** So the first document request I think that is at issue is [RFP] number 5, and this is seeking documents that the Defendant possessed, reviewed, read, or received in connection with the decision to focus on Novagold, right? (7: 12-16.)
...
**Korzenik:** *It was a decision made initially by Anne Stevenson-Yang*, and she then communicated that internally and discussed with Tim Murray...there's no third party here...and to the extent there are internal communications about that choice—there may or may not be, but I don't believe so—they would be exactly the kind of thing that comes under the definition of news...as the Second Circuit defines...that type of communication about matters of public concern come under the privilege. Ex. A, 8: 9-25; 9:1-2.

Finally, it is confirmed by the terms of the contract under which the parties' affiliated, specifically that "█████████████████████████████████████████████████████████████████████████████████████████████" Ex. B ¶ ██. JCap alone chose NG as the subject of the Report. It alone controlled the decision to publish. NG's speculation that ATP put up JCap to target NG or had "commissioned" the Report on NG was a blind stab at forging some kind of *Fitch*-type argument that JCap was not "independent." *See infra* Sect. I.a.

NG does not dispute that JCap came up with the idea to report on NG and has no new documents to contradict that. ██████████████████████████████████

██████████████████████████████████████████████████████████████

Second, NG does not dispute that JCap was not commissioned or prompted to write about NG by any third party.

> **Response to Interrogatory 3:** The persons involved in paying for and underwriting the costs of preparation of the Report: **JCAP pays for and covers all costs associated with the preparation of the Report.** JCAP does not bill those costs to any third party…JCAP objects under the Reporters' Privilege and under the objection in Paragraphs 1, 3, 4, 5 & 7 to disclosing any other discussions or communications made in connection with the Report.

████████████████████████████████████████████████████████

████████████████████████████.

## II. No Third Party Could Control the Substance, Content or Publication of the Report.

This is borne out in the black and white of JCap's agreement with ATP, which NG has:

¶ █ "█████████████████████████████████████████████████████████

████████████████████████████████████████████████"

¶ █ "█████████████████████████████████████████████████████████

████████████████████████████[.]" *See* Ex. B.

NG has no documents to show that the parties conducted themselves in any other way than under the terms of their signed agreement. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ The Report was a twenty-page long document. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████ Even if they *were* an author – which they were not - they would still be protected.[6]

JCap's representations were accurate. It was JCap who was the writer, researcher, and publisher of the Report. There are no documents showing the ATP controlled JCap's work or research. The research and writing were largely complete before ATP was consulted. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[3] Ex. 4, ATP00000080.

[4] Ex. 4, ATP00000080; 85; 86; 87; 88; 89.

[5] Ex. 4, ATP00000091.

[6] Significantly, if the ATP *was* an "author" or a "publisher" of the Report, then it would be protected under the Anonymous Speaker Privilege. That was a privilege that we raised but which NG never addressed. Judge Kuo's ruling took note of that. But *either way, the ATP is protected under 79-h* because it was a confidential third-party expert source and/or because it is "otherwise professionally affiliated" with JCap as defined by 79-h. If it was a co-author, then the ATP was entitled *on its own* to full 79-h protection.

[7] Ex. 4, ATP00000184.



▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, the parties' contract provides JCap did not need to accept any edits, and did not need to publish if it did not want to:

"▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" *See* Ex. B, ¶ ▓▓.

"▓▓▓▓▓▓▓▓▓▓▓▓▓▓" *Id.* ¶ ▓▓.

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ It was JCap's name that would appear on the Report, not the ATP's; and it was JCap's reputation for soundness and integrity that was on the line if anything in the Report was faulty. ▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

*This* is the speculative relationship NG "made up" from the beginning of this case in a failed effort to undermine JCap's editorial independence. Ex. A, 48: 16-22. ▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

There is no factual basis to suggest JCap's Report was not independent. NG has the Agreement laying out the legal terms of JCap's independence. ATP had no right to control the content or timing of the Report. No new document offers a hint of coercion or control.

---

[8] Ex. 4 ATP00000128.

NG counsel's effort to twist a privilege breaking answer out of Stevenson-Yang at her deposition does not prove its point. In the passage NG cites, NG Mot. at 14, counsel asks Stevenson-Yang about JCap's response to Interrog. 6. NG Ex. 20, Stevenson-Yang Dep. Tr., 51:9. The answer to Interrog. 6 plainly states, "As [t]o any other persons who knew of the Report or its preparation prior to its publication, JCAP objects on ground of the Reporters' Privilege[.]" ECF 61-1, at 11. The transcript shows counsel never asked her about the confidential parties invoked in JCap's full response to Interrog. 6. NG Ex. 20, at 51-55.

JCap never failed to forthrightly assert its confidential sources. Not in any status letter; not in another district; and not to this Court. JCap has always stood by its representations that it had confidential sources of information and comment for which it invoked the privilege.

### III. JCap Has Never Misrepresented its Confidential Sources of Information Regarding the Report.

JCap never represented to the Court that it did not have sources with whom it might have discussed its ideas, thesis, drafts, or receive or sought feedback from. NG uniformly omits every portion of JCap's response to discovery demands where it invokes the reporters' privilege to "unpublished materials, communications regarding the report and identities of persons consulted." ECF 61-1, at 6-7. For example:

> **Interrogatory No. 2:** Identify all persons who have provided information to you, or received information from you, concerning NOVAGOLD, NOVAGOLD securities, your investment in NOVAGOLD securities, the drafting of the Report, the Report, or the events described in the Petition. Include in your answer a detailed factual statement of the information provided.
>
> **RESPONSE:** ...Regarding "persons providing information concerning NovaGold," the information that JCAP had about NovaGold came from the publicly available documents described in our Answer to Interrogatory #1. This Interrogatory is poorly framed and therefore unclear, but there were three persons directly involved in drafting and preparing the Report: 1) Anne Stevenson-Yang, 2) Tim Murray, and 3) John Besant-Jones, a forensic accountant

who works with JCAP. Mr. Besant-Jones provided financial analysis of the available documents referenced....

To the extent that there were any recipients of JCAP's Report (see responses to Interrogatories below), they did not provide information to JCAP about NovaGold....[9]

**Unpublished materials, communications regarding the Report and identities of persons consulted are protected under the Reporters Privilege and Defendant objects to this Interrogatory to the extent that it can be construed to call for any unpublished materials that are protected by the Reporters' Privilege as set forth in ¶ 7** above and from materials that would not be subject to discovery at this stage in the litigation under the new NY Anti-SLAPP law.

Drafts of an unpublished report and comments on that draft are considered "unpublished news." *See infra* Sect. I.b. This is based on caselaw and 79-h definitions the parties briefed. *Id.*

JCap specifically said it was invoking the privilege as "to their identification and the communications with them that might be referenced in any internal editorial documents":

**"Response to RFP 7: ... The confidentiality and privileges attached to those individuals and communications with them are the basis of objections to their identification and the communications with them that might be referenced in any internal editorial documents** are objected to on the same grounds, i.e, the Reporters' s Privilege per paragraph 7 above and the Anti-SLAPP and other objections set forth above....". ECF 61-2, at 7.

JCap represented that it had confidential "identities of persons consulted," ECF 61-1, at 6, and it was invoking the privilege to the extent that they "might be referenced in any internal editorial documents[.]" ECF 61-2, at 7. JCap made the same accurate representations to the Court as it did in its response to document demands, which the Court understood:

**Court:** So let's move to [RFP] 7, which is about communications between the Defendant a[nd] a third party, right...Are you asserting, Mr. Korzenik, some of these are subject to the absolute privilege because they're confidential sources?
**Korzenik:** Yes, absolutely.
**Court:** Okay. And are there non-confidential sources?
**Korzenik:** I don't think so. I think they're just internal.
**Court:** Okay. So they're either internal **or confidential.**

---

[9] As the documents show, ATP had no inside information about NG. It just provided its expert opinions on the research and conclusions that JCap provided – as any expert source would.

**Korzenik**: Right. (Ex. A, 31: 14-19; 32:1.)

The Court then goes on to ask JCap's counsel about whether there are *non-confidential* sources, which NG here takes out of context and misconstrues repeatedly. NG Mot., at 9-10.

NG counsel asks about "subsection C" of the Declaration of Anne Stevenson-Yang, ECF 61, at ¶17(c), "with respect to third party communication." Ex. A, 33: 2-3.

> ¶17(c): *"Confidential News and Communications; Honoring Commitments to Confidentiality*: Some of the materials that JCap has regarding NovaGold and the Report are communications with persons to whom JCap has *promised anonymity and confidentiality*. We must honor those commitments; and we assert the Reporter's Privilege in order to do so. We would like to be able to use such confidential materials to support our case. But we have made commitments to confidentiality and anonymity; and we will honor them. I understand that New York protects such confidential information and communications *absolutely and unconditionally*. NovaGold complains that it will not be able to use confidential information or sources against us or against the source(s); but by the same token, we cannot use them in our defense either – as much as that would be to our advantage." ECF 61.

NG counsel complained, "we just have no way of telling what the non-confidential is and what the confidential is." Ex. A, 33: 8-9. Immediately following the above discussion about *non-confidential* **sources** of information that Mr. Korzenik replied:

> **Korzenik:** I think that when it comes to this [¶17(c)], they're either internal discussions **or they are discussions with confidential sources or commenters**, and that's it. (*Id.* 34: 2-5.)
>
> I think that the answer is that it's either internal **or its confidential** (*Id.* 35: 11-12) .... If there's some third party [non-confidential source] ...I don't know who it is right now but—I could look again but I think it's a waste of time. (*Id.* 36: 5-11.)

That is accurate. The ATP, whose identity is still not revealed in this proceeding, is *confidential*. They would not be included in non-confidential third parties. As clarified later, there were no non-confidential sources. NG repeatedly cites Mr. Korzenik's above-statement in a way that is patently false, out of the context, and which was part of a discussion of whether *non-confidential* third-party sources of information existed. NG Mot., at 1, 10, 18, 24. There is and

10

was nothing misleading about this statement. There is no explanation or justification for NG's

pushing this fabrication repeatedly to ask for sanctions against both JCap and its lawyer. *See id.*

The Court correctly understood that JCap was invoking its privilege to "**either**

**confidential sources**, right, **or** internal discussions, and those are covered…you're asserting the

privilege that's fine," Ex. A, 37:19-21. Those were the two categories of protected materials.

> **Court:** The question here was whether there were **non-confidential sources** that
> we need to think about. But you're saying that it isn't about non-confidential
> sources. It's about internal discussions. Is that right?
> **Korzenik:** I'll look at it again. I don't…can't imagine that there were. There
> could have been idle—conversation, we're looking at these guys, you know, what
> do you know about them? I don't know anything about them. You know…
> **Court:** Here it's about…documents, so if you don't have documents, you don't
> have to reconstruct that. (*Id.*, 38:1-12) (emphasis added).

JCap invoked the Reporters Privilege as to confidential communications with third parties, and

internal communications (Tim and Anne) regarding the Report, specifically noting it was

invoking it for "drafts, outtakes, everything[.]" Ex. A, 49: 11-13. Thus, there were *two*

*categories* of protected materials - internal (between JCap) and confidential (with ATP, other

anonymous experts).

NG presupposed that the Court discussed RFP 15 "rhetorically," NG Mot. at 11, but there

was an entire discussion about that request.

> **Request No. 15:** All documents, including all communications to or from JCAP
> that reflect any editorial input, editorial oversight, edits or suggested edits or
> revisions or suggested revisions or comment of or concerning the Report by any
> person prior to its publication.
>
> **RESPONSE:** Defendant objects to this RFP on the basis of the reporters
> privilege, see Objection #7, and on the basis of its protections due under the new
> Anti-SLAPP law. This RFP must be scrutinized in light of the Anti-SLAPP law
> before any such discovery or cost is imposed on the Defendant. Objections based
> on Paragraphs 1 - 9 apply to this overbroad request which violates the Reporters
> Privilege by, among other things, invading the editorial processes.

11

NG counsel stated that this demand was seeking "who were the people who did the interviews? What are the processes and procedures? We want the substance here...so if there are revisions and emails, 'we need to change this because it's not going to have enough of an effect on the stock price,' or 'we really need to focus him on this because our funder wants us to really do' – *again, Your Honor, I'm making all this up.*" Ex. A, 48: 10-20. JCap counsel responded:

> "address[ing] speculation. You're telling us – that you're making all this up and it's speculation. [] This request maps exactly into *Baker*'s Second Circuit description of news. It is evidence that relates to the **ability, efficiency, and diligence of the reportorial personnel, their newsgathering methods generally as applied in preparing the article, the witness' personal knowledge and assessment of these matters**. So that goes to **drafts, as in *HBO*, outtakes, everything.** Those are—your request maps right into the description of what is protected by 79-h." Ex. A, 49: 1-13.

NG counsel, then Mr. Genender, responded: "We disagree." *Id.* 49: 16. The Court replied: "I heard loud and clear that you disagree[.]" *Id.* 49: 21. The Court did not presuppose anything or make this decision on assumptions or rhetorical framing. JCap clearly invoked its 79-h privilege to Request 15 as to "the newsgathering methods generally as applied to preparing the article," "diligence," "assessments" of the matters in the Report, including "drafts, outtakes, everything." Ex. A, 49: 1-13. That was not based on a misrepresentation. The Court understood JCap was invoking its privilege to "**either confidential sources**, right, **or** internal discussions, and those are covered...you're asserting the privilege that's fine[.]" *Id.* 37:19-21. The Court also recognized that these requests "mapped in" precisely to the materials protected by 79-h.

NG repeatedly conflates responses from one demand to another to mischaracterize JCap's answer and to make it look as if the answer to one demand was somehow an answer to another demand or an overarching answer on its entire invocation of the privilege. NG Mot., at 11. NG's *mix-and-match* approach to claiming falsehood is itself abusive. For example, the following three statements discuss a request asking for documents *between JCap and NG* as well

as communications *within JCap* regarding those contacts *with NG*. JCap did not object to producing its communications with NG. But as to any possible communications between Anne and Tim, JCap objected. Those documents are necessarily internal, and JCap counsel correctly advised the Court, that "any other materials" in the Response to RFP6 were necessarily internal communications between Anne and Tim. That does not foreclose JCap's invocation of the protection for its confidential sources of information, or constitute any kind of misrepresentation on the part of JCap's counsel. Here is the proper context:

| Demand Discussed | Statement from the Court |
|---|---|
| **RFP 6:** All documents that constitute, reflect, or discuss communications or meetings between you and NG.<br><br>**RESPONSE:** There was an inquiry to NG by Tim Murray which resulted in a telephone conference with Jason Mercier on October 10, 2019 and there was a subsequent email with Jason Mercier. The Email will be produced. But any other materials relating to it are protected from disclosure by the Reporters' Privilege per paragraph 7. There were no in person meetings between JCAP and NG. There may have been Investor Relations calls that JCAP called into. But we do not define that as a communication or meeting between JCAP and NG. | "what I'm hearing [] is that Mr. Korzenik is saying that those other 'other materials' are internal documents that are discussions among the people at J Cap." Ex. A, 30:1-5 |
| | "They're saying that th[ey] might be responsive to the request, but they're asserting the report is privilege[d] and internal communication." *Id.* 30:13-16. |
| | "[A]t least I can identify here that [] the documents being over which the privilege is asserted are internal communications," *id.* 31:7-9. |

NG selectively quotes JCap counsel to make it seem like an answer for one response was an answer for the entire Report or for a different question. For example, "I've heard Mr. Korzenik talk about internal communications and asserting the privilege, the Reporter's Privilege over those," NG Mot., at 11 (citing Ex. A, 51:3-5). The entire quotation is taken from a portion of the transcript where the Court was asking NG to make a clear and specific showing under 79-h to overcome the privilege for *non-confidential news*.

"So in light of that, the privilege applies and we need to look at the privilege itself. So we'll look at 79-h. **Clearly if it is confidential that there's an absolute privilege. To the extent that they were confidential first as identified any communications there would be covered**.

The question then becomes when it's not covered by confidentiality and there's not an absolute privilege, then there has to be a clear and specific showing by the asserting party, so in this case, by the Plaintiff of the three parts, right? Highly material and relevant, critical or necessary, and then not obtainable from alternative sources.

The most I have seen so far is an argument that the information is germane. And so I'm not sure what you mean by germane, but that is not the same as material and relevant or critical and necessary.

And then there are also pieces of what are being asked for, which I think we've been able to clarify to the extent that things don't exist, and if there are other things that do exist, what the category is of things there. **So for example, I've heard Mr. Korzenik talk about internal communications and asserting the privilege, the reporter's privilege over those.** And then the same thing with the editorial content and process." Ex. A, 50:8-25; 51: 1-6.

JCap did not mislead the Court about the *categories* of documents it was asserting privilege over: one of those was "confidential first as identified." The Court clearly understood that. *See* Ex. A, 50:8-25; 51: 1-6. NG repeatedly *mixes and matches* isolated phrases out of a 66-page transcript to mischaracterize the bases of JCap's privilege invocations.

NG cites to the end of the conference. NG Mot. at 11-12. There the Court is laying out what NG has to do to meet its 79-h(c) burden. At that point in the transcript, the Court has already ruled that "[c]learly," if JCap has already asserted that the document "is confidential that there's an absolute privilege. To the extent that they were confidential first as identified any communications there would be covered." Ex. A, 50:8-25. When the Court references the documents identified in demands 5, 6, 7, and 8 as "internal communications," that is for NG counsel to "make your showing" under 79-h(c) as to *non-confidential* documents. To conflate *separate categories* of privilege with different bases of 79-h protection is a distortion of the

record. NG may be confused about protections for confidential as opposed to non-confidential communications. But neither the Court nor JCap's counsel were.

## IV.      JCap's Editorial Independence Was at the Center of the Aug. 11, 2021 Oral Argument on the Motion to Compel.

It is significant that the Parties, while disagreeing on so much, do not dispute these facts: (1) JCap alone chose the subject of the Report, (2) JCap did not get commissioned to cover NG by a third party; and (3) the facts set out in the Declaration of Anne Stevenson-Yang of June 9, 2021. These are the operative facts this Court found made JCap *editorially independent* for the reporters' privilege. That was the center of discussion at the Aug. 11, 2021 Motion to Compel argument, as NG tried to assert that a third party was in *control* of the Report:

> **Genender (NG counsel):** Judge, if I could be heard...the reality is that this interrogatory [14], people who fund the report, is directly relevant to whether or not they are actually able to claim the reporter's privilege. This is pay to play. **This is the *Berlinger* case**, which is a federal case, but also **the *Murray* case**,[10] which is a New York state case that says if you don't have—**the amount of editorial independence you have**, which is affected by **people who are paying you to do something**, goes to the degree and whether the reporters privilege even applies ...Were they so swayed by the prospect of **somebody funding them, giving them money to do this piece**...[.] Ex. A, 46: 2-25) (emphasis added).

JCap answered both of those questions: No—no one paid them to cover NG and no one chose Novagold as the subject of the Report. *Supra* Sect. I. Again, that is what NG's own brief admits to: JCap later approached ATP, not the other way around. NG Mot., at 4. This was further borne out in the black and white of JCap's agreement with the ATP. *See* Ex. B ▆

At the Aug. 11, 2021 Motion to Compel oral argument, Novagold's previous counsel "ma[de] up speculation" about the type of relationship he thought might impugn JCap's

---

[10] *Murray Energy Corp. v. Reorg Rsch., Inc.,* 152 A.D.3d 445, 447 (2017) (Sec. 79-h protections affirmed to niche publication covering debt-distressed market "significantly" because "editorial staff is solely responsible for deciding what to report on and that it does not accept compensation for writing about specific topics or permit its subscribers to dictate the content of its reporting.").

independence. *See* Ex. A, 48: 16-22 ("I'm making all this up"). NG counsel speculated that if JCap was "doing this for money, not for the search of truth," and had some third party who said: "We need you to say this [in the report]. Here's the money. Do it," that would "impugn their editorial independen[ce]." *Id.*, 62: 1-22.

This speculation was not true. JCap represented accurately to the Court that no one commissioned JCap to publish a hit piece on NG, nor controlled JCap's reporting. *infra* Sect. I. The Court made that editorial independence finding on the basis of those undisputed facts. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ NG's effort to manufacture a "made up" lack of independence such as in *Fitch* and *Berlinger* are as wrong now as they were in 2021. *See supra* Sect I.a.

## V. JCap Was Never Ordered to Produce a Log of Reporters Privilege Material.

NG further mischaracterizes the facts of the 79-h privilege proceedings: NG states in its motion that JCap was "ordered" to produce a log of 79-h materials. NG Mot., at 18. JCap was never ordered to produce a log of its Reporters Privilege protected materials. The Court had denied that request when it denied Novagold's renewed Motion to Compel on the Reporter's Privilege. *See* 1/19/22 Order ("**Plaintiff's request for a privilege log is denied.).** After this denial, which included denial of a privilege log for Reporters Privilege material, NG filed a Letter Motion for Reconsideration, ECF 88, to Judge DeArcy Hall, appealing only a limited issue but not the denial of a 79-h privilege log. NG never appealed the portion of this Court's 1/19/22 Order denying a log for Reporters Privilege. *See* ECF 88. The quotation NG cites from the 10/16/2023 Order was about privilege logs in general. JCap was never ordered to log its Reporters' Privilege protected materials, and it is misleading for NG to assert that.

## ARGUMENT

**I.** **Because JCap and its Counsel Had a Colorable Basis for Its Assertions and Did Not Act in Bad Faith, § 1927/ Inherent Power Sanctions Are Not Appropriate or Proper.**

The "inherent power" to sanction "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 894 F.2d 696, 702 (5th Cir. 1990), aff'd, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 42 (1991). It is a power that, while incidental to the court, "ought to be exercised with great caution." *Id.* at 43. *See Schlaifer Nance & Co. v. Est. of Warhol*, 194 F.3d 323, 334 (2d Cir. 1999) ("[A]lthough the decision to impose sanctions is uniquely within the province of a district court, we nevertheless need to ensure that any such decision is made with restraint and discretion.").

"Imposition of sanctions under a court's inherent powers requires a specific finding that an attorney acted in bad faith." *Wolters Kluwer Fin. Servs., Inc. v. Scivantage*, 564 F.3d 110, 114 (2d Cir. 2009). The Second Circuit interprets the "bad faith" standard "restrictively." *Eisemann v. Greene*, 204 F.3d 393, 396 (2d Cir. 2000). The bad faith standard for "inherent-power sanctions are appropriate only if there is clear evidence that the conduct at issue is (1) entirely without color and (2) motivated by improper purposes." *Wolters*, 564 F.3d at 114. *See also Eisemann*, 204 F.3d at 396 (declining to uphold sanctions without "high degree of specificity in the factual findings of the lower courts" of both clear evidence that actions were "entirely without color" and "for reasons of harassment or delay"). Thus while Rule 11 sanctions may engage an "*objective unreasonableness*" standard, 28 U.S.C. § 1927 and inherent sanctions require *subjective bad faith*, driven by improper purpose shown with "clear and convincing" evidence. " *Shafii v. Brit. Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996) (denying § 1927 sanctions).

"Conduct is entirely without color when it lacks any legal or factual basis; it is colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the attorney whose conduct is at issue." *Wolters*, 564 F.3d at 114. "[M]otivated by improper purposes" requires " harassment or delay, or for other improper purpose." *Eisemann*, 204 F.3d at 396 (quoting *Schlaifer*, 194 F.3d at 336).

Sec. 1927 sanctions against specifically an attorney are authorized "only when there is a clear showing of bad faith on the part of an attorney." *Shafii* 83 F.3d at 571. "Courts within the Second Circuit construe Section 1927 narrowly and with great caution, so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." *Hong v. Mommy's Jamaican Mkt. Corp.*, No. 20-CV-9612, 2024 WL 3824394, at *13 (S.D.N.Y. Aug. 14, 2024), aff'd sub nom. *Lee v. Hong*, No. 24-2435, 2025 WL 3637495 (2d Cir. Dec. 16, 2025). "As with sanctions imposed pursuant to a court's inherent power, in the § 1927 context, bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id.*

NG makes its motion under the court's inherent powers and § 1927. To support its request of the Court to exercise these inherent powers, NG accuses JCap, through its counsel and principal Anne Stevenson-Yang, of fraud on the court. The standard for sanctions under the Court's inherent power is plainly not met. First, editorial independence is a legal issue. The caselaw underpinning that finding indisputably support a finding that JCap is independent for purposes of invoking the Reporters Privilege. JCap and its counsel plainly have a colorable basis in fact and in law to argue JCap is editorially independent. Additionally, they have a colorable basis in fact and in law to argue for protection for confidential sources of information regarding

the Report, and those unpublished pieces of news, defined broadly under § 79-h. There is no evidence of bad faith, let alone the "clear and specific" showing necessary.

### a. JCap and its Attorney have a Colorable Basis to Argue JCap's Independence, which is a Legal Finding, not a Colloquial Term.

The Parties disagree over whether JCap is editorially independent. That is a legal issue. It does not mean a reporter worked entirely alone, enclosed in an office without collaborating editors, researchers, sources, experts, writers or fact checkers. Under New York law, independence is not a requirement of 79-h in the statutory language. The lack of independence exception to 79-h is fashioned by caselaw in very rare cases, namely *In re Fitch* and *Berlinger*.

In *Fitch*, a credit rating agency report could not invoke the privilege because the Court found that Fitch was *commissioned* by the *subject* of its report to write about the *subject* – and specifically to write about the subject's transaction that Fitch itself had helped structure. *In re Fitch, Inc.*, 330 F.3d 104, 111 (2d Cir. 2003). It was an ad by a *corporate issuer*. *Id.* The Court was careful to say that other financial reports issued by Fitch are not impugned by its ruling. *Id.* Given the importance of the 79-h privilege, the Second Circuit took care to say that it did not "seek to amplify or interpret New York law beyond the facts of this case." *Id.*

*Berlinger* is even more unusual. There the *subject* of the report, had solicited and controlled the output, a documentary. *Chevron Corp. v. Berlinger*, 629 F.3d 297, 308 (2d Cir. 2011). Significantly, the subject had removed from the final cut a segment that would have shown serious impropriety on the part of the subject's lawyer in a foreign legal proceeding – the, that they use "pressure tactics" on the foreign judge which the lawyer had acknowledged to be "dirty." *Id.* at 304. Significantly, there were *no promises of confidentiality* in *Berlinger* or *Fitch*, and neither of the two were 79-h cases. They both applied the weaker federal privilege under *Gonzales*. None of our facts get even close to *Fitch* or *Berlinger*.

19

In contrast, JCap's Report was not commissioned by the *subject* of the Report. *See* Decl. of Anne Stevenson-Yang ("ASY Decl."), ¶4. The sworn facts set out by Stevenson-Yang in her earlier declaration (ECF 61) and the Agreement between JCap and the ATP, Ex. B, show JCap is independent for purposes of 79-h. Both parties extensively briefed the legal question of independence. It requires that no third party have the right to *control* the contents or timing of JCap's report or publication. It does not mean or require that JCap had no sources of information, feedback, due diligence or fact-checking.

The Court rendered the correct opinion on JCap's independence, and JCap and its counsel did not mislead anyone as to those operative facts. NG's latching on to minor edits in a handful of drafts exchanged in the last month before publication do not make JCap not independent under relevant caselaw. *See e.g Fitch*, 330 F.3d at 111.

It was on the basis of these facts that JCap asserted its editorial independence: (1) JCap alone chose the subject of the Report, (2) JCap had sole discretion over when, or whether at all, to publish its Report, (3) JCap was not "put up to" to doing the Report by any third party; (4) JCap paid all its own costs to write the Report with no advance or reimbursement ever, Ex. C, and (5) the *clear contractual terms provided* that JCap controlled the substance and timing of their Report. Ex. B. ¶■. JCap's independence is well founded under the relevant caselaw. The unusual *Fitch* and *Berlinger* have no application here.

There is more than a colorable basis to argue under relevant caselaw for JCap's independence. "[A] claim is entirely without color when it lacks *any* legal or factual basis." *Schlaifer*, 194 F.3d at 337. Conversely, a claim is "colorable when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Id.* (citing *Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir.1980)). It requires looking not at just

20

"certain facts," but "the facts in their totality" to judge whether a claim "lacked a colorable basis." *Schlaifer*, 194 F.3d at 337.

NG mixed different statements to read them out of context. When the record is read properly and in its "totality," there is a colorable basis—more than colorable—to argue that JCap is and was editorially independent. *See id.* This is fortified by the "reasonable beliefs of the individual[s] making the claim," JCap principal Ms. Stevenson-Yang and JCap counsel David Korzenik. *Schlaifer*, 194 F.3d at 337. Declarations of Stevenson-Yang and Mr. Korzenik affirm their firm and genuine belief in JCap's independence. *See generally* ASY Decl.; Korzenik Decl. There is no evidence—let alone "clear evidence"—that JCap and its counsel's claim to JCap's editorial independence under relevant law was not colorable. Their assertions and the rulings on independence remain sound and correct.

### b. JCap and its Counsel have a More than Colorable Basis to Argue ATP was a Confidential Source of Information and News Under § 79h.

NG struggles to dispute that the ATP could be considered a confidential source of information under § 79-h. JCap and its counsel had, and have, a more than colorable basis to argue that is so, as they did in their initial Motion for Protective Order, ECF 62, and since then.

"News" under the Shield Law is defined as, "written, oral, pictorial, photographic, or electronically recorded information or communication concerning local, national or worldwide events or other matters of public concern or public interest or affecting the public welfare." § 79–h(a)(8). As courts in the Second Circuit have recognized, "the Shield Law does not narrowly apply only to the specific exchanges where the source conveys 'news,'" in a colloquial sense. *Giuffre v. Maxwell*, 221 F. Supp. 3d 472, 479 (S.D.N.Y. 2016). It protects all "inquiries into the newsgathering process as a whole." *Id.* (citing *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 109 (2d Cir. 2012) (affirming holding that Shield Law applied to "unpublished details of the

newsgathering process," such as who made calls and interviewed particular sources, techniques for the reporters' investigation, and the backgrounds of the coauthors and editorial staff). *See* JCap Mot. for Protective Order, ECF 62 at 4.

In JCap's brief in support of its motion for protective order, JCap cites *Trump v. O'Brien*, 958 A.2d 85 (N.J. App. Div. 2008) There the court applied 79-h to protect reporter O'Brien's "news" material, including "notes of interviews with confidential and nonconfidential sources, drafts of [O'Brien's] book, and communications concerning news-gathering and editorial processes." ECF 61, at 5-6 (citing *Trump*, 958 A.2d at 88 n.2; 94). JCap also cited *Green v. Cosby*, No. 16-mc-00099-P1, Dkt. No. 13 (S.D.N.Y. Apr. 26, 2016). There the court held it to be "very clear" that the privilege protected "notes the reporter took" and notes from conversations of people the reporter talked to including non-confidential video outtakes. ECF 61, at 6. *See also* citing *In re Application to Quash Subpoena to Nat'l Broad. Co., Inc.*, 79 F.3d 346 (2d Cir. 1996) (quashing subpoena for out-takes of interviews). It was on this firm foundation of legal precedent that JCap invoked the privilege of its drafts, its notes, documentation or communications during newsgathering, including those with the ATP, and its other newsgathering material.

JCap argued that "the identities of confidential or anonymous third parties, and any materials referencing them which JCap obtained in connection with the Report, are and must be shielded from disclosure. N.Y. Civ. Rights Law § 79–h(b); *see Giuffre*, 221 F. Supp. 3d at 476 ('At a minimum, the Shield Law would absolutely preclude any inquiry into the identity of confidential sources on which [journalist] relied in reporting the Articles or any information that may reveal those sources' identities.')." ECF 61, at 6. JCap clearly represented that "some of the materials that JCap has regarding NG and the Report are communications with persons to whom JCap has promised anonymity and confidentiality," citing ASY Decl., ¶ 17, ECF 61.

22

JCap had a far more than colorable basis in fact and in law to argue that the ATP was a confidential source of expertise, information and news. NG may not understand or like § 79-h or the caselaw surrounding it, but that does not make JCap's invocation of it improper.

### c. There is No Clear Evidence That JCap and its Attorney Acted in Bad Faith, for Harassment or Delay.

The second requirement for sanctions under both the court's inherent power and § 1927 is bad faith. *Schlaifer*, 194 F.3d at 337. It "can be inferred when the actions taken are 'so completely without merit as to require the conclusion that they might have been undertaken for some improper purpose." *Id.* (quoting *People of the State of New York v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir.)). "Bad faith must also be shown by clear and convincing evidence." *Hong*, 2024 WL 3824394, at *12.

There is no clear or convincing evidence that JCap or its attorney's invocation of the reporter's privilege as to JCap's independence or its confidential sources of information was "so completely without merit", or without merit at all, to "require a conclusion that that must have been undertaken for some proper purpose such as delay." *See People of State of N.Y.*, 80. F.3d at 72. JCap and its counsel had a far more than colorable basis to argue JCap's independence, and to protect confidential sources of information. *See infra* Sect. I.

Here, JCap and its counsel never acted "so completely without merit" to "multipl[y] the proceedings." *See* § 1927. There are no facts akin to the cases NG cites. Unlike in *Enmon*, where the court upheld sanctions against counsel who procured a temporary restraining order in Texas that would "do nothing but maintain status quo," without disclosing that this TRO sought to enjoin an already-filed federal court action in New York. *Enmon v. Prospect Cap. Corp.*, 675 F.3d 138, 144 (2d Cir. 2012). Here, JCap provided all relevant representations, still unchallenged

23

by NG, as to the legally relevant facts of its independence, and consistently and correctly invoked the privilege as to confidential sources of information. *Supra* Sect I.

Or in *DLC Mgmt. Corp*, where the Second Circuit upheld sanctions against a party for "conscious disregard for their discovery obligations" because of late production of sought maps and records after the close of discovery despite denying they existed and "never bother[ing] to search" where they finally were unearthed. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 135 (2d Cir. 1998). Neither JCap nor its counsel has acted in any such a manner. JCap has always represented that it was invoking the privilege for confidential communications *or* internal communications (editorial process). Both are properly protected by 79-h.

Nor are facts akin to *Hong*, where the court sanctioned an attorney who misrepresented when he was retained, and that his client's default was not the result of a lack of attorney but was actually a litigation strategy. *Hong*, 2024 WL 3824394, at *7. In *Hong*, sanctions were warranted because statements were "untrue and known to be untrue." *Id.* Unlike *Hong*, JCap and its counsel did not make untrue statements. JCap reiterated numerous times the facts supporting independence. *Infra* Sect. I. Nobody commissioned JCap, or controlled its reporting or publication, nor did they have any right to. *See* Ex. B. ▮▮▮▮▮▮▮.

## II. No Sanctions of Any Kind Requested Are Appropriate.

"Even where the standards for imposing sanctions are met," which they are not, "a court retains discretion to decide whether to impose such sanctions and in what form and amount." *Hong*, 2024 WL 3824394, at *13. As stated, there is no basis to find JCap or its counsel acted entirely without color and motivated by an improper purpose. Fees are not warranted under the court's inherent power or § 1927. This is unlike instances where the court awarded fees based on "clear and convincing evidence that [party] and his counsel knew the signature [on a document

submitted to the court] was fraudulent and fabricated." *Laba v. JBO Worldwide Supply Pty Ltd*, No. 20CV3443AKHKHP, 2023 WL 4985290, at *9 (S.D.N.Y. July 19, 2023). Here, JCap and its counsel have consistently asserted the accuracy, and their belief in the accuracy, of the operative facts on which the Court found JCap to be disseminating "news" and independent.

There is no fair reason to dismiss JCap's anti-SLAPP counterclaim. First, New York's substantive anti-SLAPP does apply in federal court. *Grifols S.A. v. Yu et al*, No. 24-CV-00576, 2026 WL 836657, at *4 (S.D.N.Y. Mar. 26, 2026) (citing *Berk* and deciding "the weight of the authority []favors the application of the substantive standards of the New York anti-SLAPP statute in federal court."). Moreover, there has been no bad faith in JCap's defense of its speech rights. While it may be frustrating for corporate commercial litigators that the reporters' privilege does not match with their free-wheeling understanding of Rule 26 or other litigation privileges like attorney-client or work-product, that does not make defense of the reporter's privilege "bad faith." It was correctly made.

## CONCLUSION

For the reasons above, JCap respectfully requests that the Cour deny NG's Motion for Sanctions and grant JCap and its counsel such other relief that the Court deems just and proper.

Dated: New York, New York  
April 7, 2026

MILLER KORZENIK RAYMAN LLP

By: */s/ David Korzenik*

David S. Korzenik  
Gillian Vernick  
1501 Broadway, Suite 2015  
New York, New York 10036

*Attorneys for Defendant J Capital Research USA LLC*

25